## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEO HOLLIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action** |
| | : | **No. 2:23-cv-00895-PD** |
| **CITY OF PHILADELPHIA, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2024, upon
consideration of the Motion for Partial Summary Judgment filed by Defendants, the
City of Philadelphia, Commissioner Blanche Carney, Correctional Officer Orville
Ford, and Sergeant Aisha Ryans, and any response thereto, it is **HEREBY
ORDERED** that the Motion is **GRANTED** and judgment is entered in favor of
Defendants, the City of Philadelphia, Ford, Commissioner Carney, as to all claims,
and in favor of Defendant Ryans as to Count III of Plaintiff's Complaint.


BY THE COURT:


_____

DIAMOND, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **LEO HOLLIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action** |
| | : | **No. 2:23-cv-00895-PD** |
| **CITY OF PHILADELPHIA, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants, the City of Philadelphia, Commissioner Blanche Carney, Correctional Officer Orville Ford, and Sergeant Aisha Ryans ("Moving Defendants"), by and through the undersigned counsel, hereby file this Motion for Partial Summary Judgment. In support of this Motion, Moving Defendants incorporate the attached Memorandum of Law. Moving Defendants respectfully request that this Court enter judgment in favor of Defendants, the City of Philadelphia, Ford, Commissioner Carney, as to all claims, and in favor of Defendant Ryans as to Count III of Plaintiff's Complaint.

Date:  January 23, 2024

Respectfully submitted,

*/s/ Benjamin T. Jackal*
Benjamin T. Jackal
Deputy City Solicitor
Pa. Attorney ID No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
215-683-5434 (phone)
ben.jackal@phila.gov

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEO HOLLIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action** |
| | : | **No. 2:23-cv-00895-PD** |
| **CITY OF PHILADELPHIA, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Leo Hollis ("Plaintiff") has brought an action against the City of Philadelphia, Commissioner Blanche Carney, former Correctional Officer Gerald Robinson, former Correctional Officer Jason Grundy, Correctional Officer Orville Ford, and Sergeant Aisha Ryans ("Defendants"). Plaintiff alleges corrections officers assaulted him during the intake process at Curran Fromhold Correctional Facility ("CFCF"). Based on those allegations, Plaintiff brings claims of excessive force (Count I), failure to intervene (Count II), conspiracy (Count V), and assault and battery under Pennsylvania law (Count VI) against Defendants Ryans, Robinson, Ford, and Grundy. *See* ECF No. 1, ¶¶ 21–26, 29–34, 43–45. Plaintiff brings a municipal liability claim (Count III) against the City, Commissioner

1

Carney, and Sergeant Ryans under *Monell v. Department of Social Services of New York City*, 436 U.S. 658 (1978). *See* ECF No. 1, ¶¶ 35–42.

The City, Commissioner Carney, and Sergeant Ryans are entitled to summary judgment in their favor as to Count III because the record does not support a claim for *Monell* liability. Plaintiff has not identified a violative policy or custom, has not established that any such policy or custom was the "moving force" behind Plaintiff's alleged constitutional violation, and cannot establish liability based on a failure-to-train theory. Plaintiff has not—and cannot—establish any of the necessary elements under *Monell*, and his *Monell* claims should be dismissed with prejudice.

Defendant Ford is entitled to summary judgment on all counts because Plaintiff affirmatively testified that Defendant Ford did not participate in the assault which he claims violated his constitutional rights.

## I.    LEGAL STANDARD

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the

suit under governing law.  *See id*.  All inferences must be drawn, and all doubts resolved in favor of the non-moving party.  *See United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

On motion for summary judgment, the moving party bears the initial burden of identifying these portions of the record that it believes demonstrate the absence of material fact disputes.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the moving party and may not rest on mere denials.  *Id*. at 321, n.3; *First Natl. Bank of Pa. v. Lincoln Natl. Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir. 1987).  The non-moving party must adduce more than a mere scintilla of evidence in its favor to defeat the moving party's summary judgment motion.  *See Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989).

Although all justifiable inferences must be drawn in favor of the non-moving party, the "moving party is entitled to summary judgment where no reasonable resolution of conflicting evidence and inferences therefrom could result in a judgment for the non-moving party." *Schwartz v. Hospital of Univ. of Pa.*, 1993 WL 153810 at *2 (E.D. Pa. May 7, 1993). Furthermore, "[p]laintiff cannot 'simply reassert factually unsupported allegations in its pleadings.'" *Poles v. St. Joseph's Univ.*, 1995 WL 542246 at *5 (E.D. Pa. Sept. 11, 1995) (citing *Celotex*, 477 U.S. at

325). "Plaintiff must present affirmative evidence in order to defeat this properly supported motion for judgment." *Id.*

## II.    FACTUAL SUMMARY

Plaintiff was arrested on March 10, 2021, and transported to Corran Fromhold Correctional Facility ("CFCF").    *See* Plaintiff's Criminal Docket, CP-51-CR-0004786-2021, attached as Exhibit A.    Plaintiff claims that while he was being processed, Correctional Officer Robinson assaulted him without provocation.    *See* ECF No. 1, ¶¶ 16–20; Deposition Transcript of Plaintiff, 22–25, attached as Exhibit B.    Specifically, Plaintiff alleges Officer Robinson grabbed him by the collar of his orange jumpsuit as he approached an intake desk to obtain a wristband, pulled him to the ground, and repeatedly punched and stomped him.    *Id.* at 23.

Plaintiff alleges other corrections officers joined the assault while he was on the ground, punching, kicking, and stomping him.    He testified that corrections officers choked him until he lost consciousness three times.    Exh. B, 49.    Plaintiff testified that Defendants Grundy and Ryans kicked him in the face.    *Id.* at 34, 38. He testified that he was kicked twice in his genitals, causing an injury which prevents him from being able to have children.    *Id.* at 95.    Plaintiff alleges that, at the conclusion of the initial attack, Officer Robinson obtained a 20-pound silver dumbbell from behind the intake desk and threw it at his face, striking him under his eye.    *Id.* at 23–24, 41.

Plaintiff testified that Defendant Ford did not participate in the attack and, instead, tried to prevent the other corrections officers from assaulting him. *See* Exh. B, 34–35 ("Officer Ford . . . He was telling them like stop . . . he was like, stop. Get off. Like, chill, like stop.").  Plaintiff explained that Defendant Ford attempted to pull Officer Robinson off him as the assault was occurring but was unable to do so because Officer Robinson is larger than Officer Ford.  *Id.* 35.

Plaintiff claims he went to the hospital following the incident, where he received treatment for injuries he sustained.  Exh. B, 64–65.

Defendants produced a misconduct report documenting the altercation, which included the following description of the incident:

> On March 11, 2021 at approximately 01:50 inmate Leo Hollis PP#1223962 was continuing the intake process with officer O. Ford. During the intake process inmate Hollis became hostile with staff and threatened several officers behind the intake desk and proceeded to attempt to breach the area. Loud verbal commands were given but Hollis ignored them and ran into the unauthorized area. Inmate Hollis was then removed from the area by using empty hand control techniques and then escorted to medical.

*See* Misconduct Report, D 000013, attached as Exhibit C.  The report classified Plaintiff's misconduct as "MINOR."  *Id.*

Defendants also produced Philadelphia Department of Prisons ("PDP") policies relating to employee discipline, inmate discipline, inmate intake procedures,

and the use of force.  *See* PDP Policies, attached as Exhibit E, D 000508–23, D 000524–39, D 000548–59, D 000617–36.

## III.    ARGUMENT

###     A.    Defendants, City of Philadelphia, Commissioner Carney, and Sergeant Ryans are Entitled to Judgment in Their Favor as to Count III of Plaintiff's Complaint.

Plaintiff attempts to hold the City, Commissioner Carney, and Sergeant Ryans liable pursuant to *Monell v. Department of Social Services of New York City,* 436 U.S. 658 (1978).  ECF No. 1, ¶¶ 35–42.  In *Monell*, the United States Supreme Court established that liability can only be imposed against a municipality when there is evidence that a constitutional violation by a municipal actor was the result of a municipal policy, custom or practice. *See id.* at 691–95. Put differently, courts adjudicating *Monell* claims "have recognized a two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom." *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (citations and quotations omitted). A policy occurs when a decisionmaker with final authority "issues an official proclamation, policy, or edict," while a custom occurs when practices are "so permanent and well-settled as to virtually constitute law." *See id.* (citations and quotations omitted); *see also Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (superseded by statute on other grounds).

Further, municipal liability attaches only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. Before municipal liability will be imposed, the plaintiff must prove that the municipality's alleged practices are "*so widespread as to have the force of law.*" *Bd. of Cty. Commrs. of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis added); *accord, Beck v. City of Pitt.*, 89 F.3d 966, 971 (3d Cir. 1996); *Andrews*, 895 F.2d at 1480. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). "[T]o be sure, 'official policy' often refers to formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Id.* at 480-81.

To prevail on a *Monell* claim, the plaintiff must establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Significantly, this "link" must be so direct as to establish that the allegedly deficient policy or custom was the

"*moving force*" behind the plaintiff's alleged injury. *Brown*, 520 U.S. at 407-08 (emphasis added).

Finally, beyond identifying an offending policy or custom and the way in which it led to a violation of a plaintiff's rights, a plaintiff must demonstrate that an official with the power to make policy (i.e. a municipal "policymaker") is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom. *See Andrews*, 895 F.2d at 1480. A *Monell* claim can only proceed if record evidence establishes that such policymaker was aware of similar unlawful conduct in the past but – with deliberate indifference – failed to take precautions against future violations, the failure of which directly led to the plaintiff's injury. *See, e.g., Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

> i.    *Plaintiff cannot establish his alleged injuries were the result of any municipal conduct, policy, or custom.*

Plaintiff alleges he was injured when corrections officers assaulted him during the intake process at CFCF.  ECF No. 1, ¶¶ 16–20.  Plaintiff has failed to develop any evidence of municipal action, let alone any conduct, policy, or custom, of which a policymaker was aware and deliberately chose to ignore, that was the moving force behind Plaintiff's alleged injury.  Indeed, the record demonstrates the exact opposite.

The City does not have a policy permitting the use of excessive force against an inmate.  In fact, the City's policy regarding the use of force against inmates

prohibits the alleged conduct underlying Plaintiff's complaint, such as striking an inmate who is restrained. For example, the PDP's use of force policy includes the following:

> It is the policy of the PDP to ensure that force is used only when necessary and only to the degree required to control the inmate(s) and maintain or restore order. The correct amount of force is the amount of force necessary to establish and maintain control over the subject, neutralizing threat or resistance . . . When the inmate's resistive behavior deescalates, the situation deescalates, and control of the inmate is obtained, the staff's level of force must decrease. Force is never to be used as a punishment or retaliation.

*See* Exh. D, D 000617.

Finally, Plaintiff has failed to develop any evidence that the City had a custom of using excessive force against inmates. Plaintiff cannot point to any evidence regarding the occurrence of an event similar to that which he describes in his Complaint. There is no evidence that a policymaker acquiesced in or failed to appropriately respond to an allegedly deficient custom or practice. *See, e.g.*, *McTernan v. City of York*, 564 F.3d 636, 658-59 (3d Cir. 2009) (explaining that in order to establish Monell liability, a plaintiff must "allege conduct by a municipal decisionmaker"); *see Rees v. Office of Children and Youth*, 473 F. App'x 139, 143 (3d Cir. 2012) (holding that a complaint cannot state a *Monell* claim if it "fails to link the alleged offending policies or customs to anyone within [a municipality] who had policy-making authority"); *see also Andrews v. City of Phila.*, 895 F.2d 1469,

1481 (3d Cir. 1990) (noting that a municipal decisionmaker in a § 1983 case must possess "final, unreviewable discretion to make a decision or take an action"). Plaintiff has developed no evidence of a nexus between the alleged custom or practice and the injuries he claims he suffered.

> ii.  *Plaintiff has not adduced any evidence to establish that a failure to train or supervise was the moving force behind his alleged injuries.*

In *City of Canton v. Harris*, the Supreme Court discussed a municipality's § 1983 liability for an alleged failure to properly train its employees. 489 U.S. 379 (1989).  The *Canton* Court explained that it is not enough to show that the municipality is responsible for the training program in question, nor is it enough to establish that a particular employee has been unsatisfactorily trained, as the employee's shortcomings may be the result of factors other than a faulty training program. *Id.* at 390–91.  It is likewise not enough to prove that an incident would not have happened if an employee had "better" or "more" training, because even the best-trained employees will act inconsistently with their training.  *Id.* at 391–92 ("[I]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

To the extent Plaintiff could characterize his *Monell* claim as based on a failure-to-train theory, it also fails.  He has failed to identify any specific training the

City should have offered relating to the use of force against inmates or that such training was not provided. Nor has Plaintiff developed any evidence that a policymaker consciously chose to forego such training.

Even if Plaintiff could identify some training the City did not conduct that would have prevented his injuries, he would still fail to establish the City's liability. Courts in this jurisdiction have routinely held that municipalities need not train their employees not to commit conduct that is obviously illegal—such as striking a restrained inmate with a dumbbell or kicking a restrained inmate in the genitals. *See, e.g.*, *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 915 (3d Cir. 2003) (holding that failure to train officers not to commit burglaries did not constitute deliberate indifference); *Hunter v. City of Philadelphia*, No. 15-2737, 2015 WL 7734158 *4 (E.D. Pa. Dec. 1, 2015) (where a police officer acts in a patently inappropriate manner such that "the proper response . . . is obvious to all without training," an inference of deliberate indifference is not supported"); *Lamac v. Buchanan*, No. 13-1338, 2016 WL 3921157, *1 (M.D. Pa. July 20, 2016) ("The notion that a local government must train its elected officials to refrain from assaulting people on the threshold to the township building during election days defies common sense, in that it is or should be intuitively obvious that such conduct is impermissible."); *Romano v. Young*, No. 07-1708, 2011 WL 346558 *5 (E.D. Pa. Feb. 2, 2011) (granting summary judgment on claim for failure to train on the

possibility that male police officers may exercise undue influence over a female civilian because it is "hardly obvious that a police officer, sworn to uphold the law," would violate the rights "of the very citizens whom [he was] duty bound to protect because [the officer] lacked training that instructed [him] that such activity was unlawful.").

In short, Plaintiff has failed to identify a constitutionally deficient policy or custom, failed to develop any evidence that such a policy or custom was the "moving force" behind the injuries he alleges, and failed to adduce any evidence in support of his claim that his injuries were the result of a failure to train. Accordingly, Defendants, the City of Philadelphia, Commissioner Carney, and Sergeant Ryans, are entitled judgment in their favor as to Count III of Plaintiff's Complaint.

**B.    Defendant Officer Ford is Entitled to Judgment in his Favor as to All Counts.**

A "defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (explaining that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the Constitution.").

Here, Plaintiff has failed to adduce any evidence that Defendant Ford had any personal involvement in the injuries he claims.  In fact, Plaintiff testified that Defendant Ford did not partake in the assault against him and did not strike him.  *See* Exh. B, 34–35.  To the extent Plaintiff may claim that his testimony could establish Defendant Ford's liability for failing to intervene in the assault, Plaintiff's testimony also refutes such a claim.  Plaintiff testified that Defendant Ford attempted to pull Officer Robinson off of him as the assault was occurring but was unable to do so because Officer Robinson is larger than Officer Ford.  *Id.* 35.  Because Plaintiff's testimony established that Officer Ford did in fact intervene, it cannot form the basis of a claim that Officer Ford violated Plaintiff's rights by not intervening.  *See, e.g.*, *Bethea v. Delaware*, 17 F. Supp. 3d 407, 417 (D. Del. 2014) ("to establish a Fourth Amendment violation for failure to intervene, a plaintiff must establish [*inter alia*] that the . . . officer failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge"), citing *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002).

Accordingly, because there is no genuine issue of material fact regarding whether Officer Ford violated Plaintiff's constitutional rights, he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  CONCLUSION

For the foregoing reasons, Defendants, the City of Philadelphia, Commissioner Blanche Carney, Correctional Officer Orville Ford, and Sergeant Aisha Ryans, request that the Court grant their partial motion for summary judgment and enter judgment in favor of Defendants, the City of Philadelphia, Ford, Commissioner Carney, as to all claims, and in favor of Defendant Ryans as to Count III of Plaintiff's Complaint.

Date:  January 23, 2024                              Respectfully submitted,

                                                     */s/ Benjamin T. Jackal*
                                                     Benjamin T. Jackal
                                                     Deputy City Solicitor
                                                     Pa. Attorney ID No. 319274
                                                     City of Philadelphia Law Department
                                                     1515 Arch Street, 14th Floor
                                                     Philadelphia, PA 19102
                                                     215-683-5434 (phone)
                                                     ben.jackal@phila.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEO HOLLIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action** |
| | : | **No. 2:23-cv-00895-PD** |
| **CITY OF PHILADELPHIA, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the Defendants' Partial Motion for Summary Judgment

has been filed on ECF and is available for viewing and downloading.

Date:  January 23, 2024                    Respectfully submitted,

<div style="margin-left: 4em;">

*/s/ Benjamin T. Jackal*
Benjamin T. Jackal
Deputy City Solicitor
Pa. Attorney ID No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
215-683-5434 (phone)
ben.jackal@phila.gov

</div>

Exhibit A

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 1 of 9

## CASE INFORMATION

| | | |
|---|---|---|
| Judge Assigned: Palumbo, Frank | Date Filed: 05/27/2021 | Initiation Date: 05/27/2021 |
| OTN: U 224777-0    LOTN: | Originating Docket No: MC-51-CR-0004735-2021 | |
| Initial Issuing Authority: Bradley K. Moss | Final Issuing Authority: | |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Mostiller, James D. | |
| Complaint/Citation No.: 2135017875-0004735 | Incident Number: 2135017875 | |
| County: Philadelphia | Township: Philadelphia City | |

Case Local Number Type(s)

Case Local Number(s)

| | |
|---|---|
| Originating Docket Number | MC-51-CR-0004735-2021 |
| District Control Number | 2135017875 |
| Originating Document Number | 2135017875-0004735 |

## STATUS INFORMATION

Case Status:    Closed

Arrest Date:    03/10/2021

| Status Date | Processing Status |
|---|---|
| 07/24/2023 | Awaiting Violation of Probation Hearing |
| 05/10/2022 | Sentenced/Penalty Imposed |
| 04/01/2022 | Awaiting PSI |
| 04/01/2022 | Awaiting Sentencing |
| 01/20/2022 | Awaiting PSI |
| 01/20/2022 | Awaiting Sentencing |
| 01/20/2022 | Awaiting Sentencing |
| 05/27/2021 | Awaiting Filing of Information |

Printed: 01/22/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any responsibility for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**
# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 2 of 9

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Formal Arraignment | 06/09/2021 | 11:00 am | 1104 | | Scheduled |
| Scheduling Conference | 07/08/2021 | 9:00 am | 905 | Judge Zachary C. Shaffer | Scheduled |
| Bench Warrant Hearing | 08/20/2021 | 10:30 am | 403 | Judge Joffie C. Pittman III | Scheduled |
| Bench Warrant Hearing | 10/22/2021 | 10:30 am | 403 | Judge T. Francis Shields | Scheduled |
| Judge Only Bench Warrant Hearing | 10/25/2021 | 9:00 am | 905 | Judge Zachary C. Shaffer | Continued |
| Judge Only Bench Warrant Hearing | 10/26/2021 | 9:00 am | 905 | Judge Zachary C. Shaffer | Scheduled |
| Status | 12/16/2021 | 9:00 am | 905 | Judge Zachary C. Shaffer | Cancelled |
| Waiver Trial | 01/20/2022 | 9:00 am | 808 | Judge Kai Scott | Scheduled |
| Sentencing | 04/01/2022 | 9:00 am | 808 | Judge Kai Scott | Continued |
| Sentencing | 05/10/2022 | 9:00 am | 808 | Judge Kai Scott | Scheduled |
| NSJ Hearing | 08/03/2023 | 9:00 am | 505 | Judge Frank Palumbo | Scheduled |

## DEFENDANT INFORMATION

| Date Of Birth: | 01/15/2002 | City/State/Zip: Philadelphia, PA 19144 |
|---|---|---|

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Hollis, Leo D. |
| Probation Officer | Cook, Rashan |

## BAIL INFORMATION

**Hollis, Leo D.**                                                                 **Nebbia Status:  None**

| Bail Action | Date | Bail Type | Originating Court | Percentage | Amount |
|---|---|---|---|---|---|
| Set | 03/10/2021 | Monetary | Municipal Court | 10.00% | $150,000.00 |
| Change Bail Type | 03/17/2021 | Unsecured | Municipal Court | | $150,000.00 |
| Change Non-Monetary Conditions | 04/19/2021 | Unsecured | Municipal Court | | $150,000.00 |
| Revoke | 10/26/2021 | Unsecured | Common Pleas | | $150,000.00 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 10 | F1 | 18 § 3701 §§ A1II | Robbery-Threat Immed Ser Injury | 03/09/2021 | U 224777-0 |

CPCMS 9082

Printed:  01/22/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 3 of 9

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
| --- | --- | --- |
|   Sequence/Description |   Offense Disposition | Grade   Section |
|     Sentencing Judge |     Sentence Date |     Credit For Time Served |
|       Sentence/Diversion Program Type |       Incarceration/Diversionary Period |       Start Date |
|         Sentence Conditions | | |

**Lower Court Proceeding (generic)**

| Preliminary Hearing | 05/26/2021 | Not Final |
| --- | --- | --- |

**Proceed to Court**    Defendant Was Not Present

| Information Filed | 06/07/2021 | Not Final | |
| --- | --- | --- | --- |
| 1 / Robbery-Threat Immed Ser Injury | Replacement by Information | F1 | 18 § 3701 §§ A1II |

**Guilty Plea - Non-Negotiated**    Defendant Was Present

| Waiver Trial | 01/20/2022 | Final Disposition | |
| --- | --- | --- | --- |
| 1 / Robbery-Threat Immed Ser Injury | Guilty Plea - Non-Negotiated | F1 | 18 § 3701 §§ A1II |
|   Scott, Kai | 05/10/2022 | | |
|     Confinement | Min of 11.00 Months 15.00 Days | | |
| | Max of 23.00 Months | | |
| | 11 1/2 - 23 months | | |

      Credit to be calculated by the Phila. Prison System

      PAROLE ORDERED AT THE 18 MONTH MARK WITHOUT FURTHER ORDER OF THE COURT

      ENGAGE IN VOCATIONAL TRAINING

      COURT RECOMMENDS THE NEW LEASH ON LIFE PROGRAM

      Defendant is to pay imposed mandatory court costs.

      PAROLE/ PROBATION TO BE SUPERVISED BY THE MENTAL HEALTH UNIT

      UPON RELEASE, HE IS TO BE EVALUATED FOR THE NEED FOR TREATMENT AND THERAPY

      PROBATION TO RELIST 90 DAYS AFTER RELEASE FOR STATUS

|     Probation | Max of 4.00 Years | | |
| --- | --- | --- | --- |
| | 4 years | | |

**LINKED SENTENCES:**

  **Link 1**

    CP-51-CR-0004786-2021 - Seq. No. 1 (18 § 3701 §§ A1II) - Probation is Consecutive to

    CP-51-CR-0004786-2021 - Seq. No. 1 (18 § 3701 §§ A1II) - Confinement

---

CPCMS 9082

Printed: 01/22/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**
## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 4 of 9

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| <u>Name:</u>     Philadelphia County District Attorney's Office<br>             Prosecutor | <u>Name:</u>     Justin Charles Capek<br>             Private |
| <u>Supreme Court No:</u> | <u>Supreme Court No:</u>     324492 |
| <u>Phone Number(s):</u> | <u>Rep. Status:</u>     Active |
| 215-686-8000     (Phone) | <u>Phone Number(s):</u> |
| <u>Address:</u> | 856-304-4629     (Phone) |
| 3 South Penn Square<br>Philadelphia, PA  19107 | 215-845-0250     (Office) |
| | <u>Address:</u> |
| | Schatz & Steinberg Pc<br>1500 Jfk Blvd Ste 1300<br>Philadelphia, PA  19102 |
| | Representing: Hollis, Leo D. |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 05/27/2021 | | Court of Common Pleas - Philadelphia County |
| Held for Court | | | |
| 1 | 06/07/2021 | | Attorney General of Pennsylvania |
| Information Filed | | | |
| 3 | 06/09/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 6 | 06/09/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 07/08/2021 | | Shaffer, Zachary C. |
| Status Listing | | | |
| 4 | 07/08/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 07/13/2021 | | Lloyd, James Richard III |
| Motion for Release on House Arrest Program | | | |

CPCMS 9082

Printed: 01/22/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**
# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 5 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 4 | 08/20/2021 | | Court of Common Pleas - Philadelphia County Pittman, Joffie C. III |
| Release of Prisoner | | | |
| 5 | 08/20/2021 | | Court of Common Pleas - Philadelphia County Pittman, Joffie C. III |
| Short Certificate | | | |
| 1 | 09/13/2021 | | Capek, Justin Charles |
| Entry of Appearance | | | |
| 1 | 09/29/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 10/13/2021 | | Capek, Justin Charles |
| Motion for Release on House Arrest Program | | | |
| 5 | 10/22/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 6 | 10/22/2021 | | Shields, T. Francis |
| Bench Warrant to Remain | | | |
| 4 | 10/25/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 5 | 10/25/2021 | | Shaffer, Zachary C. |
| Order Granting Motion for Continuance | | | |
| 4 | 10/26/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 6 | 10/26/2021 | | Shaffer, Zachary C. |
| Order Granting Motion to Revoke/Release and Forfeit Bail - Hollis, Leo D. | | | |

Printed: 01/22/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**
# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 6 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 7 | 10/26/2021 | | Court of Common Pleas - Philadelphia County Feder, Eric |
| Commitment | | | |
| Philadelphia Department of Prisons | | | |
| 10/26/2021 | | | |
| Pretrial Electronic Monitoring | | | |
| 10/26/2021 | | | |

| | | | |
|---|---|---|---|
| 8 | 10/26/2021 | | Court of Common Pleas - Philadelphia County Shaffer, Zachary C. |
| Short Certificate | | | |

| | | | |
|---|---|---|---|
| 9 | 10/26/2021 | | Court of Common Pleas - Philadelphia County Shaffer, Zachary C. |
| Short Certificate | | | |

| | | | |
|---|---|---|---|
| 10 | 10/26/2021 | | Shaffer, Zachary C. |
| Order Granting Motion to Revoke Bail | | | |
| Capek, Justin Charles | | | |
| 10/26/2021 | Oral Service in Court | | |
| Philadelphia County District Attorney's Office | | | |
| 10/26/2021 | Oral Service in Court | | |
| Philadelphia Department of Prisons | | | |
| 10/26/2021 | | | |

| | | | |
|---|---|---|---|
| 11 | 10/26/2021 | | Shaffer, Zachary C. |
| Scheduling Order - Non Jury | | | |

| | | | |
|---|---|---|---|
| 12 | 10/26/2021 | | Shaffer, Zachary C. |
| Counsel Attached for Trial | | | |

| | | | |
|---|---|---|---|
| 1 | 01/20/2022 | | Scott, Kai |
| Guilty Plea - Non-Negotiated | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 7 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 01/20/2022 | | Court of Common Pleas - Philadelphia County |
| Order -- Trial Disposition | | | |
| 3 | 01/20/2022 | | Court of Common Pleas - Philadelphia County |
| Commitment | | | |
| 6 | 01/20/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 4 | 04/01/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 5 | 04/01/2022 | | Scott, Kai |
| Sentence Further Deferred Defense Request | | | |
| 1 | 05/10/2022 | | Scott, Kai |
| Order - Sentence/Penalty Imposed | | | |
| APPD Parole Probation Intake 05/10/2022 | | | |
| Philadelphia Department of Prisons 05/10/2022 | | | |
| 2 | 05/10/2022 | | Court of Common Pleas - Philadelphia County |
| Penalty Assessed | | | |
| 3 | 05/10/2022 | | Philadelphia Department of Prisons APPD Parole Probation Intake |
| Court Commitment State or County Correctional Institution | | | |
| APPD Parole Probation Intake 05/10/2022 | | | |
| Philadelphia Department of Prisons 05/10/2022 | | | |
| 4 | 05/10/2022 | | Philadelphia Department of Prisons APPD Parole Probation Intake |
| Itemized Account of Fines, Costs, Fees, and Restitution | | | |

CPCMS 9082

Printed: 01/22/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0004786-2021**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 8 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

APPD Parole Probation Intake
  05/10/2022
Philadelphia Department of Prisons
  05/10/2022

---

| 5 | 05/10/2022 | | Court of Common Pleas - Philadelphia County |

  Release of Prisoner
APPD Parole Probation Intake
  05/10/2022
Philadelphia Department of Prisons
  05/10/2022

---

| 1 | 07/18/2022 | | Shirdan-Harris, Lisette |

  Entry of Civil Judgment

---

| 1 | 09/21/2022 | | Capek, Justin Charles |

  Motion for Credit for Time Served

---

| 3 | 07/24/2023 | | Court of Common Pleas - Philadelphia County |

  Hearing Notice

---

| 1 | 07/28/2023 | | Philadelphia County Adult Probation Unit |

  Gagnon 2 Summary Filed

---

| 1 | 08/04/2023 | | Palumbo, Frank |

  Order Granting Motion to Continue Probation

---

CPCMS 9082

Printed: 01/22/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

**DOCKET**



**Docket Number: CP-51-CR-0004786-2021**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Leo D. Hollis

Page 9 of 9

**CASE FINANCIAL INFORMATION**

Last Payment Date:  09/23/2022                Total of Last Payment: -$12.50

**Hollis, Leo D.**
Defendant

| | Assessment | Payments | Adjustments | Non Monetary Payments | Balance |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Motion Filing Fee (Philadelphia) | $12.50 | ($12.50) | $0.00 | $0.00 | $0.00 |
| Motion Filing Fee (Philadelphia) | $12.50 | ($12.50) | $0.00 | $0.00 | $0.00 |
| ATJ | $6.00 | $0.00 | $0.00 | $0.00 | $6.00 |
| Booking Center Fee (Philadelphia) | $175.00 | $0.00 | $0.00 | $0.00 | $175.00 |
| CJES | $2.50 | $0.00 | $0.00 | $0.00 | $2.50 |
| CQS Fee Felony (Philadelphia) | $100.00 | $0.00 | $0.00 | $0.00 | $100.00 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $22.40 | $0.00 | $0.00 | $0.00 | $22.40 |
| Costs of Prosecution - CJEA | $50.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| County Court Cost (Act 204 of 1976) | $32.70 | $0.00 | $0.00 | $0.00 | $32.70 |
| Crime Victims Compensation (Act 96 of 1984) | $35.00 | $0.00 | $0.00 | $0.00 | $35.00 |
| DNA Detection Fund (Act 185-2004) | $250.00 | $0.00 | $0.00 | $0.00 | $250.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| Firearm Education and Training Fund | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| OAG - JCP | $2.50 | $0.00 | $0.00 | $0.00 | $2.50 |
| State Court Costs (Act 204 of 1976) | $14.90 | $0.00 | $0.00 | $0.00 | $14.90 |
| Victim Witness Service (Act 111 of 1998) | $25.00 | $0.00 | $0.00 | $0.00 | $25.00 |
| Civil Judgment/Lien (Philadelphia) | $100.69 | $0.00 | $0.00 | $0.00 | $100.69 |
| Filing Fee (Philadelphia) | $12.50 | ($12.50) | $0.00 | $0.00 | $0.00 |
| OSP (Philadelphia) (Act 77 of 2022) | $1,275.00 | $0.00 | $0.00 | $0.00 | $1,275.00 |
| Costs/Fees Totals: | $2,173.44 | ($37.50) | $0.00 | $0.00 | $2,135.94 |
| Grand Totals: | $2,173.44 | ($37.50) | $0.00 | $0.00 | $2,135.94 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Exhibit B

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
   LEO HOLLIS,            : Civil Action NO.:
 3                        : 2:23-cv-00895-PD
             Plaintiff,   :
 4                        :
   v.                     :
 5                        :
   CITY OF PHILADELPHIA,  :
 6 ET AL.,                :
                          :
 7           Defendant.   :

 8                    ------

 9            Friday, December 29, 2023

10                    ------

11            Videotape deposition of LEO HOLLIS

12 held at 803 North 63rd Street, Philadelphia,

13 Pennsylvania at 10:51 a.m., on the above date,

14 before Jenese Mason, Digital Reporter and Notary

15 Public.

16                    ------

17

18

19

20

21

22

23

24 Job No.:  37802
```

Page 2

```
 1              APPEARANCES
 2
   ABRAMSON & DENENBERG, P.C.
 3 BY:  TAYLOR BRADY, ESQ.
   1315 Walnut Street
 4 Suite 500
   Philadelphia, Pennsylvania 19107
 5 ph:  215.546.1345
   tbrady@adlawfirm.com
 6 Counsel for Plaintiff
   (Via Zoom)
 7
   CITY OF PHILADELPHIA - LAW DEPARTMENT
 8 BY:  BENJAMIN T. JACKAL, ESQ.
   1515 Arch Street
 9 14th Floor
   Philadelphia, Pennsylvania 19102
10 ph:  215.683.5434
   ben.jackal@phila.gov
11 Counsel for Defendants, City of
   Philadelphia, Commissioner Blanche
12 Carney, Joe Robinson, Jason Grundy,
   Corrections Officer Orville Ford,
13 and Sergeant Aisha Ryans
   (Via Zoom)
14
15 MARSHALL DENNEHEY, P.C.
   BY:  JOHN GONZALES, ESQ.
16 2000 Market Street
   Philadelphia, Pennsylvania 19103
17 ph:  215.575.2871
   jpgonzales@mdwcg.com
18 Counsel for Defendant, Nancy Giannetta
   (Via Zoom)
19
20
             ------
21
22
23
24
```

Page 3

```
 1              INDEX
 2 WITNESS:  LEO HOLLIS
 3          EXAMINATION
 4                        PAGE
 5 By MR. JACKAL              6, 94
 6 By MS. BRADY                 84
 7          ------
 8          EXHIBITS
   (None marked.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          -  -  -
 2          PROCEEDINGS
 3          -  -  -
 4       THE REPORTER:  Okay.  We are now
 5 on the record.  The time is now 10:51 a.m.
 6 eastern.  The date is December 29, 2023.
 7 And good morning, everyone.  My name is
 8 Jenese Mason, and I am the notary and
 9 reporter assigned by Lexitas.  I'm
10 requesting that all parties please stipulate
11 and agree that by videoconference
12 technology, this will be the remote
13 deposition of Leo Hollis in the case of Leo
14 Hollis v. The City of Philadelphia, et al.
15       Before going on the record.  The
16 witness positively identified themselves to
17 me as Leo Hollis by driver's license issued
18 by the Pennsylvania Department of Motor
19 Vehicles, and the witness is presently
20 located in Philadelphia, Pennsylvania.
21       Counselors, will you please go
22 ahead and state your appearance for the
23 record, your firm and who you represent, and
24 that you can agree -- that you will agree to
```

Page 5

```
 1 stipulate that I may place this witness
 2 under oath and report this proceeding
 3 remotely.
 4       MR. JACKAL:  Good morning.  I'm
 5 Ben Jackal from the City of Philadelphia.  I
 6 represent five defendants -- sorry, six
 7 defendants.  City of Philadelphia,
 8 Commissioner Blanche Carney, former
 9 corrections officer Joe Robinson, former
10 corrections officer Jason Grundy,
11 corrections officer Orville Ford, and
12 Sergeant Aisha Ryans.  And I agree to the
13 stipulation.
14       MR. GONZALES:  And this is John
15 Gonzales.  I represent defendant Nancy
16 Giannetta, and I stipulate to permit this to
17 go forward remotely.
18       MS. BRADY:  Good morning.  My name
19 is Taylor Brady.  I'm from Abramson &
20 Denenberg and I am representing Plaintiff,
21 Leo Hollis in this action.
22       THE REPORTER:  Okay.  Thank you
23 very much.  Mr. Hollis, will you please
24 raise your right hand.  Okay.  Do you swear
```

Leo Hollis
12/29/2023

Page 6

1   or affirm that the testimony you give today
2   will be the truth, the whole truth and
3   nothing but the truth, so help you God?
4           THE WITNESS:  Yes.  Yes, ma'am.
5           LEO HOLLIS, after having been
6   first duly sworn, was examined and testified
7   as follows:
8           THE REPORTER:  Okay.  Thank you
9   very much.  Counselor, you may now begin.
10          MR. JACKAL:  Thank you.  Just
11   before I begin, I'd like to place on the
12   record that this deposition was scheduled to
13   begin at 10:00 a.m.  I was present before
14   10:00 a.m. as was Mr. Gonzales.
15          THE WITNESS:  Yeah, I was late.
16              -  -  -
17          EXAMINATION
18              -  -  -
19   BY MR. JACKAL:
20   Q.   You'll have the opportunity to say
21   whatever you want, Mr. Hollis, but I'll just put
22   this on the record and then we can get on your
23   way.  The time is now 10:54.  That's when we're
24   getting started.  And the reason for the delay is

Page 7

1   that Mr. Hollis was not present.
2        Good morning, Mr. Hollis.
3   A.   How are you doing, Mr. Jackal?
4   Q.   I'm doing well.  How about yourself?
5   A.   I'm trying to hang in there.
6   Q.   We're here to take your deposition.
7   This is part of a lawsuit that you filed against
8   the City of Philadelphia and several corrections
9   personnel for an incident that happened in March
10   2021.  Again, my name is Ben Jackal.  I represent
11   most of the defendants in this case.  As the
12   court reporter just gave you the oath, are you
13   aware that you are now under oath?
14   A.   I have no -- I don't know what that
15   means.  Under oath?
16   Q.   You just took an oath.  Is that right?
17   A.   I probably heard that before.  What was
18   it?
19          MS. BRADY:  Yeah it was --
20   remember when you raised your right hand?
21          THE WITNESS:  Yeah.  So that's,
22   that's what that means.  Yeah.  Raising your
23   right hand?  Okay.  Yeah.
24   BY MR. JACKAL:

Page 8

1   Q.   So you understand that that has the
2   same effect as though you're in the courtroom
3   right now?
4   A.   Yeah.  Yeah.
5   Q.   And it's important to be honest and
6   truthful with all of your responses, okay?
7   A.   (No verbal response.)
8   Q.   Do you understand that?
9   A.   Yes.
10   Q.   Along those lines, have you ever had
11   your deposition taken before?
12          MS. BRADY:  Have you done
13   something like this before?
14          THE WITNESS:  No.
15   BY MR. JACKAL:
16   Q.   So it's important in a deposition that
17   we don't speak over one another.  The court
18   reporter is here to make a record of everything
19   that we say, and we want to make sure that she
20   can take down everything that you say and
21   everything that I say so that the record is
22   clear.  Does that make sense?
23   A.   Yes, sir.
24   Q.   It's also important that you give

Page 9

1   verbal answers.  So you shouldn't nod or shrug or
2   say uh-huh, things like that -- those are not
3   accurately reflected in a record, and we're here
4   to create a clear record.  Does that make sense?
5   A.   Yes, sir.
6   Q.   Your attorney may object to some of my
7   questions.  Unless she instructs you otherwise,
8   you have to answer the question anyway despite
9   the objection.  I don't anticipate that this
10   deposition will take long, but if for any reason
11   you need to take a break, that's fine, just let
12   me know.  The only thing I ask is that you answer
13   the question that I've asked before you take the
14   break.  Is that all right?
15   A.   Yes, sir.  I just don't want to answer
16   the same question.
17   Q.   Understood.  And I won't ask the same
18   question twice.  If at any point you don't
19   understand a question that I've asked, let me
20   know and I'll try to rephrase it in a way that is
21   clearer.  If you do answer a question, though,
22   I'm going to assume that you understood that
23   question. Is that fair?
24   A.   Yes, sir.

Page 10

1    Q.   Okay.  So have you consumed any alcohol
2  or narcotics in the past 24 hours?
3    A.   No.
4    Q.   Are you on any kind of medication this
5  morning?
6    A.   No.
7    Q.   Is there any reason that you can think
8  of that you would not be able to give truthful
9  answers to my questions today?
10    A.   No.
11    Q.   And let's get started.  What is your
12  full name?
13    A.   Leo Deontay Hollis.  L-E-O, D-E-O-N-T-
14  A-Y, and last name is Hollis, H-O-L-L-I-S.
15    Q.   Have you ever gone by any other names?
16    A.   No.
17    Q.   Do you have any aliases?
18    A.   No.
19    Q.   What's your date of birth?
20    A.   01/15/2002.
21    Q.   Do you know your social security
22  number?
23    A.   Yes.
24    Q.   What is it?

Page 11

1    A.   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.
2    Q.   Where do you currently live?
3    A.   803 North 63rd Street, Philadelphia,
4  Pennsylvania 19151.
5    Q.   How long have you --
6    A.   Apartment third floor.  I live there --
7  apartment third.
8    Q.   How long --
9    A.   Yes, sir.
10    Q.   Just to get that apartment number on
11  the record, what was that apartment number?
12    A.   Apartment third floor --  third floor.
13    Q.   And how long have you lived there?
14    A.   I've been living there since -- I could
15  say, probably March 2021, since I got out.  Well,
16  well, April, April 2021.  April 5th, 2021, is
17  when I moved in.
18    Q.   Do you live with anyone else?
19    A.   I live with my father.
20    Q.   What's his name?
21    A.   Herman Hollis.  H-E-R-M-A-N, H-O-L-L-I-
22  S.
23    Q.   Other than your father, does anyone
24  else live there?

Page 12

1    A.   No.
2    Q.   So back in March 2021, where did you
3  live?
4    A.   In jail.
5    Q.   So before you went to jail, what was
6  your address?
7    A.   Oh, before?  I was at an Airbnb.  Yeah.
8  I was living at an Airbnb.
9    Q.   Do you remember where that was?
10    A.   No.
11    Q.   Do you remember what neighborhood it
12  was in?
13    A.   Probably, like -- let me see, uptown or
14  something somewhere in uptown near Willow Group.
15  Yeah Uptown.  Deep Uptown.
16    Q.   Was it not in Philadelphia?
17    A.   Yeah, it was in Philly.  You know it's
18  Philadelphia, because they still got the SEPTA
19  buses running around there.  But it's like, when
20  you say uptown, I'm saying towards, like,
21  Sheltonham, over good neighborhood, good Airbnb
22  houses over there.  I don't live -- go to Airbnbs
23  in the city.
24    Q.   But you don't remember what the address

Page 13

1  was?
2    A.   No. I don't -- I don't remember the
3  address.  No.
4    Q.   What is your highest level of
5  education?
6    A.   12th.  I graduated high school diploma.
7    Q.   Where did you go to high school?
8    A.   I went to three different high schools.
9  Started off at Gratz, Simon Gratz, then I went to
10  alternative school.  Then I went to Fairfield
11  Central High School in South Carolina.  And the
12  last one was Brandy Virtually -- Brandy Virtual
13  Academy.  It's a home school.  So --
14    Q.   Is that where you got your degree from?
15    A.   Yes, sir.
16    Q.   So other than the high school degree,
17  do you have any other degrees or certificates?
18    A.   I got certificates from like -- not
19  from school, but I got certificates from like
20  home healthcare aid and helping old people and
21  stuff like that.  I don't got no other type of
22  certificates.
23    Q.   What is it that you do for a living
24  today?

Leo Hollis
12/29/2023

Page 14

1    A.    Well, I do home healthcare aide.  I'm
2  trying to start doing Amazon Flex.  Basically,
3  you got to have your own car and you just drop
4  off packages instead of, you know, ordering them
5  and, and using Amazon truck.  It's better with
6  you -- with your own car.  That's what I'm trying
7  to do.
8    Q.    So how long have you done home
9  healthcare aide?
10    A.    I've been doing it for like four months
11  now.
12    Q.    What's the name of your employer?
13    A.    My -- name of my employer like the --
14  like the firm,  like the office?
15    Q.    The company that you work for.  Yeah.
16    A.    It's not a company.  It's like a --
17  it's like a -- it's like a home health care firm.
18  I don't know the name.  No. I don't have my -- I
19  don't have my phone.  My phone is dead.  Like, I
20  -- like, I just woke up late, so I don't have my
21  phone on me.  If I had my phone, I can give you
22  them details.
23    Q.    And what's the name of the supervisor
24  that you report to?

Page 15

1    A.    Ms. Gloria.  And the location is, is
2  down there Broad and Oregon.
3    Q.    How many hours per week do you work in
4  home health care?
5    A.    I work 6 hours a day.
6    Q.    That's five days a week or seven days a
7  week?
8    A.    It's -- 12, 18, 24 -- probably, like
9  36.
10    Q.    How many days per week do you work?
11    A.    Six.  Six times six.
12    Q.    And where do you work?  What's the
13  location that you go to when you do home health
14  care?
15    A.    I go to different locations.  They put
16  me with different people.
17    Q.    And approximately how much do you make
18  per hour?
19    A.    I make 13.50 an hour.
20    Q.    So going back to March 2021, did you
21  have a job?
22    A.    Yeah.
23    Q.    What were you doing?
24    A.    I was doing DoorDash and Uber Eats.

Page 16

1    Q.    How much money did you make doing
2  DoorDash and Uber Eats?
3    A.    A lot.  I don't know -- a lot.
4  Probably over 250 a day.  Yeah, 250 a day.
5    Q.    250 per day?
6    A.    Yeah.
7    Q.    And how long did you do that delivery?
8    A.    I did it every day.  I loved it.  I
9  love driving.  I did it every day.  I'm trying to
10  get back to doing it.  Got to get my car.
11    Q.    Was that a full-time job or a part time
12  job?
13    A.    To me, it was full time, because I
14  could do it anytime, you know, I could take
15  breaks, like, like, I did it a lot -- you know,
16  like, a lot of hours with them.
17    Q.    So other than home health care and
18  delivering for Uber Eats and DoorDash, have you
19  had any other jobs in the past ten years?
20    A.    Yeah.  I had plenty of jobs.  I worked
21  at Walmart.  I worked at Walmart from January all
22  the way to August in the COVID.  Working during
23  COVID.  I worked at KJ's.  I worked at KFC.  And
24  that was the only two jobs.  My first job was

Page 17

1  KJ's, KFC, Walmart, and then it went from Uber
2  Eats, DoorDash to home health care.  That's how
3  it went.
4    Q.    Okay.
5    A.    Yes, sir.
6    Q.    Are you claiming that as a result of
7  the incident in this lawsuit, you lost any wages?
8  Is that part of your allegation?
9    A.    To certain jobs?
10    Q.    Right.
11    A.    To certain jobs, yes.  Yeah.
12    Q.    And what jobs were those that you were
13  not able to work as a result of this incident?
14    A.    Jail.  I can't be a CO.  I want to be a
15  correction officer.  I want to be in there
16  helping people that's going through the hard
17  times, and I can't work there.  That's the only -
18  - that's the only job that I can't work at
19  because of this incident.
20    Q.    Are you married?
21    A.    No.
22    Q.    Do you have any children?
23    A.    There was more jobs that I did I
24  couldn't work at because of that incident.  I

Page 18

1  just don't know.  I don't know.
2       Q.   I should have added to the instruction.
3  If there's anything that you remember that you
4  wanted to have answered in response to a --
5       A.   Yeah.
6       Q.   -- question that I asked earlier, feel
7  free to go back and add or --
8       A.   Yeah.
9       Q.   -- read your answer.
10       A.   Okay.  Yeah.  I appreciate that.
11       Q.   Yeah.  So just let me know.  But I do
12  ask that you answer the question that I've asked
13  you when I've asked it.  So do you have any
14  children?
15       A.   No.
16       Q.   How tall are you?
17       A.   5'8".
18       Q.   And how much do you weigh currently?
19       A.   I weigh 140.
20       Q.   Back in March 2021, how much did you
21  weigh then?
22       A.   Back in 2021, I actually think I
23  weighed the same amount, 140.
24       Q.   Other than the arrest in March 2021

Page 19

1  that caused you to go to CFCF, have you ever been
2  arrested on any other occasion?
3       A.   Never.  Never.
4       Q.   And it's a little bit of an odd
5  question, but other than going to jail in March
6  2021, have you ever been incarcerated?
7       A.   No, sir.
8       Q.   And prior to March 2021, have you ever
9  been to CFCF?
10       A.   No.
11       Q.   And just to make the record clear, CFCF
12  stands for Curran-Fromhold Correctional Facility;
13  is that right?
14       A.   Yes.
15       Q.   So I want to talk about the incident
16  that formed the basis of your lawsuit.
17       A.   Yeah.
18       Q.   On March 11th, 2021, at around 12:40
19  a.m. --
20       A.   1:40 -- it was 1:40 a.m.
21       Q.   Okay.  I appreciate the correction, but
22  just let me get my question out and then you can
23  respond.
24       A.   Okay.

Page 20

1       Q.   So March 11th, 2021, sometime after
2  midnight, do you remember that date and time?
3       A.   Yes. I remember that date and time.
4       Q.   Where were you then?
5       A.   I was in the intake and processing
6  room.
7       Q.   Who were you with?  Who else were you
8  with?
9       A.   By myself.  Other inmates that I have
10  no -- I have -- I don't know.
11       Q.   What were you doing before that?
12       A.   Before what?
13       Q.   Before you went to the intake room at
14  CFCF.
15       A.   I sat in the cell on a cold bench.
16       Q.   And where was that cell?
17       A.   In the facility.
18       Q.   So you were arrested sometime earlier;
19  is that right?
20       A.   I got arrested March 9th, 2021.
21       Q.   And why were you --
22       A.   I stayed in the 35th District for two
23  days.  I entered CFCF March 11th.
24       Q.   Okay.

Page 21

1       A.   Sir, you keep cutting me off every time
2  I talk.
3       Q.   I'm sorry.  Let me pause this.  It
4  might be because of the Zoom.
5       A.   Yeah.  You won't let me finish.  You
6  ask me questions so I'm going to answer it
7  because guess what --
8            MS. BRADY:  (indiscernible
9       00:16:24)
10            THE WITNESS:  No, we good.  My
11       memory is so perfect when it comes to that
12       day.  So when I entered CFCF, it was around
13       6:30.  I sat in there for 5 hours on a cold
14       bench around 12:00.  I got jumped by eight
15       correction officers at 1:40 a.m. that's when
16       it occurred.
17  BY MR. JACKAL:
18       Q.   I apologize for cutting you off.  I
19  want you to be able to give complete answers and
20  say as much as you want.  It's just a little bit
21  more difficult talking through the Zoom, that's
22  all.
23       A.   Yes, sir.  You're good.
24       Q.   So can you tell me in your own words

Page 22

1  what happened?  You say you were jumped?
2      A.   So what happened was this officer named
3  Officer Robinson, you know, he just -- he just
4  went against this -- went against the rules.
5  Went against the regulations and rules, you know.
6      Q.   What did he do?
7      A.   Put his hands and feet on me with
8  multiple other officers.  It's like a gang attack
9  or something.  It's like I, I was getting gang
10 attacked, or, like, jumped into, like, a blood or
11 a crypt.  It was -- it was, like -- it was weird.
12 I was getting, like -- I don't know, like, they
13 knew me from somewhere or something or, like -- I
14 don't know.  They just -- stomping my face out,
15 like, like, like I was -- I don't know, like I
16 was an intruder.  I don't know.  It was -- it was
17 kind of crazy.
18     Q.   Where specifically did the attack take
19 place?  You said it was in the receiving room?
20     A.   So when I went to the front desk,
21 basically to get processed with a wristband, they
22 put -- I think they were supposed to put a
23 wristband over my wrist.  Instead of putting a
24 wristband over my wrist, they grabbed me.  He --

Page 23

1  officer, officer Robinson grabbed me by the
2  collar of my orange V-neck jumpsuit, grabbed me
3  and slammed me.
4           Imagine you grabbing somebody like this
5  and slamming them and then you got another
6  officer behind your back and you choked out like
7  this on camera.  And then you're getting stomped,
8  and then you're getting punched constantly,
9  constantly, over and over and over.  And also,
10 you have all the inmates screaming, get them off,
11 get them off, get off of him.  Get off.
12          Y'all hurting him.  Y'all killing him.
13 Get off of him.  Y'all want to kill him.  Get off
14 him.  Y'all, y'all going to kill him.  Y'all
15 going to kill him.  Then he went behind his desk.
16 He left.  After that, you know, officers had to
17 stop him.  It was him, like, four other got a
18 little kicked in.  After that, they stopped him.
19 He raged.  He came back, on the video, he
20 stopped.
21          You thought it was over.  I thought it
22 was over.  I thought -- no, I thought I could go
23 to the hospital and get some help now.  He came
24 back with a dumbbell, a silver 20-pound dumbbell

Page 24

1  and threw it at my face while I was already
2  choked up.  That's when -- that's when everything
3  -- like , everything -- like, I didn't feel no
4  more punches.  Everything went numb.  You hit me
5  with a dumbbell, so any, any punches is going to
6  go numb now.
7           And, and, and that's when, like, I was,
8  like, bleeding internally.  I, I felt like my
9  brain was bleeding.  Broken bone particle under
10 my eye, broken nose, broken first lip, second --
11 bottom lip busted split wide open.  Spine injury,
12 neck still hurting.  Yeah.
13     Q.   Okay.  So you recall that --
14     A.   No white shirt in place.  No white
15 shirt -- never came.  No sergeant.  You said I
16 took that name down when you said it earlier.
17 You said, Aisha Ryans.  She was nowhere to be
18 placed during that scene or afterwards.  I never
19 seen a white shirt until they took me to the
20 hospital.  Took me back when I was supposed to go
21 to the hole because I did something wrong.  I
22 didn't go to the hole.  They put me in the cell
23 because I didn't do anything wrong.
24          So when I went in the cell, I finally

Page 25

1  seen a white shirt the next day.  And, and he --
2  I felt like he cried with me because he was like,
3  they're wrong for that.  They're absolutely wrong
4  for that.  That's what happened.  That's when I
5  seen that white shirt.
6           And it wasn't a Aisha Ryans.  It was
7  another sergeant.  He was -- he was an Indian
8  short man, like 5'9", Indian, short.  I can -- I
9  know his face like the back of my hands.  If I
10 see his face -- he'll tell you.  We sat there in
11 that -- in that room.  We had a discussion.  He
12 made me write -- he, he made me write a memo on
13 March 11th around -- this was the next day, March
14 12th, around probably, like some -- early, early,
15 early in the morning.
16          Probably around, like, 2:00, 2:00 in
17 the morning.  And he came to my cell and he asked
18 me what happened.  I wrote the memo down for him
19 and he sent me to the nursery.  I want you to go
20 back -- I want you to go to the nurse.  Like, I
21 don't know how they had you in a cell like that.
22 Go to the nurse.  And I went to the nurse, and
23 guess what the nurse did?  "Oh, nothing's wrong
24 with you, go ahead."  So I went in pain.  I had

Leo Hollis
12/29/2023

Page 26

1 pain walking up the stairs, getting back on the
2 elevator, discussing that incident that occurred
3 on March 11th, 1:48.
4    Q.   So you named six individuals as
5 defendants in this lawsuit.
6    A.   Yes, I did.
7    Q.   I'm going to ask you about each one of
8 them in turn.
9    A.   I need a paper.  I need --
10    Q.   So Commissioner Blanche Carney.  Have
11 you ever met Commissioner Blanche Carney?
12    A.   I, I need to see his face.  I need to
13 see a picture.
14    Q.   She's the prison commissioner.  She's
15 the commissioner of the prison system.
16    A.   Never met her.  Never met her in my
17 life.
18    Q.   So she was not there --
19    A.   Never met her.
20    Q.   Was she there when you were assaulted?
21    A.   And I said, it was another sergeant
22 that was there.  Afterwards, two days later, they
23 came and pulled me out of my cell and talked to
24 me 2:00 in the morning about this incident.  I

Page 27

1 never talked to no other white shirt.  It's the
2 only sergeant I ever talked to.
3    Q.   So getting back to the actual assault
4 that occurred.  Former warden, Nancy Giannetta,
5 you named her as a defendant in this lawsuit.
6 Have you ever met Warden Giannetta?
7    A.   How are you saying I named these people
8 in this lawsuit?  Like, where is this paper at?
9        MS. BRADY:  Excuse me, Mr. Jackal,
10    would it be helpful if I pull a copy of the
11    complaint for Mr. Hollis?
12        THE WITNESS:  Yeah.  Yeah.
13        MS. BRADY:  I can grab a copy from
14    my office real quick.
15        MR. JACKAL:  I can put a copy of
16    the complaint up on the screen.
17        THE WITNESS:  No.  I don't want on
18    screen.  I, I want to pause, and I want to
19    see the copy in my -- with my own eyes in
20    front of me please.
21        MS. BRADY:  Can we take a brief
22    pause?  I apologize.  Yeah.  I just have to
23    grab a copy real quick.  Like, I have it in
24    my office.

Page 28

1        THE WITNESS:  Like, he acting like
2    it's too much --
3        MR. JACKAL:  Let's take a five-
4    minute break.
5        THE REPORTER:  Okay.  We are now
6    going off the record.  The time is now 11:14
7    a.m. eastern.
8        (Off the record.)
9        THE REPORTER:  Okay.  We are now
10    back on the record.  The time is now 11:18
11    a.m. eastern.
12 BY MR. JACKAL:
13    Q.   Okay.  Mr. Hollis, I understand from
14 your attorney that you now have a copy of the
15 complaint that you filed -- a paper copy in front
16 of you?
17    A.   Yeah.
18    Q.   Is that right?
19    A.   Mm-hmm.
20    Q.   If you could please look at paragraph
21 9.  That's on page 5 of the complaint.  Let me
22 know when you're there.
23    A.   Page 9?
24    Q.   Paragraph 9, page 5.

Page 29

1    A.   Defendant Blanche or something?
2    Q.   Yeah.  So I haven't asked you a
3 question yet, but --
4    A.   Yeah.  I know who that is.
5    Q.   So paragraph 9 says, "Defendant,
6 Blanche Carney, is the commissioner of PDP, is a
7 policymaker for Defendant, the city, and she is
8 being sued in her individual and official
9 capacity."  Did I read that correctly?
10    A.   Yes, you did.
11    Q.   So have you ever met Commissioner
12 Blanche Carney?
13    A.   Well, with the details you just said
14 after that, no, I haven't met her.
15    Q.   And was she there when you were
16 assaulted on March 12th, 2021?
17    A.   Commissioner of the PDP?  What is the
18 commissioner of the PDP?  Because it's -- if you
19 could tell me what that is, I could tell you if
20 she's there -- if she was there or not.  I don't
21 -- is that like a white shirt?  Is that a regular
22 correction officer?  Got to know who --
23    Q.   She's not a regular corrections
24 officer.  She's the head of the prison system.

Page 30

1    A.    No. she was not there.

2    Q.    Okay, that's my question.

3    A.    No.  No, she wasn't.  No white shirt --

4    Q.    The following paragraph, paragraph 10,

5 says, "Defendant, Nancy Giannetta, was at all

6 times relevant here to the warden of CFCF and was

7 a policymaker for Defendant, the city, and she is

8 sued in her individual and official capacity."

9 Did I read that correctly?  Mr. Hollis, did I

10 read that correctly?

11    A.    Yes.  I just want to know when I have a

12 chance to speak on that again.

13    Q.    Mr. Hollis, your attorney has the

14 opportunity to ask you questions at the end of

15 this deposition --

16    A.    But you did tell me that I can go back

17 and speak on stuff that you asked me, so that's

18 what I'm doing.  I'm doing it.

19    Q.    Sure.  If you have any additional

20 information you'd like to add for a question I've

21 already asked, that's fine.

22    A.    What, what -- why do you have to bring

23 up my attorney?

24    Q.    But I ask you just to answer the

Page 31

1 questions put to you.

2         MS. BRADY:  I'm going to have time

3    to also -- if you want to go into anything

4    more, I have time to ask you questions at

5    the end, too.

6         MR. JACKAL:  But now I just want -

7    -

8         THE WITNESS:  Like, I don't know

9    that -- like, I don't know that.

10 BY MR. JACKAL:

11    Q.    For now, I just ask you to answer the

12 questions that I'm asking.

13    A.    Okay.  So I'm going to go back to that

14 -- what I just said, when you're asking me, do I

15 remember all these people being present, my eyes

16 are closed.  My eyes are, like, so big.  They're

17 so swollen, I can't see shit.  Excuse my

18 language.  So I'm bleeding --

19    Q.    So Mr. Hollis, you have no memory --

20    A.    -- out of my nose, I'm bleeding, out of

21 my mouth.  I didn't say I didn't have memory.  I

22 said I can't see anything because my eyes are so

23 big and are swollen, and they're -- and they're

24 black, so I can't see anything.  All I see is

Page 32

1 nurses.

2    Q.    I understand what you're saying, but

3 before you were assaulted, your eyes were not

4 injured in any way, were they?

5    A.    Yeah.  That's why I remember

6 everything.  That's why I was saying I remember

7 everything for it.  Yeah.  That's why I explained

8 every detail to you like that.

9    Q.    So when I talk to you about each of

10 these defendants, my question is simply, do you

11 remember seeing them, or do you remember them

12 being present at the time of the assault, okay?

13    A.    No, you said after.  Yeah.  I do

14 remember before.  Now, after that I got jumped, I

15 don't know who I seen because my eyes are

16 swollen.  So before I got jumped, I know

17 absolutely everybody that was in that room.  Yes.

18    Q.    So again, going back --

19    A.    The camera would make -- and the camera

20 would make it -- the video will make it so much

21 better, then I could pinpoint them out.

22    Q.    Okay.

23    A.    So you had to be (indiscernible

24 00:27:07) to be right on camera.

Page 33

1    Q.    So, going back to Commissioner Carney,

2 do you remember her being present?

3    A.    I just told you no.

4    Q.    Same question.  Warden Giannetta, do

5 you remember her being present?

6    A.    No, she wasn't present.

7    Q.    You've already testified that

8 correctional officer, Joe Robinson, was present.

9 So prior to --

10    A.    That's the one who hit me.

11    Q.    I understand.  Prior to --

12    A.    That's the one that attacked me.

13    Q.    Just let me get my question out.  Prior

14 to March 2021, had you ever met Joe Robinson

15 before?

16    A.    No.  No.

17    Q.    If you turn the page to the following

18 page in your complaint, paragraph 14 says,

19 "Defendants Sergeant A. Ryan's, correctional

20 officers, Robinson, Grundy, Ford, and then John

21 Doe 1 through 10," and I'm going to stop there.

22 Did I read those names correctly?

23    A.    Yeah.

24    Q.    So former corrections officer, Jason

Leo Hollis
12/29/2023

Page 34

1 Grundy, have you ever met corrections officer
2 Grundy before?
3    A.    Have I ever met him?  I remember that
4 name.
5    Q.    Was he present when you were assaulted?
6    A.    Yes, he was.
7    Q.    Do you recall what, if anything, he
8 did?
9    A.    He kicked me in my face.
10    Q.    Anything other than kicking you in the
11 face?
12    A.    Probably punched me in my face.  I know
13 kick for sure.
14    Q.    And corrections officer Orville Ford, do
15 you know him?
16    A.    Yes.  Yes.
17    Q.    Had you met him prior to March 2021?
18    A.    No.
19    Q.    Was he there when you were assaulted?
20    A.    Yes.
21    Q.    What, if anything, did he do?
22    A.    Officer Ford, out of these eight
23 correctional officers that attacked me -- so
24 basically it was eight correctional officers.  He

Page 35

1 was the only officer, you know, that -- he was
2 telling them like stop.  Like -- he was like an
3 inmate.  He was like, stop.  Get off.  Like,
4 chill, like, stop.
5          He pulled -- once Officer Robinson was
6 beating on me, he pulled him off.  But you know,
7 that -- Officer Ford is like 4'9" probably like -
8 - he's like 5'1", probably like 120.  So he
9 couldn't stop Officer Robinson, but he was there,
10 and he tried to pull Robinson off from me.
11    Q.    Did Officer Ford ever hit you?
12    A.    I just said he didn't.  I just --
13 you're asking me the same questions.  I just said
14 Officer Robinson -- I mean, Officer Ford is 5'2",
15 120, and he pulled Officer Robinson off of me.
16 He never hit me.  I just said that.
17    Q.    So sergeant --
18    A.    Because what I think when I start
19 talking, he gets lost.  I think that's what goes
20 on, because he asked me a question, then I'm
21 going to answer it, but I'm going to answer a
22 long -- I'm going to give you a long answer
23 every time.
24          MS. BRADY:  You just --

Page 36

1          THE WITNESS:  You know why I'm
2    going to give you a long answer, because
3    I'm, I'm hurt.  I'm hurt behind this.  I got
4    jumped.  I'm going to give you a long
5    answer, and I'm going to give you the truth
6    every time you ask me.
7 BY MR. JACKAL:
8    Q.    I understand that, Mr. Hollis.  I
9 appreciate that.  And I'm going to give you every
10 opportunity to say what you need to say.  I just
11 ask that you answer my question specifically.
12 That's all.
13          THE REPORTER:  And also, I'm
14    sorry, can I ask if everyone could please
15    just speak one at a time, just for the sake
16    of the recording, make sure we get an
17    accurate, verbatim record, okay?  Thank you.
18 BY MR. JACKAL:
19    Q.    Okay.  So finally, Sergeant Aisha
20 Ryans.  Do you know her?
21          MS. BRADY:  Let me grab some
22    tissues real quick, for my client.  Sorry.
23 BY MR. JACKAL:
24    Q.    Again, Mr. Hollis, if at any time you

Page 37

1 need a break, that's fine.  Again, I just ask
2 that you answer the question that I've asked you
3 before we take that break.  Are you good to
4 continue, Mr. Hollis?
5    A.    Yeah.
6    Q.    So my question is, do you know Sergeant
7 Aisha Ryan's?
8    A.    No.
9    Q.    Do you know whether she was there when
10 you were assaulted?
11    A.    Some sergeants wear black shirts, so I
12 think she was present.
13    Q.    So do you know whether Sergeant Ryan's
14 wears a white shirt or a black shirt?
15    A.    She wears a black shirt, because there
16 was no white shirts around.
17    Q.    Do you specifically remember a female
18 sergeant being present?
19    A.    I know Sergeant Ryans was present.  She
20 was teasing me.  Yes.  I know her name.  You got
21 to understand, these last names been going by.
22 So they're on a gold tag that I could never
23 forget.  That's right.  You know, I could never
24 forget this gold tag that's on your shirt.  It's

Page 38

1  about a four-digit badge number, but I know this
2  last name.  Yes, she had a black shirt on.  She
3  was the one teasing me, and she kicked me in my
4  face.
5       Q.   When you say she was teasing you, what
6  specifically did she say to you?
7            MS. BRADY:  I apologize.  My
8       client just wants to ask me a brief
9       question.
10           (Off the record.)
11           MS. BRADY:  All right.  We're good
12      to continue.
13  BY MR. JACKAL:
14      Q.   My question is, you said Sergeant
15  Ryan's was teasing you.
16      A.   Yes.
17      Q.   Do you recall specifically what, if
18  anything, she said to you?
19      A.   All right. She -- do you want to hear
20  what she said?
21      Q.   Yeah.
22      A.   She was like, "All that shit you was
23  talking, now you got what you wanted.  You got
24  what you deserve."

Page 39

1       Q.   You know what she was referring to?
2       A.   "Now, now everybody going to be
3  laughing at you when you was trying to make
4  everybody laugh."  That was her exact words.
5  "Ha, ha, ha, ha, ha, now look at you like a
6  raccoon, ha, ha."  While I'm getting dragged out
7  with my legs like this. I'm getting dragged out.
8  I had my -- Somebody had this leg, somebody had
9  this leg, somebody had this two arms.  They was
10  treating me like, like I was a slave.
11      Q.   So you testified that Sergeant Ryans --
12      A.   Teased me.  Teased me.  Yeah.
13      Q.   You said that she told you -- she
14  referred to all that shit that you were talking?
15      A.   All she say -- yeah.
16      Q.   Do you know what she was referring to
17  when she said that?
18      A.   No. I have no clue.
19      Q.   So in total -- I know you've already
20  described this, but I'm going to ask you more
21  specific questions about what happened to you.
22  Can you tell us in total how many times the
23  corrections officers hit you?
24      A.   That's, that's, that's a number that I

Page 40

1  can't -- that's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
2  11, 12, stopped, came back, hit me with a
3  dumbbell, stomp, stomp, stomp, stomp, stomp.
4  That's how exactly it went.  So approximately 19,
5  20 hits.
6       Q.   And where in the body did they hit you?
7  Again, I know you've already described the
8  assault.
9       A.   Probably more than 20 hits.  In the
10  body?
11      Q.   What part of your body did they strike
12  you?
13      A.   Oh, my face.  It was -- it wasn't no
14  body.  It was all face.
15      Q.   And how did they hit you?  Was it a
16  shove or a punch, a kick?
17      A.   Punch, punch, kick, kick, stomp, stomp,
18  dumbbell weight -- dumbbell weight.
19      Q.   Okay.
20      A.   Yeah.
21      Q.   Were there other inmates around at the
22  time of the assault?
23      A.   Oh, it's hundreds, it was hundreds of
24  inmates.  It was --

Page 41

1       Q.   Hundreds of inmates?
2       A.   Yeah.  It was a lot -- it was -- the,
3  the cells was compact with people -- pound, pound
4  with people.  It was -- it's a lot of people.
5  It's a lot of people.  It's a lot of people.
6       Q.   Your testimony is that --
7       A.   But we're in a cell.  Like, I'm outside
8  of a cell.  Like, I'm behind -- they got me
9  behind the desk.  All the inmates is in a cell.
10  Like, they're in a cell.  Like, I'm supposed to
11  get processed.  So it's one by one.
12      Q.   Your testimony is that Officer Robinson
13  hit you with a dumbbell.  Do you know --
14      A.   Hit me with a dumbbell -- hit me with a
15  dumbbell.
16      Q.   I understand.
17      A.   Yes, sir.
18      Q.   Do you know where he got that dumbbell
19  from?
20      A.   It was behind the desk, like, right
21  over there by the chair.  I guess they'd be
22  working out back there or something.
23      Q.   What part of your body did the dumbbell
24  make contact with?

Leo Hollis
12/29/2023

Page 42

1    A.   My face.  My -- under my eye.  And
2  broke a bone.  Broken bone particle on record,
3  under my eye.  I still feel it.  Like, it's weird
4  -- it's a weird feeling.
5    Q.   At any time during the encounter, did
6  you strike any of the officers?
7    A.   Never stroke -- never strike nobody.
8  You know why?  Because he's a cop.  He has a
9  badge.  So that's extra years.  So, no, I
10 wouldn't strike nobody.  That's why I didn't go
11 to the hole.
12   Q.   Do you know why the correction law
13 officers assaulted you?
14   A.   No. I have no clue.  Maybe because I
15 was talking shit.  Maybe, maybe because I was
16 talking shit saying, I don't want to be here.
17 You don't know how it feel to be in jail.  I
18 didn't do anything wrong.  So they was basically
19 telling me, shut the fuck up or we're going to
20 whip your ass.  You got this inmate talking, you
21 got this inmate talking, and you keep telling me
22 you want to go home.
23        They said, you should have never did
24 the crime.  So I was going back and forth.  We

Page 43

1  was going back and forth.  That gives you no
2  right to put your hands -- we could go back and
3  forth for five hours, me and you.  I have no
4  right, no right, no right to put my hands on you,
5  my brother, especially with a badge.
6    Q.   Do you remember --
7    A.   No right.
8    Q.   So your testimony is that you were
9  speaking back and forth to the corrections
10 officers before the assault happened?
11   A.   No.  No.  Just one.  Just Robinson.
12 Just Robinson.
13   Q.   Do you remember specifically what he
14 said to you?
15   A.   I don't know what was wrong with him.
16 He must have woke up on the wrong side of the bed
17 that night for the shift, or maybe he wants to
18 show off for a new CEO.  Like, I'm going to show
19 the CEO that this inmate -- these inmates ain't
20 tougher than me.  I don't know what was going
21 through his head.  I don't.  But the man -- he,
22 he crossed the line, you know, and for him to be
23 still working there is ridiculous.  It's
24 ridiculous.

Page 44

1    Q.   I understand that's your testimony.  My
2  question is, what specifically did Officer
3  Robinson say to you before the assault?
4    A.   I don't know.  I don't know.  This is
5  not yesterday.  I don't know.  I don't know what
6  that man said.  The man woke up on the wrong side
7  of bed.  He was just saying all types of stuff.
8  You should have never -- you should have never
9  did the crime.  You should -- he was like, you
10 should have never did the crime.  You want to be
11 a man?  You want to be a man?  You want to keep
12 talking shit?  You want to keep talking shit?
13 I'm going to show you.  I'm going to show you.
14        I'm not -- I'm not -- I'm thinking they
15 going to feed, get put some of my food or not
16 feed me or give me a tray and I don't get a juice
17 or something.  I'm not thinking that these people
18 are going to do this on camera -- like, on
19 camera.  Y'all going to, like, like try to
20 destroy my whole face.  That's basically what
21 they try to do.  Like -- everybody.  Yeah.
22   Q.   At any time before the assault again,
23 did you ever go behind the intake desk in the
24 receiving room?

Page 45

1    A.   No.  That's where they dragged --
2  that's where he grabbed my shirt and pulled me
3  back there.  I'm not walking behind no cop desk.
4  You out of your mind, you'll get pepper sprayed.
5  You will -- you're an inmate, you got -- no, you
6  got orange on and I'm a cop.  I dare you to  walk
7  behind this desk.  You'll get pepper sprayed
8  until this mace empty.
9        So, no, I didn't walk behind no desk.
10 I walked to the desk, get my -- to get my
11 wristband --  this man said, come to the end.  I
12 walked to the end.  He grabbed me by the front
13 of, of my orange jumper, grabbed me to slam me
14 while I got somebody behind me choking me out.
15 Then he started stomping me and punching me, then
16 went and grabbed the dumbbell.  That's how it
17 went.  I never walked behind the desk.  I never
18 ran behind the desk.  Doesn't make sense.
19   Q.   Did you go into any restricted area
20 before the assault?
21   A.   No.  I'm not crazy.  No, I wouldn't do
22 that.  Against rules.
23   Q.   Do you remember what Officer Robinson
24 looks like?

Page 46

1    A.   Yeah.
2    Q.   How tall is he?
3    A.   He's like -- possibly 6'2", 6'3".
4    Q.   And if you had to estimate about how
5 much does he weigh?
6    A.   He weigh probably 175, 180.
7    Q.   Excuse me, that was a bad question.
8 Back in 2021, approximately how much did he
9 weigh?
10    A.   You said that was a bad question,
11 because you're asking me -- you, you, you thought
12 you was --
13         THE WITNESS:  Ma'am, ma'am, every
14    time I talk he's trying to stop -- please, I
15    got to talk.  I'm not going to answer
16    unaccordingly.  I'm not going to answer
17    wrong.  I'm telling this man the truth.
18         MS. BRADY:  Okay.  Yeah.  I
19    understand --
20         THE WITNESS:  I don't know how
21    much he weigh in 2023 and 2020.  2021, he
22    probably weighed about 175, 180.
23 BY MR. JACKAL:
24    Q.   And that was my question.  I appreciate

Page 47

1 you clarifying.
2         THE WITNESS:  If I cry, then enter
3    me.
4         MS. BRADY:  We can take a break
5    whenever you want.
6         THE WITNESS:  -- just acknowledge
7    for me.
8 BY MR. JACKAL:
9    Q.   Are you ready to keep going Mr. Hollis?
10    A.   We've been ready, you know, we just --
11    Q.   Any time prior to the assault, did you
12 ever become hostile with any corrections
13 officers?
14    A.   No, not hostile.  We had a
15 conversation.
16    Q.   And any time prior to the assault, did
17 you ever threaten any of the corrections
18 officers?
19    A.   No, sir.
20    Q.   Were you under the influence of any
21 narcotics at the time of the assault?
22    A.   No, sir.
23    Q.   Had you used any drugs at all on March
24 10th, 2021?

Page 48

1    A.   No. March 9th, I smoked legal
2 marijuana.  I sat in the district for two days.
3 So, please -- so for two days, you're, you're,
4 you're happy high.  It goes away in probably an
5 hour once you realize you're locked up.  So I
6 wasn't high.  I wasn't intoxicated.  I didn't
7 have no type of substances in me that early,
8 early morning of March 11th.
9    Q.   So other than marijuana, in --
10    A.   Two days before.
11    Q.   -- a few weeks preceding the incident,
12 did you use any other drugs?
13    A.   No, sir.
14    Q.   Did you take any Prescriptions in March
15 2021?
16    A.   No, sir.  No, sir.
17    Q.   So I know you've already touched on
18 this when you described the assault, but I want
19 to be specific and ask you specifically, did the
20 corrections officers say anything to you as they
21 were hitting you?
22    A.   It was kind of crazy.  Like, yeah, Ms.
23 Ryans, she had, like, a black shirt on.  I
24 remember her face, bro.  She was like, you got

Page 49

1 what you wanted now, right?  Like, you got what
2 you wanted.  Like -- and I'm like, whatever, guess
3 that they really, you know, thought they'd get
4 away with this.
5    Q.   And did you --
6    A.   I think they did this -- I think they
7 do this way more often, and it's just not on
8 camera.  That's how it goes.
9    Q.   Did you say anything back to the COs as
10 they were assaulting you?
11    A.   I couldn't.  I couldn't.  I was getting
12 choked out, sir.  Please, I was getting choked
13 out.  I can't say nothing.  I'm getting choked
14 out on the ground.  On the ground, I'm getting
15 choked out.  I can't say anything.  It's like my
16 -- it's like somebody got a knee on my neck, like
17 I'm George Floyd.  I can't say nothing.  I'm
18 getting choked out.
19    Q.   Did you ever lose consciousness?
20    A.   Yeah, yeah.  I lost my conscious like
21 three times.  Yes, like three times.  I don't
22 know how I'm still breathing.  I thought -- I
23 guess I was -- like, breathe under water, like,
24 like, you have, like, a kid and y'all in the

Page 50

1 bathtub. Let's see who can stay under the water
2 the longest or under the pool. Let's see who
3 staying under water long.
4        So they're choking me. I'm in my head.
5 You better -- you better stay on the water. You
6 better -- you better keep your breath. Keep your
7 breath, keep your breath. Because I was getting
8 choked out by a man that was over 225 pounds. And
9 he was bald headed, black, and he was -- and he,
10 he was an officer, and I don't know his name, but
11 I remember he was 200 and like 40 pounds.
12        He was pure 6 -- he wasn't that tall.
13 He's probably like 5'11", 5'10", 5'11", 5'10".
14 But he was very husky. He weighs around 240.
15 And I mean, when this Officer Robinson grabbed my
16 chest and slammed me, he got behind me and, like,
17 did some UFC stuff. Why are you choking me? So
18 I can't move. No, you supposed to put handcuffs
19 on me if I did something wrong or whatever y'all
20 saying I did, none of this was supposed to occur.
21 I was supposed to get my wristband and go the
22 hell to my cell.
23        It was never supposed to be grabbing me
24 by my V-neck, never supposed to be choking me.

Page 51

1 It was never supposed to be none of that. None
2 of that -- none of that -- none of that -- like,
3 that night should never have even -- like, none
4 of that should never happen. They were -- like,
5 the, the, the -- that like -- that's why I'm
6 saying I'm flabbergasted that they really put
7 their hands on me. Like, I would never think
8 somebody would do that, especially a cop.
9     Q.   How did the assault end?
10    A.   What do you mean?
11    Q.   So what's the last part of the assault
12 that you remember?
13    A.   Like, the last hit?
14    Q.   Yeah.
15    A.   The last hit was -- they was really
16 just trying to get the man off of me. Like, he
17 couldn't stop. Like, he wouldn't give up. He
18 just kept attacking me. So now you got all the
19 officers --
20    Q.   Who is that that you're referring to
21 when you say he was on top of you and he wouldn't
22 stop?
23    A.   Say what?
24    Q.   Which corrections officer are you

Page 52

1 referring to when you say, the man was on top of
2 you and he wouldn't stop?
3     A.   Officer Robinson was on top of me. He
4 kept punching me. He wouldn't stop. I'm talking
5 about Officer Robinson, that's the main one.
6 Officer Robinson.
7     Q.   Where did you go when the assault was
8 over?
9     A.   They took -- they, they had me by my
10 legs and my arms, and they took me to the nurse
11 room. The nurse came in there and said, I can't
12 do nothing. Like -- that you have -- you're
13 going to have to go to the emergency room,
14 there's nothing I could do.
15    Q.   Did you go to the emergency room after
16 that?
17    A.   Yeah. An hour-and-a-half later.
18    Q.   Do you remember which emergency room?
19    A.   Yeah. Jefferson Torresdale Hospital,
20 at possibly like 2:45, 3 o'clock in the morning.
21    Q.   (coughs) Excuse me. Did you receive
22 medical treatment at Jefferson?
23    A.   Yeah.
24    Q.   Do you remember what they told you your

Page 53

1 injuries were?
2     A.   They said I had a broken nose, broken
3 bone particle under my eye, top lip split, bottom
4 lip split. My chin -- my chin was, like,
5 swollen. I don't know what the fuck is wrong with
6 my chin. My chin was swollen, and I had a neck
7 injury. Like, my neck was just -- my neck wasn't
8 the same. I can't sleep the same.
9     Q.   So after the March 12th, 2021 assault,
10 did you make a complaint about the assault?
11    A.   Yeah. I told my family. Like, I had --
12 I -- like, my aunt was trying to keep it away.
13 She was like, don't tell nobody. Don't, don't
14 tell nobody, because if you talk over that jail
15 phone is being recorded. So I didn't want to
16 tell nobody that they did that to me so they
17 could come back. I told you that, sergeant -- I
18 told you that one of the sergeants, it was an
19 Indian man. He was approximately, like 5'10".
20 He came two days later on March 12th, around
21 12:00, 1:00 in the morning, and took me into a
22 room and asked about that situation.
23    Q.   Did you fill out any forms, like a
24 grievance form?

Leo Hollis
12/29/2023

Page 54

1    A.   Yeah. I filled out a memo. Yes, a memo.
2  I wish I had their own -- I wish I can get it,
3  but that's on -- that's in their property.
4            MS. BRADY:  I have it.
5            THE WITNESS:  You got that memo?
6            MS. BRADY:  Yeah.
7            THE WITNESS:  Yeah.  Yeah.
8  BY MR. JACKAL:
9    Q.   Did anything happen as a result of
10 filling out that memo, the grievance form?
11   A.   No.  I was healthy.  I kind of felt --
12 you know, for the once I kind of felt safe.  I
13 was in a room with one white shirt, and it was
14 3:00 in the morning.  I didn't see no other
15 officers.  No, I'm not about to say -- I, I was
16 scared.  I was scared.  I ain't going to lie, I
17 was scared.  When they pulled me out, it was
18 like, 3:00 in the morning.  They pulled me out of
19 my room 3 o'clock in the morning.  All -- I'm in
20 a multi cell with three people.  All my cellies
21 woke up and said, bro, we -- bro, give me your
22 aunt number, give me your dad number, give me
23 your mom number.  This is not right.  3:00 in the
24 morning?  They're pulling me out -- myself 3:00

Page 55

1  in the morning.  They didn't say discharge.  They
2  say nothing like that.  So I didn't know what was
3  going on. That man name -- I'm trying to figure
4  out his name.  It's in here.  I've seen it -- the
5  white shirt in here, man.
6            MS. BRADY:  I'll pull up -- Ben,
7       do you have any exhibits that you would like
8       to show my client?  I'm sorry.  I was trying
9       to get him into the deposition because we
10      were running late.  So are you not showing
11      any exhibits? I can show -- I wasn't able to
12      do my full prep.
13           THE WITNESS:  Yeah. she want to
14      show because it's going to cover it.  She
15      can show me, but it's going to cover their -
16      - everybody camera in face.
17           MR. JACKAL:  I just ask that you
18      do any questioning like that at the end,
19      after I've done my questioning.
20           MR. JACKAL:  Okay, great.
21 BY MR. JACKAL:
22   Q.   So after the March 12th, 2021 assault,
23 did you ever --
24   A.   March 11 -- March 11th.  March 11th.

Page 56

1    Q.   Okay.  March 11th, 2021 assault --
2    A.   Yes, sir.
3    Q.   -- did you ever see any of the
4  corrections officers who assaulted you again?
5    A.   No -- I did.  I've seen Officer
6  Robinson in jail. I went home, I got six months
7  house arrest.  So due to house arrest --
8  everybody know how house arrest works.  If you
9  walk off that porch, if you do anything, you're
10 going back to jail.
11        So I went back to jail.  And it was
12 time to go to court one of these days -- I had to
13 go to court -- basically go back on house arrest
14 because it wasn't nothing major.  And looked to
15 my right, my eyes flashed before -- like, my --
16 my life kind of flashed before my eyes.  I seen
17 the man that almost killed me, and it was
18 Robinson.  He looked at me. Please, I'm answering
19 my question.  Please.
20        He looked at me and said, "Hey, he
21 running back.  Grab --," I don't know if it was
22 Ms. Ryans.  I think it was Ms. Ryans, because
23 she's a sergeant.  She had a black shirt on.  He
24 said, "Look, that's the little nigga that we

Page 57

1  beat.  That's, that's the nigga we beat his ass.
2  That's the nigga right there."  So now me and him
3  going back and forth again.  "Oh, bro, it's in
4  lawsuit."  "Oh, bro, karma going to get you."
5  "God going to get you.  God going to get you."
6        I ain't got -- no.  We're going back
7  and forth through a glass.  "This is -- this is
8  on camera."  This is August -- we can say the
9  20s.  I don't know what day, 20, 21st, 22nd --
10 between 20 and the 30th of August, I seen this
11 man again. We was talking through glass.  But he
12 wouldn't attack me.  He wouldn't -- he couldn't --
13 attack me because it was like 40 -- it was like
14 20 people behind me.
15        And I just -- I just explained the
16 story to them so fast.  They're ready to, like --
17 they're ready -- they're ready to see that man.
18 You know what I'm saying?  So he, he, he got away
19 from me fast.  He went to the lady.  She came
20 back.  "Oh, that's the nigga we beat ass, haha,
21 haha."  I'm like, "Yeah, come here now.  Open
22 this door now, though.  Open -- let me get my one
23 on one."
24        So we was talking like that, and once

Leo Hollis
12/29/2023

Page 58

1 the COs start recognizing who he was and who I
2 was, they separated him and moved him to the
3 other side fast. Yeah. So that's --
4     Q.   So you said this was sometime in
5 August?
6     A.   Yeah, this was in August.
7     Q.   What year was that?
8     A.   Same year, 2021.
9     Q.   You said that he made some comment to
10 you about you being the person that they had
11 beaten before; is that right?
12     Q.   Yeah. He was like, "That's, that's the
13 little nigga we beat." Mind you, this is like,
14 April, May, June, July. That's like five months
15 later.
16     Q.   Did you say anything to him?
17     A.   You still on it. It's five months
18 later and you still on it.
19     Q.   Did you say anything back to
20 corrections officer Robinson?
21     A.   I sure did. I said, "Karma going to
22 get --"
23     Q.   What did --
24     A.   I said, "Karma going to get you. God

Page 59

1 going to get you." I just repeated myself.
2     Q.   Did you make a reference to a lawsuit?
3     A.   I sure did. I said, "It's going to be
4 a lawsuit, bro. You, you didn't do -- you, you,
5 you went behind rules and regulations and
6 attacked me. Are you out your mind?"
7     Q.   (coughs) Excuse me. You made reference
8 to the attack being on --
9     A.   He laughed at me. He laughed at me
10 like it was a joke, like I was just playing
11 around. Like I didn't go through no pain, none
12 of that. He laughed at me.
13     Q.   Other than the encounter with CO
14 Robinson and Sergeant Ryan's, did you encounter
15 anyone else who assaulted you after the fact?
16     A.   I didn't see -- I ain't seen nobody
17 else. And mind you, you got to remember his face
18 stand out the most. You got to remember this is
19 two years ago. It's almost four -- three years
20 ago. This is 2024 now, and what, a week? So
21 this is three years ago, bro. Like, his face was
22 the only face I remember five months later,
23 though. His face was the only face I remember.
24 And as far as, like, right then and there, oh,

Page 60

1 yeah, that's Officer Robinson. That's it.
2     Q.   You mentioned that you talked to your
3 family members about the assault. I think you
4 said you talked to your aunt about the assault;
5 is that right?
6     A.   Yeah.
7     Q.   And what is her name?
8     A.   Her name is Myesha Kates. M-Y-E-S-H-A,
9 K-A-T-E-S. Her phone number is 843-516-9554.
10     Q.   So other than your aunt, did you tell
11 any other family members about the assault?
12     A.   I told my whole family, everybody.
13     Q.   What did your aunt advise you to do as
14 a result of the assault?
15     A.   Stay away from the COs. Don't even ask
16 for a pencil. And she asked -- the first
17 question was, "Are you in the hole?" I said,
18 "No." She said, "How the hell you're not in the
19 hole?" If they so called -- said you attacked
20 them or whatever that y'all trying to defend,
21 whatever, whatever, lie you're trying to make up.
22 She asked me, "Are you in hole?" I said,  "No."
23 She said, "But they said you attacked them." I
24 said, "Right." She said, don't ask -- stay with

Page 61

1 themselves. Don't even ask for a pencil. Stay -
2 - like, they said, stay away. Stay away. I
3 stayed away.
4         I stayed in my cell. I didn't even
5 come out. I came out probably like two times,
6 because I was embarrassed because of my eyes.
7 Even the COs was making fun of me when they
8 passed out trades. Yeah. So that's what my aunt
9 said when she first answered that phone.
10     Q.   Believe you testified that you do not
11 have the grievance report that you filled out as
12 a result of this claim?
13     A.   We don't got the -- we don't got the
14 grievance. It wasn't a grievance, it was a memo.
15     Q.   Do you have that document?
16         THE WITNESS:  Do we have it?
17         MS. BRADY:  I believe then that
18     you passed it over with discovery. I didn't
19     have time to do the full file prep. Let me
20     just double check. I'd have to grab the
21     file. So if you want me to do that after
22     you finish your questioning.
23         MR. JACKAL:  That's fine. I'm
24     just asking about documents that Mr. Hollis

Page 62

1  has, not documents that --
2        THE WITNESS:  I don't got no --
3  bro, listen, listen this my -- this is my
4  first time being in this type of
5  predicament, you know what I'm saying?  So
6  my sister had a birthday party last night.
7  You feel me?  So I didn't know -- I didn't
8  know to bring any type of paperwork.
9        MS. BRADY:  Oh, it's okay.  You
10  didn't have to bring any paperwork.
11  BY MR. JACKAL:
12     Q.  My question is, do you have in your
13  possession any paperwork that documents this
14  assault?
15     A.  Like I just said, I didn't know to --
16  not to bring any paperwork because I've never
17  been this type of predicament.  I have a whole
18  folder with all types of stuff, like my --
19  everything, everything, hospital stuff -- all
20  that.
21     Q.  I would ask that you give that to your
22  attorney.
23     A.  She already got it.
24     Q.  For the record, we are going to -- we

Page 63

1  are requesting that you provide those documents
2  to us.
3     A.  We can provide that for you.
4     Q.  Did you experience any emotional
5  injuries as a result of the assault?
6     A.  Yeah.
7     Q.  What were those?
8     A.  I'll never -- I'm never going to look
9  the same again.  My eyes is always going to be
10  black underneath like a raccoon.  And my tooth is
11  broken.  And my tooth is broken -- like, it's
12  chipped.
13     Q.  We'll get to physical injuries in a
14  moment, but do you have any --
15     A.  That's emotional though.  That's
16  emotional, bro.
17     Q.  How so?
18     A.  When you can't talk the same, when you
19  don't look the same, that's emotional.
20     Q.  Have you undergone any mental health
21  treatment as a result of the assault?
22     A.  Mental health like therapy?
23     Q.  Anything like that.  Yeah.
24     A.  I went to physical therapy.

Page 64

1     Q.  Okay.
2     A.  I didn't go to, like, no therapy to
3  talk with a man about what happened to me, for
4  him to be like, it's going to be okay.  I didn't
5  do that.  I didn't do that.
6     Q.  Other than relating to this assault,
7  have you ever been diagnosed with any mental
8  illnesses?
9     A.  No.
10     Q.  Now, I want you to describe what
11  physical injuries you experienced as a result of
12  the assault.
13     A.  Broken nose, broken bone particle under
14  my eye, top lip split.  Bottom lip split.  Eyes
15  on dubs.  When I say dubs, they're so big.  Like,
16  who hit you?  A truck?  Yeah.  That's how big it
17  was.  Chin was swollen.  So you got a broken bone
18  particle in the eye, you got a broken nose, you
19  got a top lip split, bottom lip split, and your
20  eyes on dubs.
21     Q.  Did you receive any treatment for those
22  injuries?
23     A.  Yes.  I went to the hospital.
24     Q.  And what was that treatment?  What did

Page 65

1  they tell you to do?
2     A.  Say what?
3     Q.  What treatment did you receive at the
4  hospital?
5     A.  I can't remember, bro.  I can't
6  remember, but it's on file, bro.  I went to the
7  hospital.
8     Q.  Do you remember taking any medication?
9     A.  Yeah.  I took a lot, bro.  I took a lot
10  of medication.  A lot.  Like, a lot of
11  medication, klonopin, ibuprofen -- all types of
12  medications.  Bro, it was crazy.  Yeah.  I took a
13  lot of medication.  Yeah.
14     Q.  Do you still experience any symptoms
15  from this assault?
16     A.  Yeah.  Yeah.
17     Q.  What are those?
18     A.  Yeah.  I can't sleep -- I can't sleep
19  right at night.  My mouth -- like, my, my tooth
20  hurt.  I just went -- like, I went to the
21  hospital to tell them that, you know, my --
22  because I had to go -- like, I just went to the
23  hospital.  So I'm saying, like, my face was
24  hurting.  So I go there because my face hurting

Page 66

1 due to that, because I've never been to no other
2 type of crazy stuff like that.
3          So my face -- I'm like, oh, my face
4 hurting like -- they like, oh -- yeah they be
5 like, yeah we see you, you came from CFCF. You,
6 you look like your tooth was broke or something.
7 They say tooth. I said, "What you talking
8 about?" It's my -- it's like one of my eye right
9 now is swollen. It's coming up -- it's coming up
10 to your eye. So they broke my tooth. And I
11 still -- I'm still having that pain. I don't
12 trust dentists. I don't go to dentist. I just
13 brush them.
14     Q.    Have you ever been diagnosed with a
15 tooth injury as a result of the assault?
16     A.    Yeah, it's on file. Yeah. They said I
17 had a -- they told me -- somebody said I had
18 something wrong with my tooth.
19     Q.    Did you ever receive treatment for that
20 tooth injury?
21     A.    I was getting kicked in the side of my
22 jaw. Like, my tooth is, like, broke.
23     Q.    I understand. Have you ever had any
24 work done on your tooth as a result of --

Page 67

1     A.    Any what?
2     Q.    Any work done? Any treatment?
3     A.    Just I don't like dentist. We don't go
4 to dentist. We brush our teeth. List the ring,
5 don't eat candy. We don't go to dentist. See?
6 Perfect teeth.
7     Q.    Did you experience any injuries to your
8 face after March 2021?
9     A.    No.
10     Q.    None at all?
11     A.    No. Not one.
12     Q.    Have you ever broken a bone in your
13 face after March 2021?
14     A.    No.
15     Q.    In your complaint, and this might help
16 to have it in front of you. So this is paragraph
17 20 of your complaint.
18     A.    That is --
19     Q.    You allege that you experienced some
20 physical injuries as a result of the assault.
21 You put that in your complaint. I just want to
22 talk through each one of them. I won't belabor
23 the point, but I just want to ask you about each
24 one of these injuries that you included. So the

Page 68

1 first one it says --
2     A.    I'm sorry. Can I -- wait, wait, wait.
3     Q.    -- mildly displaced anterior superior
4 nasal bone fractures.
5     A.    Yeah.
6     Q.    Understand what that means?
7     A.    Yeah.
8     Q.    What does it mean?
9     A.    My nose was broke. That's what it
10 means.
11     Q.    Did you ever receive any treatment as a
12 result of your broken nose?
13     A.    Yeah.
14     Q.    What was that?
15     A.    Nozzle spray -- All types of stuff,
16 therapy, moving it from left and right, doing the
17 type of massages they told me to do with my nose.
18 Putting tissue up my -- doing all types of stuff
19 to help your nose get back right because it was
20 fractured.
21     Q.    And that's physical therapy that you're
22 describing?
23     A.    I'm talking about physical therapy. You
24 know, my girlfriend trying to get it right. You

Page 69

1 know, doing different type of breathing massages
2 and stuff with your nose.
3     Q.    And when did you undergo physical
4 therapy?
5     A.    Like, it's always stuffed. Huh?
6     Q.    When did you do that physical therapy?
7     A.    Stuff with blood. I did that physical
8 therapy 2021.
9     Q.    Was that at CFCF?
10     A.    No. I would never do no therapy in
11 jail. I'm scared of cops. I'm, I'm -- I would
12 stay in my cell bro. I'm not coming out. I'll do
13 that when I get out of jail.
14     Q.    Where did you do physical therapy?
15     A.    It was on -- a chiropractor. What
16 chiropractor -- damn, I wish I came with all my
17 stuff. I had a chiropractor.
18          THE WITNESS: Is it here? I had a
19     chiropractor I went to on, on, on the
20     boulevard.
21          MS. BRADY: Yeah. I'll grab your
22     phone.
23 BY MR. JACKAL:
24     Q.    And if you don't remember, that's fine,

Page 70

1 but do you remember his or her name?
2      A.   Like, I'm not playing with these
3 people.  Huh?
4      Q.   Do you remember the name of the
5 chiropractor that you saw?
6      A.   I know where he's at.  Like, it was
7 across street from Checkers, right on Roosevelt
8 Boulevard, right near -- all right.
9      Q.   If you don't remember the name, that's
10 fine.
11      A.   I don't remember the name.
12      Q.   Are you no longer -- how long did you
13 go to that physical therapist?
14      A.   Until they arrested me.  Until they --
15 until they arrested me again for nothing.  For
16 house arrest.  The house arrest, though.  So I
17 tried -- I've been doing this -- I was doing it
18 June, July, August.  I came home October 1st.  I
19 did it for like, a week or two in October 1st,
20 and they locked me up again for house arrest.  So
21 I completed my two years.
22           So I did it June, July, August, and
23 then, like, one week, like, in October.  So we're
24 going to say like three months-and-a-half.

Page 71

1      Q.   So that was October 2021.  That's the
2 last time you saw the chiropractor?
3      A.   Yeah.  That's the last time I saw them.
4 Yeah. I'm not try to go back.  They said, you got
5 to talk to your lawyer, and I just want -- I'm
6 about to go to a different one because my neck
7 been hurting when I've been sleeping.  So I might
8 have to go to a different one.  We already found
9 this out -- we already found the new one out.
10      Q.   So turning back to paragraph 20 of your
11 complaint.
12      A.   I'm still in that page.
13      Q.   The second injury you identify is a
14 small chip fracture off the nasal spine of the
15 maxilla.  My understanding is that the nasal
16 spine of the maxilla is the bone between your
17 nose and your mouth.  Is that a bone that you
18 fractured?
19      A.   All I know is right there on your nose.
20 Right there -- like, right here in the middle.
21      Q.   So you described a nasal fracture.  I
22 believe that's the first injury, number 1.  Did
23 you break any other bones in your face?
24      A.   Broken bone particle under my eye.

Page 72

1      Q.   Other than those two fractures, did you
2 break any other bones?
3      A.   No.
4      Q.   We'll skip a couple of these.  I think
5 they're redundant.  Number 4 is the
6 subconjunctival hemorrhage.  Do you know what
7 that means?
8      A.   No.
9      Q.   My understanding is that that refers to
10 a broken blood vessel underneath the surface of
11 your eyeball.
12      A.   Yeah.  Yeah.
13      Q.   Is that something that you experienced
14 as a result of the assault?
15      A.   Yes, I did, sir.  That's crazy how you
16 knew that, that word.
17      Q.   I had to look it up.  I'm not --
18      A.   I figured out. I was about to say it's
19 on a paper.
20      Q.   So did you receive any treatment to
21 treat that injury?
22      A.   Yeah.
23      Q.   What did you do?
24      A.   I went to Torresdale Hospital.  I kept

Page 73

1 going back.
2      Q.   Do you remember what they did to treat
3 that injury?  The injury to your eye?
4      A.   Like, they put, like, some type of,
5 like -- it was, like, something white.  I don't
6 know.  It's, like, a white thing, and they had
7 put it on my nose to try to straighten it out.
8 And then it was putting stuff up my nose and all
9 types of stuff.  I know that it hurt, bro.  I
10 know it hurt.
11      Q.   So that's the nose injury that I think
12 you've already talked about, but the injury to
13 your eye?  So, number 4.
14      A.   Yeah.  Yeah.  To my eye.
15      Q.   Did you do anything to treat that
16 injury?
17      A.   Yeah, yeah.  We got -- first I had to
18 get -- first I had to get a lot of medication for
19 the, the swelling to go down.  Once the swelling
20 went down, it really wasn't too much pain after
21 that.  It was just like, the bone is gone.  It's
22 broke, it's gone.  It's a missing piece.  You
23 have a broken bone part on your eye.
24      Q.   So is it your understanding that injury

Page 74

1 --
2      A.    So it was painful.
3      Q.    If we could just talk one at a time,
4 for the sake of the court reporter.
5      A.    Well, I don't know when I could stop
6 talking, because I thought I could answer your
7 question.  I didn't know the answer was only
8 going to be 30 seconds.
9      Q.    It's just that when you pause, I think
10 you're done.  So it's miscommunication.  It's
11 probably my fault.
12      A.    Yeah, yeah -- no, that's my fault.  I
13 apologize.  I'm so sorry.
14      Q.    I'm doing my best to get through this.
15 All right. I guess let's move on to number 6.
16 And that's in paragraph 20.  You identify an
17 injury called the radiculopathy in your cervical
18 region.
19      A.    Yeah.
20      Q.    Again, I had to look it up, but I
21 understand that that means a pinched nerve in
22 your neck.
23      A.    Yeah, yeah.
24      Q.    Is that something that you experienced

Page 75

1 as a result of the assault.
2      A.    I still feel it.  Yeah. Like, it's
3 weird, it's like a shock -- like a shock.  If
4 you ever  have, like, a -- like, a shock feeling,
5 like you just got stung or something, that hurt.
6 Yeah.
7      Q.    Where does that shock feeling occur?
8      A.    Like, in the back of my neck.  Like,
9 when I got -- like, when he grabbed me, pulled me
10 to his right -- he grabbed me, pulled me in, and
11 then he slammed me.  So when he slammed me,
12 that's  -- like that, that, that right there was
13 like, oh, my God, he -- I just thought my neck
14 was break.  Like -- yeah.
15      Q.    And did you undertake any treatment to
16 address that problem?
17      A.    Yeah. Actually, I had got an MRI.
18 Like, like I said, you know, I would have been in
19 a lot of treatment if I didn't go back to jail
20 due to walking out and taking my trash on house
21 arrest.  So that stopped a lot of therapy,
22 hospital visits.
23           So now I'm just trying to literally go
24 through -- I'm going through this pain in a cell.

Page 76

1 You know, I'm going -- I'm trying to get
2 different type of medications to see which one is
3 going to stop the pain from my neck.  I'm
4 sleeping on a hard, little, thin -- you know, so
5 it's, like, it's making it worse, you know.
6      Q.    So you say that you got an MRI done.
7 Where was that done?
8      A.    It was in 2021.
9      Q.    But where was it taken?
10      A.    Let's say July, August.  No, we're
11 going to say August.  Definitely August.
12      Q.    So the MRI was in August 2021.  Do you
13 remember the location where you were?
14      A.    No.
15      Q.    You don't remember where it was done?
16      A.    It was in, like -- it was in -- I drove
17 there, man.  Like, see, I'm thinking this on
18 file, so I'm not thinking, oh, let me go out
19 there and try to get this document.  I'm thinking
20 it's on file.  I'm thinking that my lawyer has
21 already got this information.  But --
22      Q.    I'm just asking you what you understand
23 and what you remember right now about these
24 injuries.  That's all I'm asking.  I'm not asking

Page 77

1 you --
2      A.    I don't remember -- I don't remember
3 the location right now.
4      Q.    So, number 8, you identified something
5 called segmental and somatic dysfunction of the
6 pelvic region.  As far as I can tell, this refers
7 to an injury to your pelvis
8      A.    Yeah.
9      Q.    Is this a thing you experienced as a
10 result?
11      A.    Yeah.  Yeah.
12      Q.    Can you describe what that is?
13      A.    Like, no homo -- they, they kicked me
14 in my private part, bro.  They, they -- it was
15 hurting me, bro.  They kicked me in my private
16 part.
17      Q.    How many times did they kick you there?
18      A.    Probably like two.  Once I let out that
19 scream, it was off -- it was -- they just kept
20 hitting my face afterwards.
21      Q.    As far as you remember, how would you
22 describe how strong the kick was?  Was it like a
23 --
24      A.    Oh, my God.  It was like --

Leo Hollis
12/29/2023

1    Q.    -- full strength kick?
2    A.    You had kicks and then you had stomps.
3 Started with kicks and ended with stomps.
4    Q.    When you say there's a difference
5 between kicks and stomps, what do you mean?
6 What's the difference?
7    A.    A stomp is somebody lifting their leg
8 and applying pressure and stomping you.  A
9 regular kick is like, you know, how -- what can
10 you kick?  I don't know, the softball.  So, like,
11 you know, regular kick. They just, like -- they
12 releasing it.  They leave it all the way back.
13 They put  pressure in then it's, like, you know,
14 like that.  Oh, but -- anyways he's kicking me,
15 and I'm on the ground.  He's kicking my shit.
16    Q.    So if I understand your demonstration
17 and what you just explained, for a regular kick,
18 would the top of the person who's kicking you,
19 would their foot contact you  -- excuse me.
20 That's a poor question.  Let me start over.
21        If I understand what you're trying to
22 explain.  When somebody kicks you, does the top
23 of their foot come into contact with you?
24    A.    Yeah. Come in contact with my face?

1    Q.    Okay.  And when somebody stomps you,
2 does the bottom of their foot come into contact
3 with you?
4    A.    Yeah.  Right to -- right under my eye
5 and broke my bone.
6    Q.    Was that before or after they used the
7 dumbbell to hit you?
8    A.    Oh, the dumbbell was the end.  Yeah.
9 The dumbbell was the end.  So when he stomped my
10 face -- like, bro, all this is all face work.  So
11 I can't tell you which hit hit harder and which
12 kick kick harder.  I can't tell you, bro, because
13 once that dumbbell hit me, everything went numb.
14 I can't tell you if something went harder or
15 lighter or, you know. I could just tell you that
16 it was a big impact.  Obviously, we can see.  But
17 I can't tell you which one was harder.
18    Q.    Was the dumbbell the last strike that
19 you remember?
20    A.    That was the last strike.  No, how, how
21 it went, man -- the nigga grabbed a dumbbell and
22 hit my face, bro.  They moved a dumbbell out the
23 way, he's still hitting me.  I'm numb, though.
24 I'm numb.  I'm not feeling nothing, though.  You

1 feel me?  So that's how it went.
2    Q.    So, number 9, going back to your
3 complaint.
4    A.    You're not supposed to have dumbbells
5 behind a jail desk, first of all, but okay.
6    Q.    Going back to your complaint, and it's
7 paragraph 20, number 9.  You describe pain of
8 your right shoulder.  Did you injure your right
9 shoulder in the assault?  (coughs) Excuse me.
10    A.    Yeah.
11    Q.    Can you explain what that injury was?
12    A.    It was probably a fall, bro.  That fall
13 was the most major pain, like, the neck,
14 shoulder, back.  That, that fall was the most
15 pain, bro.  Then this man had me in a headlock,
16 like, literally choking me out.  Like, one of my
17 eyes popped up, so you know I'm in a headlock.
18 He got his big arms in all different type of ways
19 on my little body.  So my shoulder probably got
20 in contact.
21        And it didn't get dislocated -- it
22 didn't get dislocated, but it, it hurt.  It hurt
23 -- everything hurt, like everything, like all the
24 top.  I'm talking about from chest up, hurt like

1 -- bro, what?
2    Q.    Was it a bruise to your right shoulder?
3    A.    Yeah. It was definitely a bruise.  It
4 was a big bruise.  It was a bruise.  I had a lot
5 -- I had a lot of scratches and cuts and blood.
6    Q.    And then number 10, finally, it says, a
7 strain of your muscle, fascia and your tendon,
8 lower back.  Did you experience an injury to your
9 lower back as a result of the assault?
10    A.    Yeah.
11    Q.    Can you explain what happened?
12    A.    That's when I fell.  Wondering how it
13 feels?
14    Q.    Just explain what the injury was and
15 how it feels -- how it felt.
16    Q.    That's my back -- my back --- my back,
17 bro, and it feel -- it felt -- it felt -- it felt
18 painful.  Yeah.
19    Q.    Did you receive any treatment for that
20 injury?
21    A.    Yeah. I went to therapy.  Everything
22 that I said went to therapy, went to hospital
23 visits.
24    Q.    So you described --

Leo Hollis
12/29/2023

Page 82

1    A.   And I had my girlfriend.  My girlfriend
2 was really the therapy, you know, massaging me,
3 my nose -- first with the nose, and then, you
4 know, the, the, the -- right here, you know,
5 right here, literally, right here, bro.
6    Q.   I think you said that you still
7 experience some pain or some injury as a result
8 of the attack.  What are those injuries that you
9 still experience?
10   A.   My neck, you know, my tooth.  Yeah.
11   Q.   Your neck and your tooth.  Anything
12 else?
13   A.   Not right now.  Not right now.
14   Q.   In describing the attack, I think you
15 said that it was on video.  Is that right?
16   A.   Oh, yes, it was.
17   Q.   At any time.  Say again.  You can --
18 please finish your --
19   A.   (indiscernible 01:15:17), so that's it.
20 Because like, they like to sweep stuff under the
21 road.  Oh, no, that camera that night, it wasn't
22 recording.  No, it wasn't recording.
23   Q.   Did you ever, at any time, ever see the
24 video of the assault?

Page 83

1    A.   Never seen it.  I want to see it so
2 bad.  I want to see it so bad.  I'm not ready,
3 but I'm ready.  It's about time.  I'm ready.
4    Q.   Okay.  That's actually all the
5 questions I have for you, Mr. Hollis.  Thank you
6 for your time.
7    A.   Thank you, Mr. Jackal.
8    Q.   Mr. Gonzales or your attorney may have
9 questions for you.
10       MR. GONZALES:  I have no questions
11   for you.  Thank you, Mr. Hollis.
12       THE WITNESS:  Thank you, Mr.
13   Gonzales.
14       MS. BRADY:  All right.  I have a
15   few just clarifying questions.  Would you
16   mind if we take a brief break so people can
17   use the restroom, grab water?
18       MR. JACKAL:  That's fine.  Thank
19   you.
20       MS. BRADY:  All right.  Thank you,
21   Ben.
22       THE REPORTER:  Okay.  Thank you.
23   Now the time is 12:11 p.m.  We're going off
24   the record.

Page 84

1        (Off the record.)
2        THE REPORTER:  Okay.  We are now
3    back on the record.  The time is now 12:22
4    p.m. eastern.
5                    -  -  -
6              EXAMINATION
7                    -  -  -
8 BY MS. BRADY:
9    Q.   All right.  Thank you.  Hello, Mr.
10 Hollis.  My name is Taylor Brady from Apramson &
11 Denenberg.  I'm just going to ask you a few
12 clarifying questions about the incident, the
13 injuries, and the aftermath.  So I just want to
14 bring you back to the night that the attack
15 happened, and just wanted to clarify today --
16 when the attack went underway.  We talked a lot
17 about the injuries to your face.  Did they kick,
18 stomp
19 --
20   A.   Yes.
21   Q.   -- punch you anywhere else on your
22 body?
23   A.   Yes.  My -- it was, like -- it was,
24 like, on my private part.  And I didn't even

Page 85

1 think nobody was going to do that, but I got
2 kicked in my private part, like twice.
3    Q.   And at what point during the assault
4 were you kicked in your pelvic region?
5    A.   Just is in the middle of them punching
6 -- like, in the middle of Robinson punching me,
7 and they just doing the kicking.  So they kicking
8 in all type of places.  He just trying to mess up
9 my face.  They just trying to -- trying to, you
10 know, -- I don't know what they was doing.  They
11 were just -- like, I ain't even feel nothing.
12       They -- I was feeling his -- I was
13 feeling everything he was doing.  But once
14 somebody -- once somebody else kicked me in my
15 ball -- excuse me, my private part, yeah, I knew
16 they were trying to hurt me.
17   Q.   Were you standing or on the ground?
18   A.   I was -- I was, like, in a headlock on
19 the ground.  Laying down in headlock.
20   Q.   I know we described the difference
21 between the kick and the stomp.  In the pelvic
22 region, was it a kick or a stomping assault?
23   A.   It was like a hard kick.
24   Q.   Hard kick.

Leo Hollis
12/29/2023

Page 86

1    A.   Like a hard kick.
2    Q.   I want to take you back to when you
3  said CO --
4    A.   I started hearing bells.  Like, oh, my
5  God.  I started seeing stuff, hearing stuff,
6  like, until I blacked out.  Like, I lost
7  conscious like twice.  I'm getting hit in all
8  types of places that I've never been hit before.
9  That was crazy.  I'm sorry to interrupt.
10    Q.   That's okay.  So while CO Robinson was
11  attacking you, you said that another person told
12  him to stop.
13    A.   That was -- that was -- that was the
14  little shirt boy.  That was Ford.  That was
15  Officer Ford.
16    Q.   How long was the assault going on
17  before anyone attempted to intervene?
18    A.   For real, for real, I think nobody
19  knew he was going to do that.  I really don't
20  think nobody knew he was going to do that.  So
21  when he said, come in the desk, you know, I was
22  just getting my wristband.  Once he puts my
23  wristband in my hand, you know, I'm looking down
24  to put my wrist, he grabs me by my collar, and

Page 87

1  then like, you know, I can do it to somebody
2  because I know how to, you know, fight, of
3  course.
4       But he grabbed me and then, you know --
5  you know, slammed me.  Like, he had no right to
6  do -- like, what was going through his mind.  He
7  asked me, was we arguing?  Just going back and
8  forth about me not being in jail.  I don't want
9  to be in jail.  So that man had no right.
10    Q.   I understand.  How long did it take for
11  anyone to -- did the other officers watch while
12  this was happening?
13    A.   They just literally -- like, some
14  watched, some kicked.  That's why I say it was
15  one white Caucasian man that literally sat in the
16  corner and didn't do anything.  And I knew he was
17  a sergeant.  He just had a black shirt on.  He
18  was there a long time.  He just sat there.  He
19  the one that was like, "Man, I don't -- hey, you
20  was talking shit, bro.  I wasn't going to
21  participate and hit you or nothing, but that's
22  what happens when you talk shit in here.  They
23  fuck you up."
24       That's just -- that was literally his

Page 88

1  words.  That was literally his words.  That's
2  what the -- I think that was Grundy.  I think it
3  was Grundy.  The one that said that.
4    Q.   Okay.  But you're not sure?
5    A.   But -- no.  I'm sure that it was Grundy
6  that sat there and watched.  Officer Ford was the
7  one that pulled Robinson off me.
8    Q.   And how long did it take before anyone
9  attempted to --
10    A.   It was a long time.  It was a long
11  time.  We talking about minutes and minutes and
12  minutes and minutes and minutes.
13    Q.   And while that was happening, did the
14  officer that attempted to pull you off -- was he
15  watching what was going on?
16    A.   What did you say?
17    Q.   Was he watching?
18    A.   Who?  The officer that's beating me?
19    Q.   The officer that was trying to pull
20  Officer Robinson.
21    A.   Oh, Ford.  Yeah, he was watching.  Ford
22  -- like, Ford -- like, Ford he didn't want to hit
23  -- Ford is cool.  When I first came in -- like,
24  when you first come in jail, they make you strip,

Page 89

1  they make you take all your clothes off, they
2  search your clothes.
3       He's the one -- Ford is the one that
4  search your clothes.  All right.  "I'll let you
5  keep shoestrings," you know, regular stuff.
6  Broken down my shoestrings, my shoes -- "Yeah,
7  I'll let you keep your shoestrings."  Like, he's
8  a cool guy.  And I would never forget Ford.  He
9  had a Caribbean accent.  He was cool, you know.
10    Q.   But he watched for several minutes?
11    A.   He watched -- he watched -- he watched
12  for several minutes.  He watched.  He watched and
13  watched, and he still didn't have enough strength
14  to pull Robinson off me.  He's short, he's small,
15  and he wasn't that husky.  So he just, you know,
16  he was, like, a person that was like, you know,
17  was just there to do his job.
18    Q.   After the assault, did you file any
19  grievance report with the prison?
20    A.   Yeah.
21    Q.   How many?
22    A.   Probably like two or three.  I had
23  ripped up jaws.  I was trying to find the right
24  words to say to the sergeant.  I'm trying to get

Page 90

1  this to the head.  This grievance I'm trying --
2  you know, I probably filed like two or three.
3      Q.   Were there any disciplinary actions
4  taken against you?
5      A.   They, they, they, they said that I was
6  supposed to go to the hole for doing nothing, for
7  getting beat on, but of course they knew what
8  they did.  So they did not.  They knew what they
9  did.  They was like, we already did -- F-d him up
10  so much, while putting him in the hole would make
11  it worse.  They really helped me by staying out.
12           They really helped me for not going to
13  the hole, because that way I got the pictures
14  out.  I would never -- I would have never had no
15  pictures.  You all would never seen my face of it
16  being disorganized.  You all would have never had
17  no greetings.  You all would never had no
18  recorded phone calls if it probably wasn't for
19  that sergeant that we talking about, that Indian
20  man, that's the only sergeant that, that was --
21  you know, that, that, that came onto the case.
22  He didn't put me in the hole.
23      Q.   So, to your knowledge, they didn't take
24  any disciplinary actions against you?

Page 91

1      A.   No.
2      Q.   I want to talk a little more about how
3  your injuries affect you today, both physically
4  and emotionally.  Would you be able to describe
5  how they affect you today?
6      A.   I cry every day.  I cried in here
7  earlier.  I cry every day about it, because I
8  feel like -- you think he going to get away, and
9  I know I'm not letting, I'm, I'm not letting up.
10  I cry every day about it emotionally.  And the
11  physical part is just -- that, that's just --
12  like my neck, oh, my God.  That's why I said I
13  got to start therapy back.  So I tell you, I got
14  to start therapy of my neck.  Every time I sleep,
15  I got to turn a different way.  It's like a shock
16  -- it's like a nerve shock that I get in my neck.
17           It's a nerve shock.  It hurts.  So it's
18  my neck -- and then my tooth.  You didn't see me
19  asking for no crackers or anything, like my tooth
20  hurts.  You don't see me eat a lot.  I got to eat
21  -- I got to eat certain stuff certain ways.  I
22  adjust -- it's a whole different adjustment.
23  Imagine your mouth being adjust.  You know you
24  got to breathe certain ways.  it's a whole

Page 92

1  adjustment, you know, so just adjusting to it.
2  You got to understand, it wasn't even 30 months
3  ago.  Months go by like this.  That happened
4  yesterday for real, for real to me.
5      Q.   So you were taken to the ER and also
6  the nurse in CFCF.  How did they treat you for
7  your injuries?
8      A.   In hospital, everything I said to that
9  man --  you know what I mean.  They, they, they
10  put, like, a white thing over my nose, I guess,
11  for it to be straightened out or something.  And
12  then I had nozzle -- I had, like, sticks going up
13  my nose, spray getting on my -- spray --- they
14  spraying my nose.  They really couldn't do too
15  much about the, the, the, tooth part, you know.
16  They couldn't do too much about that.  Yeah.  The
17  broken bone particle in my eye,  they treated
18  that.  So --
19      Q.   What treatment did you receive when you
20  were released besides -- if you need to elaborate
21  on any of the treatment that you received, any
22  additional hospital stays?
23      A.   Yeah. I just went to the -- like, like
24  due to this incident, like my, my, my feet -- my,

Page 93

1  my side, you know, or, like, if you look in that
2  picture of my face, it's so swollen.  It's
3  ridiculous.  So my tooth still be hurting because
4  of that.  It's nothing the dentist could do but
5  pull it out.  Now I'm going to be feeling more
6  pain, root pain and, and all type of other pain.
7  So this pain right here is just, like,
8  ridiculous.  If they would have never did it, I
9  wouldn't have to go through it.
10      Q.   Did you receive any additional
11  medication upon your release to treat any of your
12  injuries from the doctor?
13      A.   Yeah. I was on -- what medication I was
14  taking?  It was something for, like, pain in my
15  back.  I can't remember the name of it.  It was
16  something for pain in my back.  Yeah.
17      Q.   And you are continuing to seek
18  treatment because of the injuries?
19      A.   Yeah.  I'm about to start -- we going -
20  - I was going to the chiropractor out the
21  boulevard near Cottman Avenue -- near Cottman
22  Avenue.  Chiropractor.  You look chiropractor up
23  near Cottman Avenue, it'll come right up.  Across
24  street from checkers, it'll come right up.  And I

Page 94

1  -- and I remember my, my nurse face.  So yes, I
2  would like to start therapy back up.
3          And I will start therapy back up,
4  because I need, like, type of -- like, something
5  -- you got to -- you got to massage, you got to
6  stretch.  You know, I'm, I'm not stretching, I'm
7  not massaging -- getting good massages.  So the
8  older I get, the worse the pain feels.  I get
9  shock and nerve pains in my spine and my neck.
10 It hurts.  Yeah.
11     Q.   Well, I want to thank you for your
12 time.  That's all the additional questions I have
13 currently.
14               - - -
15             EXAMINATION
16               - - -
17 BY MR. JACKAL:
18     Q.   I just have a few follow-up questions
19 based on that, and I promise this won't take very
20 long.  You described the kicks to your private
21 areas.
22     A.   Yeah.
23     Q.   You said there were some kicks to your
24 private areas.

Page 95

1      A.   It was like -- it was like -- yeah, it
2  was like one or two kicks, bro.  When I let out a
3  scream, bro, they ain't kick me no more right
4  there.  I tell you, it was all up -- it was all
5  up after that.
6      Q.   And did that cause any injury in your
7  private area?
8      A.   Yeah, man, I can't have kids.  I'm not
9  playing with you right now.  I'm dead serious.
10 I'm dead serious.
11     Q.   Why do you say that you can't have
12 kids?
13     A.   Why, why do I say that?
14     Q.   Has a medical professional ever told
15 you that you can't have kids?
16     A.   I don't believe what doctor say.
17     Q.   Have you ever --
18     A.   I can't have kids.  Sir, I can't have
19 kids because I was kicked in my balls with a
20 boot.  I'm dead serious.  You think I'm playing?
21 Y'all think I'm playing with you, man.  Y'all
22 probably think I'm crazy.  I'm dead serious.  I
23 really can't kids.  That's why you -- that's why
24 you don't see me with them.  Come on now.

Page 96

1      Q.   Have you ever seen a doctor for that
2  specific injury?
3      A.   I told you.  I get real -- like, you
4  know, when I talk about my private part I don't
5  like -- you know, I used to go to a doctor as a
6  kid, and I used to be like -- she's like, show me
7  -- you know, you got to show me your private
8  part,  and I'm like, no, I'm not doing it.  So I,
9  you know, was pissing blood type shit, you know.
10 When I went to cell, I'm "Celly, hey, bro.  Come
11 on, you in -- celly?"  "What?"  "I'm pissing
12 blood," type shit, you know.
13     Q.   What's the name of your --
14     A.   Sir, you ever -- you ever pissed blood
15 before?  I mean, piss blood.
16     Q.   What's the name of your cellmate who
17 saw you piss blood?
18     A.   I was just talking about it.  I was
19 just talking about it, Gene.  We got to -- we got
20 to do our research on that and figure out my
21 celly's name.  I had three cellies.  I was in a
22 multi cell purpose room, in a closet that you're
23 not supposed to be in a cell of one inmate.  I was
24 in a closet   Three inmates.  And his name was

Page 97

1  Gene.  The first name is G-E-N-E.  His last name,
2  I cannot remember.
3      Q.   Sorry. Just to make --
4      A.   And hold up.  Gene, this was in 2021,
5  he was 26, so it's 2023, he's 28.  And he was
6  locked up for a shooting.  So we'll be able to
7  find him.  He's upstate right now, so I'll
8  definitely be able to find him.
9      Q.   And just so the record is clear, your
10 testimony is that you never saw a doctor to treat
11 the injury --
12     A.   I never -- I never said I ain't seen a
13 doctor.  I said I don't like -- I said, when I'm
14 around a doctor, it gets kind of weird.  I don't
15 like showing my private part.  I asked you after
16 that, have you ever pissed blood?  So I never
17 admitted that I never seen the doctor.  Yeah, of
18 course, I see the doctor.
19     Q.   Have you seen a doctor to treat that
20 injury?  That's my question.
21     A.   Have you ever been kicked in your balls
22 by a girl?  Have you ever been kicked in your
23 balls by a girl?  You don't go to hospital.
24          MS. BRADY:  Okay. Just answer

Page 98

1    his question.
2  BY MR. JACKAL:
3      Q.   This deposition is me asking you
4  questions.
5      A.   You don't go to a hospital after that,
6  sir.  You don't go to a hospital after that.  No.
7           MS. BRADY: It's okay, just answer
8      his question
9           THE WITNESS:  You don't go to a
10     hospital when a girl kick into your balls.
11     You don't.  You just fight it like a man.
12 BY MR. JACKAL:
13     Q.   So you never saw a doctor to treat an
14 injury to your private parts?
15     A.   Yes, sir. I did sir, bro.
16     Q.   Sorry.  I'm going to ask one more time,
17 because I don't think --
18     A.   Look at my whole hand, my hand -- look
19 at my whole hand.  My hand cut up right now. You
20 think I went to the hospital? My man, I've been
21 through that.
22          MS. BRADY:  That's okay.  Just
23     answer the questions he's asking.  You don't
24     have to answer anything else.

Page 99

1           THE WITNESS:  I'm just saying like
2      he know I went to the hospital that night.
3  BY MR. JACKAL:
4      Q.   I understand you went to the hospital.
5  After you went to the hospital, did you ever see
6  a doctor to treat any injury to your private
7  parts as a result of the assault?
8      A.   No. It's --
9      Q.   You mentioned in answering questions
10 from your attorney that you have photographs of
11 your injuries; is that right?
12     A.   Yes.  Yes, I do.
13     Q.   Are you still in possession of those
14 photographs?
15     A.   Yes, I have.
16     Q.   I ask you to please turn those over to
17 your attorneys.  And for the record, we would
18 request any photographs you have documenting your
19 injuries.
20     A.   They will be sent to sent to you.  My
21 attorney already have it.
22     Q.   And that's all the questions I have,
23 Mr. Hollis, thank you for your time.
24     A.   You have a blessed one.

Page 100

1           MR. GONZALES:  No questions,
2  thanks.
3           THE REPORTER:  Okay.  And
4  Counselor Brady, no more questions for you?
5           MS. BRADY:  No more questions.
6  Thank you.
7           THE REPORTER:   Okay.  All right.
8  So we are -- let me just make sure.  Okay
9  and transcripts orders.  I know that Ms.
10 Brady that the witness wants to read and
11 sign.  Are there any transcript orders?
12          MS. BRADY:  I'm not sure.  I'm
13 covering today, so I apologize.  I don't
14 know if -- Ben?
15          MR. JACKAL:  We would like a
16 transcript.  Thank you.  An electronic is
17 fine for us.
18          THE REPORTER:  Okay.
19          MR. GONZALES:  And, Jenese, the
20 City's paying my bill, so they're not going
21 to pay for two transcripts.  So
22 unfortunately, I'm not ordering a separate
23 one from the City.  My apologies.
24          THE REPORTER:  Okay.  No worries.

Page 101

1  Okay.  All right, then, that concludes, and
2  so we are now going off the record.  The
3  time is now 12:38 p.m. eastern.
4  (Proceedings concluded at 12:38 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 102

CERTIFICATE OF DIGITAL REPORTER

1

2

3    I, JENESE MASON, a Digital Reporter and

4  Notary Public within and for the State of

5  Pennsylvania, do hereby certify:

6

7    That the foregoing proceeding hereinbefore

8  set forth was accurately captured with

9  annotations by me during the proceeding.

10

11    I further certify that I am not related to

12  any of the parties to this action by blood or

13  marriage, and that I am in no way interested in

14  the outcome of this matter.

15

16    IN WITNESS THEREOF, I have hereunto set my

17  hand this 29th day of December, 2023.

18

19

20

21  _____

22  Jenese Mason, Notary

   Notary Commission GG 961785

23  Commission Expires: February 24, 2024

24

---

Page 103

1    DEPOSITION ERRATA SHEET

2

3  Our Assignment No. 37802

4  Case Caption: LEO HOLLIS vs. CITY OF

5  PHILADELPHIA, ET AL.

6

7    DECLARATION UNDER PENALTY OF PERJURY

8

9    I declare under penalty of perjury that I

10  have read the entire transcript of my deposition

11  taken in the above-captioned matter or the same

12  has been read to me, and the same is true and

13  accurate, save and except for changes and/or

14  corrections, if any, as indicated by me on the

15  DEPOSITION ERRATA SHEET hereof, with the

16  understanding that I offer these changes as if

17  still under oath.

18

19        Signed on the ____ day of _____,

20  20___.

21

22  _____

23  LEO HOLLIS

24

---

Page 104

1    DEPOSITION ERRATA SHEET

2  Page No. _____ Line No. _____ Change to:

3  _____

4  _____

5  Reason for change:

6  _____

7  Page No. _____ Line No. _____ Change to:

8  _____

9  _____

10  Reason for change:

11  _____

12  Page No. _____ Line No. _____ Change to:

13  _____

14  _____

15  Reason for change:

16  _____

17

18

19

20  SIGNATURE: _____  DATE: _____

21  _____

22  LEO HOLLIS

23

24

Exhibit C

```
Working...
18-OCT-2023 11:41                                                        Page 1
                        Philadelphia Prison System
                           Misconduct Reports

        Inmate 1223962 HOLLIS, LEO D D

    Misconduct J21001274 Class MINOR
           Date 03/12/2021 00:20
       Facility CFCF
       Location receiving room
          Descr Inmate in unauthorized area

Summary: Inmate Leo Hollis entered an unauthorized area and had to be removed.

Narrative:On March 11, 2021 at approximately 01:50 inmate Leo Hollis PP#1223962
was continuing the intake process with officer O.Ford. During the intake process
inmate Hollis became hostile with staff and threatened several officers behind
the intake desk and proceeded to attempt to breach the area. Loud verbal
commands were given but Hollis ignored them and ran into the unauthorized area.
Inmate Hollis was then removed from the area by using empty hand control
techniques and then escorted to medical.


Names of Inmate Witnesses:
Officer O.Ford

Names of C/O and Supervisors:
Officer J.Grundy
Officer G.Robinson
Sergeant A. Ryans



        Finding DISMISSED
        Finding 03/18/2021 00:00 by CAPTAIN BROWN
Notice Served                      by
Report Served                      by
        Processed 05/24/2022 14:51 by HARMER_C

Charge Description                            Plea       Finding
1       DISRESPECTING ANY STAFF MEMBER        NO CONTEST DISMISSED
2       BEING IN AN UNAUTHORIZED AREA         NO CONTEST DISMISSED
3       REFUSAL TO COMPLY WITH A VALID ORDER  NO CONTEST DISMISSED



18-OCT-2023 11:41                                                       Page 2
                        Philadelphia Prison System
                           Misconduct Reports

        Inmate 1223962 HOLLIS, LEO D D

    Misconduct J21007324 Class MINOR
           Date 12/24/2021 14:48
       Facility CFCF
       Location A1Pod2
```

Exhibit E

| | **PHILADELPHIA PRISONS**<br><br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>1.C.13 | **Page** 1<br><br>**of** 11 |
| --- | --- | --- | --- |

| | |
| --- | --- |
| **Part:** I - Administration and Management<br><br>**Section:** C - Personnel | **Related Pennsylvania Minimum Standards:**<br>Title 37 PA Code § 221<br>**Related ACA Standards:** 2-CO-1C-04, 4-ALDF-7B-17, 4-ALDF-7E-04 |
| **Subject:** Represented Employee Disciplinary Procedures | **Supersedes:** Policy 1.C.13 signed on November 12, 2014 |
| **Approved:** _____ Commissioner | **Signature Date:** March 8, 2016 |
| **Effective Date:** April 8, 2016 | **Scheduled PAD Review:** Annually<br>**Scheduled Commissioner's Review:** March 8, 2020 |

## Purpose

The purpose of this policy is to establish guidelines for the equitable implementation of corrective and disciplinary actions for employees of the Philadelphia Prison System.

The purpose of the policy is to also provide a measure of consistency and progression of disciplinary actions. This consistency, however, does not require that the PPS must administer the exact level of disciplinary action the same way in each and every instance. Each instance of violation of the rules and regulations of the Philadelphia Prison System turns on its own facts and distinguishing variables, such as prior work history, time period during which the violation occurred (i.e. during the reckoning period of other previous infractions), and mitigating or aggravating circumstances.

This policy attempts to ensure compliance with established standards of conduct established to protect the integrity and reputation of the department.

The purpose of discipline is to correct inappropriate behavior and to ensure effective and efficient departmental operations and employee adherence to reasonable and acceptable rules of performance.

## Introduction

The offenses herein shall guide supervisors and the Disciplinary Board in administering fair and uniform penalties for violations of the Philadelphia Prison System (PPS) ethics.

Penalties recommended by the Prison Disciplinary Board for offenses listed should, barring mitigating or aggravating circumstances (see page 10), be within the prescribed limits. The schedule shall, in no way, limit any penalty which the Commissioner may impose.

Offenses not included in the following list shall result in penalties similar to those specified for listed offense of comparable seriousness.

Reckoning periods are recognized as the period of time during which an employee is expected to have a record free of any type of offense.

**Revised**                                      **March 8, 2016**                                      **Revised**

| PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13 | Page 2 of 11 |
|---|---|---|

| **Part:** I - Administration and Management<br><br>**Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures<br><br>**Date:** March 8, 2016 |
|---|---|

All reckoning periods for offenses for which an employee has been found guilty shall begin on the date the first offense was committed. Second, third, and subsequent violations committed during the reckoning period of the first violation shall be treated as second, third, etc., offenses.

Any type of offense committed after the reckoning period expires counts as a first offense.

Repeated violations of PPS rules and regulations or other courses of conduct indicating staff has little or no regard for the responsibilities and obligations of employment in the Philadelphia Prison System may be cause for dismissal.

## Policy
It is the policy of the Philadelphia Prison System (PPS) to provide fair and consistent treatment to employees when it becomes necessary to administer corrective and/or disciplinary action.

Employee disciplinary action will occur within the principles of progressive discipline, which involves steps of discipline to be used to correct negative behavior or poor job performance.

Any employee, regardless of occupation, position, or profession, may be warned, reprimanded, demoted, suspended, or dismissed by the appointing authority. The degree and type of action taken shall be based upon the judgment of the appointing authority in accordance with the provisions of the Civil Service Regulations and Collective Bargaining Agreements.

## Procedural Overview
The disciplinary code is intended to provide for understanding, compliance, and enforcement of rules and regulations regarding employee conduct and performance. The PPS has the responsibility to establish rules of employment and to advise employees of these rules. Employees have the responsibility to know the rules and to comply with them.

## General Procedures
Authority to administer corrective action will be structured in a progressive manner.

Action may be taken against an employee who should be alerted to a job performance problem that must be corrected.

Failure to apply corrective action as soon as possible after discovering a performance problem could result in the employee's continued use of unacceptable job practices, the adoption of unacceptable job

D 000509

| ![logo] | **PHILADELPHIA PRISONS**<br><br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>1.C.13 | **Page**    3<br><br>**of**     11 |
|---|---|---|---|
| **Part:** I - Administration and Management<br><br>**Section:** C - Personnel | | **Subject:** Represented Employee Disciplinary<br>          Procedures<br><br>**Date:** March 8, 2016 | |

practices by other employees, or the continued employment of an individual whose performance poses a serious threat to the PPS, its staff, inmates, visitors, or the public.

To avoid the aforementioned problems, corrective action will be taken in a timely fashion.

An employee may appeal any disciplinary action taken under this policy as provided in the respective Collective Bargaining Agreements and/or the Civil Service Regulations.

## Progressive Discipline

Progressive discipline is a way for the institution to bring awareness to employees of their weaknesses in a job-related area. This allows an employee the opportunity to change the undesired behavior. The objective, then, of progressive discipline is a change in an employee's behavior toward the desired result. The concept also carries with it the feature that the penalties which management may seek to invoke are appropriate given the circumstances of the employee's infraction.

The PPS is committed to progressive discipline. Appropriate positive, corrective efforts, such as training, counseling, and instruction in accordance with applicable work performance standards may be pursued before taking disciplinary action.

## Preparation of Employee Disciplinary Charges

Many employee disciplinary charges which should be handled on an informal basis at a lower level are forwarded for formal Disciplinary Board action. Conversely, many valid charges cannot be successfully prosecuted because of improper preparation. In addition to difficulty in prosecution, such improperly prepared charges consume valuable time of the administration, employees, union representative, and, if applicable, the Civil Service Commission. Therefore, the Charging Party/Complainant will consult with his/her immediate Supervisor if there are any questions on the validity and necessity for the preparation of an Employee Violation Report. If so, the correct General Orders and/or other pertinent regulations to be cited should be reviewed.

<div align="center">

**Participants at Disciplinary Steps**

</div>

Other than the employee charged with a violation, the participants at each step of the disciplinary process might vary. The recommended participants are indicated below:

| Verbal Admonition | Immediate Supervisor<br>Union Representative, if requested |
|---|---|

D 000510



| | |
|---|---|
| **PHILADELPHIA PRISONS POLICIES & PROCEDURES** | **Policy Number** 1.C.13 |  **Page** 4 **of** 11 |

| | |
|---|---|
| **Part:** I - Administration and Management **Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures **Date:** March 8, 2016 |

| | |
|---|---|
| Employee Warning Record | Immediate Supervisor Union Representative, if requested |
| Warden's Hearing | Complainant Warden Union Representative Employee |
| Formal Hearing | Chair-Deputy Commissioner (or designee) Secretary-Personnel Representative Charging Party-Complainant Employee & Union Representative or Other Representative (Private Attorney at employee's request) Witnesses Board Members |

The Disciplinary Board will include one (1) peer and other managers designated by the Commissioner. Voting Members will total three (3): One (1) Peer, two (2) managers. The Warden or Deputy Warden from the charging institution will not sit as a board member. The employee has the right, if he/she requests, to be represented at each step in this disciplinary process. The highest-ranking member of the Disciplinary Board shall be expected to complete a memo that explains the Board's findings. The memo will include the Board's logic in determining guilt and any other information that the voting members deem relevant. The memo will then be forwarded to the Commissioner's Office. The Board will make two recommendations; whether or not the charges are sustained, and, if sustained, what the penalty will be. The Commissioner will review the recommendations and make a determination of the disciplinary action to be taken.

In cases where disciplinary action calls for a nine (9) day suspension or less, the Warden of the facility shall send a request for disciplinary action after the hearing at the Warden's level, to the Commissioner, who will then decide if the discipline is appropriate.

### Implementation of Corrective and Disciplinary Actions
#### Counseling
A Supervisor shall:
1. Meet with the employee in private and explain that the purpose of counseling is to inform the employee about a work performance or behavior problem which, if not corrected, could lead to a disciplinary action;

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13 | Page 5 of 11 |
|---|---|---|---|

| **Part:** I - Administration and Management **Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures **Date:** March 8, 2016 |
|---|---|

2. Review the issues which resulted in the counseling and discuss methods of resolving them with the employee;
3. Clarify the Supervisor's expectations, and establish goals and objectives if necessary;
4. Inform the employee how his/her performance will be monitored, explaining what shall happen if the employee does not correct the previously discussed problem areas;
5. Complete Counseling Record Form (memorandum), and ask the employee to sign; give the employee the original copy;
6. Submit a copy of the Form for the Supervisor's file.

*Training*
A Supervisor may recommend additional training for an employee by taking the following steps:
1. Meet with the employee and discuss problem areas;
2. Explain how training can help the employee to resolve the problem;
3. Determine which of the following types of training would be appropriate:
    a. On-the-job training provided by the Supervisor or designee at the Supervisory level;
    b. Training provided by a PPS training program, which provides an official training record.
4. Provide the employee with written notification of the type of training and instructions for obtaining the training;
5. Confirm the completion of training, and place documentation in the employee's file.

*Verbal Admonition*
In issuing a verbal warning:
1. The Verbal Admonition will be issued to the employee by his/her Supervisor.
2. The Supervisor will meet with the employee in private and explain that the purpose of the verbal admonition is to inform the employee about a work performance or behavior problem which, if not corrected, could lead to a disciplinary action.
3. If requested, the employee may have a union representative present during the verbal admonition session.
4. The Supervisor will review the issues which resulted in the verbal admonition and discuss methods of resolving them with the employee.
5. The Supervisor will clarify his/her expectations, and establish goals and objectives if necessary.
6. The Supervisor will inform the employee how his/her performance will be monitored, explaining what shall happen if the employee does not correct the previously discussed problem areas.
7. The Supervisor will complete the verbal admonition (memorandum) and ask the employee to sign.
8. The Supervisor will place a copy of the dated verbal admonition (memorandum) in the employee's file.

| | **PHILADELPHIA PRISONS** **POLICIES & PROCEDURES** | **Policy Number** 1.C.13 | **Page** 6 **of** 11 |
|---|---|---|---|

| **Part:** I - Administration and Management **Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures **Date:** March 8, 2016 |
|---|---|

### *Employee Warning Record (Written Warning)*
In issuing a written warning:
1. The Written Warning will be issued to the employee by his/her Supervisor.
2. The Supervisor will meet with the employee in private and explain that the purpose of the written warning is to inform the employee about a work performance or behavior problem which, if not corrected, could lead to a disciplinary action.
3. If requested, the employee may have a union representative present during the.
4. The Supervisor will review the issues which resulted in the verbal warning and discuss methods of resolving them with the employee.
5. The Supervisor will clarify his/her expectations, and establish goals and objectives if necessary.
6. The Supervisor will inform the employee how his/her performance will be monitored, explaining what shall happen if the employee does not correct the previously discussed problem areas.
7. The Supervisor will complete the Written Warning, and ask the employee to sign; give the employee the original copy.
8. The Supervisor will place a copy of the dated written warning in the employee's personnel folder.

### *Employee Violation Report*
In issuing an Employee Violation Report, the following steps shall be taken:
1. The official issuing the report shall, in person, explain the reason for the report and what modifications are necessary in the employee's behavior. The employee shall also be advised of the consequences of future infractions.
2. An Employee Violation Report (EVR) shall be issued within 14 days calendar days of the date the City *first* determines or reasonably should have determined that an alleged work rule violation by that employee occurred, provided that, in the case of allegations that are the subject of a confidential investigation by law enforcement or another governmental entity, or an investigation by the Office of Professional Compliance that may lead to a criminal investigation, the notice of the alleged work rule violation will be provided within fourteen (14) calendar days of the conclusion of the investigation so as not to compromise the confidentiality of the investigation. In cases where the employee requests leave, including Family Medical Leave requested before an EVR is completed, the EVR will be issued as soon as possible after the employee returns to work. The employee shall receive an official, written, three-part Employee Violation Report. The official Employee Violation Report form shall be completed, and the employee will be required to sign it. The first section is completed by the complainant and cites the rule(s) being violated and the specifics of the charge; the second section affords the employee the opportunity to respond; the presiding officer of the Preliminary Hearing completes the third section. The employee has the right to union representation. The union will receive a copy of the Employee Violation Report.

| ![Philadelphia Prisons logo] | **PHILADELPHIA PRISONS**<br><br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>1.C.13 | **Page**   7<br><br>**of**   11 |
|---|---|---|---|

| **Part:** I - Administration and Management<br><br>**Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures<br><br>**Date:** March 8, 2016 |
|---|---|

3. As a result of the Employee Violation Report, a Preliminary Hearing shall be held. Generally, a Preliminary Hearing is held as soon as possible after the employee is issued an Employee Violation Report; therefore, consideration must be made to allow for completion of the disciplinary process within 90 days of issuance of an EVR, including the commencement of a formal hearing. The Warden's Office must make every attempt to schedule a preliminary hearing within 30 days of issuance of the EVR so that, in the event that a formal disciplinary hearing is required, both the PPS and the employee have ample time to prepare. Note also that the 90-day period excludes any leave taken by the employee, including Family Medical Leave, after the issuance of the EVR. The accumulation of days within the 90-day time frame stops when the employee begins leave and continues only when the employee returns to work.

4. After completion of the hearing, the final (third) section of the Employee Violation Report is completed, including the action taken. The case may be closed at this level with a recommendation for warning or suspension, as per Disciplinary Matrix for Represented Employees Disciplinary Procedures (Appendix A), or the charges may not be sustained. If the charges are sustained, the Warden may recommend up to a nine (9) day suspension to the Commissioner, or the case may be referred to the formal Disciplinary Board. Generally, a formal disciplinary hearing is scheduled after a Preliminary Hearing is held, and within 90 days of the issuance of the EVR. The 90-day period excludes any leave taken by the employee, including Family Medical Leave, after the infraction or the PPS' knowledge of the infraction. The accumulation of days within the 90-day time frame stops when the employee begins leave and continues only when the employee returns to work.

## Suspension
The appointing authority or designee may personally discuss with the employee the reason(s) for the suspension. In accordance with Civil Service Regulation 17.04, notice of the suspension shall be given to the employee and, at the same time, to the Personnel Director of the City of Philadelphia. Each suspension without pay shall not exceed thirty (30) calendar days.

## Demotion
The PPS reserves the right to demote an employee due to substandard work performance or for disciplinary purposes. In accordance with Civil Service Regulation 17.01, the PPS must notify the employee, in writing, of their intention and reasoning at least ten (10) calendar days before the effective date of the demotion.

## Reduction in Pay
The appointing authority for just cause may reduce an employee's salary within the pay range prescribed for their respective class. In accordance with Civil Service Regulation 17.05, the employee and Personnel

| ![Philadelphia Prisons logo] PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13 | Page 8 of 11 |
|---|---|---|
| **Part:** I - Administration and Management  **Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures  **Date:** March 8, 2016 | |

Director of the City of Philadelphia will be notified ten (10) calendar days prior to the effective date of the pay reduction.

## Dismissal

Dismissal is the most severe penalty in the employee disciplinary process and shall be reserved for situations when an employee has repeatedly demonstrated an inability to follow agency and/or unit directives, procedures, or orders when other forms of disciplinary action have been exhausted; for first offenses which threaten the security or integrity of the PPS; or for conduct of such a serious nature that dismissal is warranted. In accordance with Civil Service Regulation 17.01, the appointing authority will notify the employee and the Personnel Director of the City of Philadelphia within ten (10) calendar days before the effective date of the dismissal.

## Disciplinary Matrix for Represented Employee Disciplinary Procedures

This guide, found in Appendix A, is intended to help achieve consistency in disciplinary action and to give employees some predictability about possible repercussions which arise from their actions.

The guide consists of six columns: General Order (Number); General Order (Charge); Typical Penalty Range (first offense); Typical Penalty Range (second offense); Typical Penalty Range (third offense); and the Reckoning Period during which an employee is expected to have a record free of the same type of offense for which he/she was previously found guilty.

- The General Order Number Column: This column simply notes the number of the General Order, as per Policy and Procedure 1.C.11.2 General Orders, and is in numerical order.
- The General Order (Charge) Column: This column lists the General Order which has been violated. The General Orders are listed in a condensed form, which represents the essence of each order. *All employees are responsible for familiarizing themselves with all rules and regulations of the PPS (General Orders 1 & 2).*
- The Typical Penalty Columns: These columns do not dictate the penalty to be imposed for a particular (or comparable) offense; rather, they establish the range of penalties within which the penalty imposed usually falls. The PPS may impose a penalty ranging in severity from a verbal admonition to termination of employment. A range of penalties is deemed to be important for both the employee and PPS, because a range will allow the appropriate authority to appropriately weigh both aggravating and mitigating factors.
- The Reckoning Period Column: Reckoning periods are recognized as the period of time during which an employee is expected to have a record free of any type of offense for which he/she was found previously guilty. All reckoning periods for offenses for which an employee has been found guilty shall begin on the date the first offense was committed. Second, third, and subsequent violations of

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13 | Page 9 of 11 |
|---|---|---|---|

| | |
|---|---|
| **Part:** I - Administration and Management<br><br>**Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures<br><br>**Date:** March 8, 2016 |

the same section committed during the reckoning period of the first violation shall be treated as second, third, etc., offenses.

The Disciplinary Hearing Board shall not consider any previous disciplinary violations and/or punishment until after guilt has already been established. That is, the Disciplinary Hearing Board will not view the past record of the accused employee until determining the penalty for the rule infraction(s), after the charges have been sustained.

The Disciplinary Hearing Board/Wardens may make a recommendation for disciplinary action of less severity than the suggested penalty sanctions in these guidelines. These disciplinary guidelines are guidelines only and shall be considered in conjunction with aggravating and mitigating circumstances surrounding each case. Mitigating circumstances include conditions which indicate that the employee is not wholly at fault. When, in the judgment of the appointing authority or designated representative, mitigating circumstances exist and can be substantially documented, specific corrective action may be reduced or not invoked. Mitigating Factors could include willingness to report the offense to proper officials, whether the employee has shown a willingness to accept responsibility for his/her actions, etc. The following table specifies some factors that are considered:

| Factors Considered When Determining Penalty | | | |
|---|---|---|---|
| 1. The basic penalty is the one that would be used if there were no other considerations. It is based on:<br>  a. Offense<br>    1. Character<br>    2. Seriousness<br>    3. Consequences<br>  b. Rehabilitative potential of penalty<br><br>  c. Character of employee's position | 2. Favorable elements are those considerations which tend toward the imposition of less severe penalties. Included are:<br>  a. Situation:<br>    1. Possibility of genuine misunderstanding<br>    2. Provocations<br>    3. Mitigating circumstances<br>  b. Employee:<br>    1. Length of service<br>    2. Quality of work record<br>    3. Past contributions<br>    4. Record of cooperativeness | 3. Unfavorable elements are considerations which tend to show a need for more severe action than is usually taken. Included are:<br><br>a. Penalties for past offenses<br>b. Combination of offenses<br>c. Series of offenses<br>d. Character of other offenses<br>e. Other recent offenses | 4. Penalty assessed results from weighing of favorable and unfavorable factors in relationship to the offense:<br><br>a. Proposed penalty is determined on the basis of all information available at time of disciplinary action |

## Disciplinary/Administrative Options

- **Verbal Admonition:** An informal communication from an employee's Supervisor to the employee; should be used only for very minor offenses in an attempt to help the employee avoid misconduct in the future.

**Revised**                              **March 8, 2016**                              **Revised**



| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13 | Page    10 of    11 |
|---|---|---|---|

| **Part:** I - Administration and Management **Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures **Date:** March 8, 2016 |
|---|---|

- **Employee Written Warning:** A formal communication from an employee's Supervisor to the employee which is punitive in nature and should be used in situations where a Verbal Admonition is not considered to be suitable, or in situations where a member has already received a Verbal Admonition in the past.
- **Employee Violation Report:** A formal communication from an employee's Supervisor to the employee which is punitive in nature and should be used in situations where a Written Warning is not considered to be suitable, or in situations where a member has already received a Written Warning.
- **Suspension:** Suspension without pay, up to 30 days per incident requiring discipline. Suspension without pay may be taken for lesser periods of time depending on the offense.
- **Demotion:** A demotion to a lower rank/position, which is punitive in nature and adversely affects an employee's pay and/or pay range.
- **Reduction in Pay:** A reduction in the salary of an employee, for just cause, within the pay range prescribed for the class. In the case of a permanent employee, notice of intention to effect a reduction in pay and the reasons for such action shall be given to the employee and to the Personnel Director of the City of Philadelphia ten (10) calendar days prior to the effective date of the reduction.
- **Dismissal:** A dismissal/termination from employment in the PPS, which is punitive in nature, and is the most severe disciplinary action. Before it is initiated, the facts and circumstances in the case must be carefully reviewed to ensure that they support the conclusion that the member has demonstrated an unwillingness or refusal to conform to the rules of conduct, or has so breached the employee-employer relationship that other rehabilitation is not appropriate and dismissal is warranted for the offense.

## Multiple Offenses
When an employee is found guilty of multiple charges, the penalty imposed will be for the most serious violation.

## Lateness
An employee's Supervisor shall ensure accountability for staff punctuality. The Supervisor will document all instances of lateness on the employee's attendance record. The Supervisor will review all attendance sheets weekly and ensure that necessary disciplinary action is taken, as follows:
- 3 late notations – employee is issued a counseling (in writing)
- 3 additional late notations – employee is issued a Verbal Admonition (in writing, with a copy sent to Human Resources)
- 2 additional late notations – employee is issued a Written Warning (in writing, with a copy sent to Human Resources)
- 1 additional late notation and every late notation thereafter - employee is issued an Employee Violation Report

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13 | Page 11 of 11 |
|---|---|---|---|

| **Part:** I - Administration and Management<br><br>**Section:** C - Personnel | **Subject:** Represented Employee Disciplinary Procedures<br><br>**Date:** March 8, 2016 |
|---|---|

The Supervisor will be responsible for seeing that all employees conform to the standards set within this policy by the PPS. Any employee that violates these procedures is subject to disciplinary action.

**<u>Non-Disciplinary Options</u>**
Training/Corrective Counseling:  Not all inappropriate behavior will require imposition of discipline.  In some cases, non-disciplinary action, such as counseling accompanied by documentation in a performance log, may be more appropriate.  An employee counseling should take place as soon as possible after the unacceptable behavior or poor performance is first noted.  The purpose of non-disciplinary action is to inform the employee of a potential problem which may result in discipline if it continues; to help correct the problem before it becomes significant; and/or, to advise the employee of expected behavior. However, the option of Corrective Counseling/Training is reserved primarily for minor offenses.

It is the intention of the PPS to deal with offenses by its employees using progressive discipline.  That is, for a first offense, Supervisors may start with the lowest appropriate method of discipline.  A second offense by the same employee should be addressed by a more severe punitive sanction, including a suspension for a longer period of time than was given previously, a demotion, or dismissal.  However, the misconduct may be so egregious on the first offense that it might warrant a more serious sanction from the beginning, including dismissal.

While not a disciplinary sanction, it might be appropriate to transfer, reassign, or require additional training of employees.  Additional training, or Corrective Counseling, while not considered discipline, may be used by the appointing authority prior to any disciplinary action being imposed, as well as in between the stages of progressive discipline.

**<u>Compensation for Off-Duty Employees Participating in All Levels of the Disciplinary Process</u>**
Off-duty employees who will not be compensated:
- Employee charged (if any charge is sustained)
- Witnesses requested by employee or union, unless subpoenaed

Off-duty employees who will be compensated:
- Charging Officer
- Witnesses requested by the PPS
- Employee charged (if all charges are not sustained)
- Any employee served with a subpoena

**Revised**                                        **March 8, 2016**                                        **Revised**

D 000518

| | **PHILADELPHIA PRISONS**<br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>1.C.13.1 | **Page** 1<br><br>**of** 5 |
|---|---|---|---|

| **Part:** I - Administration and Management<br><br>**Section:** C - Personnel | **Related Pennsylvania Minimum Standards:**<br>Title 37 PA Code § 221<br>**Related ACA Standards:** 2-CO-1C-04, 4-ALDF-7B-17,<br>4-ALDF-7E-04 |
|---|---|
| **Subject:** Non-Represented Employee Disciplinary Procedures | **Supersedes:** Policy 1.C.13 signed on June 29, 2012 |
| **Approved:** _____<br>Commissioner | **Signature Date:** November 12, 2014 |
| **Effective Date:** December 12, 2014 | **Scheduled PAD Review:** Annually<br>**Scheduled Commissioner's Review:** November 12, 2018 |

## Purpose
The purpose of this policy is to establish the procedures that will be used in the PPS for non-represented employee disciplinary proceedings. This policy pertains to non-represented (Management) employees who are not covered under any standing Bargaining Agreements with the City of Philadelphia.

## Policy
It is the policy of the Philadelphia Prison System (PPS) to provide fair and consistent treatment to employees when it becomes necessary to administer corrective and/or disciplinary action.

Employee disciplinary action will occur within the principles of progressive discipline, which involves steps of discipline to be used to correct negative behavior or poor job performance.

Any employee, regardless of occupation, position, or profession, may be warned, reprimanded, demoted, suspended, or dismissed by the appointing authority. The degree and type of action taken shall be based upon the judgment of the appointing authority in accordance with the provisions of the Civil Service Regulations.

## Definitions
*Appointing Authority*: Commissioner of Prisons

## Procedural Overview
The disciplinary code is intended to provide for understanding, compliance, and enforcement of rules and regulations regarding employee conduct and performance. The PPS has the responsibility to establish rules of employment and to advise employees of these rules. Employees have the responsibility to know the rules and to comply with them.

## General Procedures
Authority to administer corrective action will be structured in a progressive manner.

**Revised**                                    November 12, 2014                                    **Revised**

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13.1 | Page 2 of 5 |
|---|---|---|---|

| Part: I - Administration and Management | Subject: Non-Represented Employee Disciplinary Procedures |
|---|---|
| Section: C - Personnel | Date: November 12, 2014 |

Action may be taken against an employee who should be alerted to a job performance problem that must be corrected.

Failure to apply corrective action as soon as possible after discovering a performance problem could result in the employee's continued use of unacceptable job practices, the adoption of unacceptable job practices by other employees, or the continued employment of an individual whose performance poses a serious threat to the PPS, its staff, inmates, visitors, or the public.

To avoid the aforementioned problems, corrective action will be taken in a timely fashion.

An employee may appeal any disciplinary action taken under this policy as provided in the Civil Service Regulations.

## Steps in Normal Disciplinary Procedure

Except in those instances where infraction is so serious that some steps may be eliminated, the following successive steps for violation of an established rule or regulation will be:

- a Verbal Admonition to the employee. A dated memorandum of the verbal admonition will be placed in the employee's personnel folder with a copy to the employee.
- a written Employee Warning Record if the violation continues or the offense is considerably more serious than one in which a Verbal Admonition is sufficient. A dated Employee Warning Record will be placed in the employee's personnel folder with a copy to the employee.
- an official, written, three-part Employee Violation Report if violation continues or the offense is serious enough to threaten the safety or security of PPS facilities, staff, inmates, visitors, or the public. The first section is completed by the complainant and cites the rule(s) being violated and the specifics of the charge; the second section affords the employee the opportunity to respond; and the third section allows the chairperson of the disciplinary hearing to note the actions taken at the initial hearing, to include forwarding to a formal Disciplinary Board, if warranted.

The Employee Violation Report will be forwarded to the Commissioner for review. If necessary, the Commissioner will appoint a fact finder or investigator to further investigate the specifics of the charges as presented by the Complainant.

## IMPLEMENTATION OF CORRECTIVE AND DISCIPLINARY ACTION

## Verbal Admonition

    In issuing a verbal warning:

1. The Verbal Warning will be issued to the employee by his/her Supervisor.

D 000520

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13.1 | Page 3 of 5 |
|---|---|---|---|

| **Part:** I - Administration and Management | **Subject:** Non-Represented Employee Disciplinary Procedures |
|---|---|
| **Section:** C - Personnel | **Date:** November 12, 2014 |

2. The Supervisor will meet with the employee in private and explain that the purpose of the verbal admonition is to inform the employee about a work performance or behavior problem which, if not corrected, could lead to a disciplinary action.
3. The Supervisor will review the issues which resulted in the verbal admonition, and discuss methods of resolving them with the employee.
4. The Supervisor will clarify his/her expectations, and establish goals and objectives if necessary.
5. The Supervisor will inform the employee how his/her performance will be monitored, explaining what shall happen if the employee does not correct the previously discussed problem areas.
6. The Supervisor will complete the Verbal Admonition (memorandum) and ask the employee to sign; he/she will give the employee the original copy.
7. The Supervisor will place a copy of the dated Verbal Admonition in the employee's file.

**Employee Warning Record (Written Warning)**
   In issuing a written warning:
1. The Written Warning will be issued to the employee by his/her Supervisor.
2. The Supervisor will meet with the employee in private and explain that the purpose of the written warning is to inform the employee about a work performance or behavior problem which, if not corrected, could lead to a disciplinary action.
3. The Supervisor will review the issues which resulted in the verbal warning and discuss methods of resolving them with the employee.
4. The Supervisor will clarify his/her expectations, and establish goals and objectives if necessary.
5. The Supervisor will inform the employee how his/her performance will be monitored, explaining what shall happen if the employee does not correct the previously discussed problem areas.
6. The Supervisor will complete the Written Warning, and ask the employee to sign; he/she will give the employee the original copy.
7. The Supervisor will place a copy of the dated written warning in the employee's personnel folder.

**Employee Violation Report**
   In issuing an Employee Violation Report, the following steps shall be taken:
1. The official issuing the report shall, in person, explain the reason for the report and what modifications are necessary in the employee's behavior. The employee shall also be advised of the consequences of future infractions.
2. An Employee Violation Report shall be issued within a reasonable time after the alleged infraction or knowledge of the alleged infraction. Generally, an Employee Violation Report (EVR) is issued to an employee within 90 days of the infraction or completion of any investigation that sustains violations of PPS Policy and Procedure. The 90-day period excludes any leave taken by the employee, including Family Medical Leave, after the infraction or completion of the investigation,

| PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13.1 | Page 4 of 5 |
|---|---|---|

| **Part:** I - Administration and Management | **Subject:** Non-Represented Employee Disciplinary Procedures |
|---|---|
| **Section:** C - Personnel | **Date:** November 12, 2014 |

but prior to the issuance of the EVR. The accumulation of days within the 90-day time frame stops when the employee begins leave and continues only when the employee returns to work.

3. The employee shall receive an official, written, three-part Employee Violation Report. The official Employee Violation Report form shall be completed, and the employee will be required to sign it. The first section is completed by the complainant and cites the rule(s) being violated and the specifics of the charge; the second section affords the employee the opportunity to respond; the presiding officer of the Preliminary Hearing completes the third section.

4. As a result of the Employee Violation Report, a Preliminary Hearing shall be held by the Warden of the facility. After completion of the hearing, the final (third) section of the Employee Violation Report is completed, including the action taken. The case may be closed at this level with a recommendation for disciplinary action, or the charges may not be sustained. If the charges are sustained, the Warden will refer the case for a formal disciplinary hearing.

## Participants at Disciplinary Steps

Other than the employee charged with a violation, the participants at each step of the disciplinary process might vary. However, the recommended participants are indicated below:

| Verbal Admonition | Immediate Supervisor |
|---|---|
| Employee Warning Record | Immediate Supervisor |
| Warden's Hearing | Complainant<br>Warden |
| Formal Hearing | Chair-Commissioner (or designee)<br>Secretary-Personnel Representative<br>Charging Party-Complainant<br>Representation (Private Attorney at employee's request and expense)<br>Witnesses |

The above formal hearing arrangement applies to non-represented employees at the rank of Deputy Warden and above. Formal hearings for Captains will be comprised of the same Disciplinary Board as for represented employees (refer to Policy and Procedure 1.C.13 Represented Employee Disciplinary Procedures).

The employee has the right of representation at the hearing. He/she will be given sufficient time to respond to disciplinary charges, with such time being appropriate to the nature and severity of the charges.

The Commissioner or designee will make two determinations: whether or not the changes are sustained, and, if sustained, what the penalty will be.

**Revised**                     **November 12, 2014**                     **Revised**

D 000522

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 1.C.13.1 | Page 5 of 5 |
|---|---|---|---|

| Part: I - Administration and Management  Section: C - Personnel | Subject: Non-Represented Employee Disciplinary Procedures  Date: November 12, 2014 |
|---|---|

## Summary Suspensions

Authority for Summary Suspensions is found in Civil Service Regulation 17.04, which states that the appointing authority (Commissioner) may suspend an employee without pay from his/her position at any time for just cause. Additionally, the appointing authority may issue suspensions "pending investigation" without specifying further reasons in cases where the agency desires to remove an employee from the job while an investigation is being carried on. In exercising his/her discretion, the Commissioner has the right to set aside (by suspension) a reasonable period for investigation.

## Lateness

An employee's Supervisor shall ensure accountability for staff punctuality. The Supervisor will document all instances of lateness on the employee's attendance record. The Supervisor will review all attendance sheets weekly and ensure that necessary disciplinary action is taken, as follows:
- 3 late notations – employee is issued a counseling (in writing)
- 3 additional late notations – employee is issued a Verbal Admonishment (in writing, with a copy sent to Human Resources)
- 2 additional late notations – employee is issued a Written Warning (in writing, with a copy sent to Human Resources)
- 1 additional late notation and every late notation thereafter - employee is issued an Employee Violation Report

The Supervisor will be responsible for seeing that all employees conform to the standards set within this policy by the PPS. Any employee that violates these procedures is subject to disciplinary action.

## Compensation for Off-Duty Employees Participating in All Levels of the Disciplinary Process

Off-duty employees who will not be compensated:
- Employee charged (if any charge is sustained)
- Witnesses requested by employee, unless subpoenaed

Off-duty employees who will be compensated:
- Charging Officer
- Witnesses requested by the PPS
- Employee charged (if all charges are not sustained)
- Any employee served with a subpoena

**Revised**                    November 12, 2014                    **Revised**

D 000523

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 3.C.1 | Page 1 of 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Related Pennsylvania Minimum Standards:** Title 37 PA Code § 95.240 |
|---|---|
| **Section:** C - Rules and Discipline | **NCCHC Standard:** J-E-09 **Related ACA Standards:** 4-ALDF-6C-01-19, 2-CO-3C-01 |

| **Subject:** Inmate Discipline | **Supersedes:** Policy 3.C.1 signed on April 18, 2011 |
|---|---|
| **Approved:** _____ Commissioner | **Signature Date:** March 9, 2015 |
| **Effective Date:** April 9, 2015 | **Scheduled PAD Review:** Annually **Scheduled Commissioner's Review:** March 9, 2019 |

## Purpose

The purpose of this policy is to describe the inmate disciplinary procedures that will be used in the Philadelphia Prison System (PPS) to enforce facility rules and regulations.

## Policy

It is the policy of the PPS to have in place a system of inmate discipline that will serve to protect the public, inmates, and staff, and, to maintain order in the system and its facilities.

## Definitions

*Critical Infractions:* rule violations that have critical/extreme inmate and facility management implications. Critical infractions are listed in PPS Policy and Procedure 3.C.2 Prohibited Acts.

*Disciplinary Hearing Officer (DHO):* an impartial person who is specially trained and certified to conduct all disciplinary hearings in the PPS in accordance with the time limits and procedures established in this policy. The DHO will be appointed by the Commissioner and report to the Deputy Commissioner for Administration. The DHO shall be assigned on a full time basis to these duties. When necessary, an alternate DHO will be appointed and trained.

*Facility Disciplinary Coordinator (FDC):* a facility staff person designated by the Warden who assists the DHO in the conducting of all disciplinary hearings.

*Minor Infractions:* minor infractions are rule violations that do not have serious inmate and facility management implications. Minor infractions are listed in PPS Policy and Procedure 3.C.2 Prohibited Acts.

D 000524

|  | **PHILADELPHIA PRISONS**<br><br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>3.C.1 | **Page  2**<br><br>**of      16** |
|---|---|---|---|

| **Part:**  III - Institutional Operations | **Subject:**  Inmate Discipline |
|---|---|
| **Section:**  C:  Rules and Discipline | **Date:**  March 9, 2015 |

*Major Infractions:*  major infractions are rule violations that have serious inmate and facility management implications. Major infractions are listed in PPS Policy and Procedure 3.C.2 Prohibited Acts.

## Procedural Overview
Inmate discipline will be maintained through the impartial application of a fully developed, well-understood set of rules and regulations and a hearing procedure that incorporates all applicable due process requirements. Inmates will be required to conform to the standards of conduct reflected in appropriately posted PPS rules and regulations, which will be provided to them during orientation. Prohibited Acts are listed in PPS Policy and Procedure 3.C.2 and in the Inmate Handbook.

An inmate violating any PPS rules or regulations may be subject to disciplinary action under the provisions of this policy. Such disciplinary action is intended to correct behavior. It is never intended to humiliate or degrade. One or more of a range of penalties will be imposed for rule violations. The written rules will be reviewed annually and updated, if necessary.

A properly managed inmate discipline program will perform the following functions:
- maintain security, control, and safety;
- ensure the inmates' due process rights;
- ensure fair and consistent disciplinary practices; and
- ensure proper documentation of all rule violations.

## Responsibility of Employees
It is the duty of every PPS employee to be familiar with the discipline process,  including familiarity with the rules of the system, rationale for the rules, dispositions available, and report writing. Each employee will be aware of the scope of his or her authority, and exercise that authority fairly and impartially. Each employee has a responsibility to address all infractions of the rules.

## Reporting Infractions
Many minor rule violations can be addressed informally. However, those which cannot be addressed informally will be documented in writing in accordance with this policy.

Following observation of a rule violation, the reporting staff member will input details concerning the rule violation into the Integrated Jail Management System (IJMS) Inmate Management desktop (Inmate Misconduct screens). The IJMS input and all reports will be prepared promptly and will include the following details of the activity being reported:
- the date and time of the offense;
- the specific rule(s) violated;

**Revised**                                      **March 9, 2015**                                      **Revised**
D 000525

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 3.C.1 | Page 3 of 16 |
|---|---|---|---|

| Part: III - Institutional Operations | Subject: Inmate Discipline |
|---|---|
| Section: C: Rules and Discipline | Date: March 9, 2015 |

- the location of the offense;
- a formal statement of the charge;
- the inmate(s) involved and witnesses;
- adequate details of the violation to substantiate the charge, including;
  - type and disposition of contraband or physical evidence;
  - unusual behavior by the inmate;
  - person(s) involved;
  - what transpired, etc.
- a description of the immediate action taken, including any force used by the inmate or staff (refer to PPS Policy and Procedure 3.A.8 Use of Force and Restraints);
- the signature and title of the staff member filing the report; and
- the date and time of the report.

Note: In cases where multiple staff members or inmates have been assaulted by one inmate, an Inmate Misconduct Report will be generated for each victim.

This form will be produced in duplicate from the IJMS and forwarded to the Shift Supervisor.

**Report Processing Outline**
A Report of Inmate Misconduct will be handled as follows:
- a report may be disposed of by a Supervisor subsequent to a fact finding review. This informal disposition must be agreed to in writing by the inmate and may be utilized for minor infractions only. No subsequent administrative appeal of the finding or disposition will be allowed.
- a report may be disposed of by the DHO subsequent to a full and formal hearing. Both the guilty finding and the disposition may be appealed.

**Review of Reports of Inmate Misconduct**
The Shift Supervisor will immediately review Reports of Inmate Misconduct upon receipt. The report review is for the purpose of ensuring that the rules violated (charges) and the description of the offense are consistent. In cases where the description does not support the charge, the Shift Supervisor will return the report to the reporting staff member(s) with instruction to amend the report. This task may not be assigned to a subordinate.

At the time that the report is reviewed, the Shift Supervisor will refer the disciplinary report to the appropriate Supervisor for processing. The Supervisor will enter the information required on the notification section of the Report of Inmate Misconduct and will give the charged inmate one copy of the form. This notice will be promptly given to the inmate within twenty-four (24) hours prior to the

| Revised | March 9, 2015 | Revised |
|---|---|---|

D 000526

| | **PHILADELPHIA PRISONS** **POLICIES & PROCEDURES** | **Policy Number** 3.C.1 | **Page** 4 **of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

disciplinary hearing. The hearing may be held, with the inmate's written consent, within twenty-four (24) hours of the reporting of the inmate misconduct. A signed copy of the Report of Inmate Misconduct will be returned to the Shift Supervisor. The staff member delivering the notice will note any inmate refusal to sign the acknowledgment of receipt.

Regardless of whether the infraction will be resolved informally or through a full hearing, the Supervisor will take no punitive steps at this stage of the proceedings. The Supervisor may, however, order that the charged inmate be placed in prehearing segregation status (as provided for in the following section).

**Fact Finding Review**
A fact finding review will be conducted into each reported offense. The disciplinary report will be submitted to the Shift Supervisor, who will be responsible for seeing that a fact finding review into the report is initiated within twenty-four (24) hours of the time the violation is reported. A review may be delayed solely because of a facility emergency.

**Prehearing Segregation**
Prior to the beginning of the fact finding review, the Supervisor will determine whether the inmate should remain in general population status pending investigation.

The Supervisor will assess the risk to the safety and order of the facility if the inmate were to remain in general population status and the type of violation with which the inmate is charged, and decide whether or not the inmate will be placed in a more restrictive status. Major infractions will not automatically result in placement of the inmate in prehearing segregation. Inmates will be placed in prehearing segregation only if the inmates' continued presence in the population will pose a serious threat to him/herself or to others, or if there is reason to believe the inmate poses an imminent threat to the security of the facility (e.g., through riot, escape, or safety hazards).

When an inmate is placed in prehearing segregation, the Supervisor ordering the segregation will input the relevant information into the IJMS and forward the Special Management Status Placement Order produced from the IJMS by the Shift Supervisor to the Deputy Warden of Operations for review within twenty-four (24) hours (excluding weekends and holidays) of the inmate's placement in segregation. The Deputy Warden will indicate approval or disapproval on the placement order. The Deputy Warden will then forward the Special Management Status Placement Order to the Warden for final review within seventy-two (72) hours (excluding weekends and holidays) of the inmate's placement in segregation. The Warden will indicate approval or disapproval on the placement order. Any time spent by an inmate in prehearing segregation will be credited against any subsequent term of disciplinary detention imposed.

| | **PHILADELPHIA PRISONS** **POLICIES & PROCEDURES** | **Policy Number** 3.C.1 | **Page** 5 **of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

## Components of Disciplinary Fact Finding Review

As part of the review, the Supervisor will, as soon as it is practical, interview the inmate and any other parties who may have information regarding the incident and record the substance of those interviews on the IJMS Inmate Management desktop for further review.

When appropriate, written statements may be taken from witnesses, and supplemental reports will be prepared by staff. Staff may record their written statements or supplemental reports in the IJMS Inmate Management desktop.

The fact finding review will be completed within seventy-two (72) hours, excluding weekends and holidays. The Supervisor will have the option of continuing the case for additional investigation, referring the matter for criminal prosecution, referring the matter for a disciplinary hearing, or, in the case of minor infractions, resolving the matter informally.

## Methods of Disciplinary Disposition
### *Informal Disposition*

Minor infractions may be resolved through an informal process that will include providing the inmate with a written statement of the rule violated, an opportunity to be heard, and a decision by a Shift Supervisor or designee not involved in the incident within seven (7) working days.

An inmate may not be placed in disciplinary detention nor lose earned time/good time for a minor infraction as part of an informal disposition.

An inmate must consent, in writing, to the imposition of extra work duty or other minor disposition as part of the informal resolution of a minor rule violation. The resolution may include other dispositions as outlined below. Acceptance by signature of an informal disposition on a Disciplinary Fact Finding/Informal Disposition Report Form precludes any administrative appeal of the action by the inmate. The record of the informal disposition will be forwarded to the Warden and then to the inmate's social service file. If the inmate does not consent to the informal disposition, the disciplinary report will be referred for a formal hearing.

### *Formal Disposition*

Critical and major infractions will be handled through the formal disciplinary process, referral for prosecution, or both. Incidents involving major violations will not be resolved informally and may subject the inmate to maximum available dispositions. If a rule violation occurs that is not listed as a major violation in PPS Policy and Procedure 3.C.2 Prohibited Acts, it may still be referred for a hearing if the Supervisor deems the violation disruptive or otherwise serious enough to warrant formal disposition.

**Revised**                    **March 9, 2015**                    **Revised**

D 000528

| | **PHILADELPHIA PRISONS** **POLICIES & PROCEDURES** | **Policy Number** 3.C.1 | **Page** 6 **of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

## Disciplinary Hearings

If the reviewing Supervisor has a reasonable belief that an infraction has occurred and that formal disciplinary action is warranted, a hearing for disciplinary action will be scheduled to occur within seven (7) working days from the date of the violation.

## Convening Hearings

A disciplinary hearing will be convened as soon as is practical for the purpose of hearing the case. In any case, the hearing must be convened within seven (7) days after the alleged violation, excluding weekends and holidays. The DHO will conduct all disciplinary hearings. The DHO will be assisted by a Facility Disciplinary Coordinator (FDC).

The FDC will perform the following functions:

- schedule time, location, and inmates for all hearings;
- coordinate security coverage and arrangements for inmate representation;
- maintain log records of all hearings, as required, including ensuring that IJMS entries are made promptly; and
- prepare records necessary for DHO reviews of status, as required (see below).

The purpose of the hearing will be to determine the facts of the alleged violation, weigh the evidence, and make a ruling as to the disposition of the case, using only information and evidence available in the hearing. Formal rules of evidence need not be followed.

## Disciplinary Assistance

An inmate accused of a rule violation may request, and will be appointed, on request, the services of any staff member on the approved list to assist the inmate during his or her disciplinary hearing. An inmate may select a staff member who is not on the approved list if the staff member agrees to assist the inmate and the Warden approves. This person shall assist the inmate in understanding facility rules and regulations, disciplinary procedures, due process requirements and presentation of evidence. The Warden may appoint an assistant for an inmate who, in the judgment of supervisory staff ,and in consultation with mental health, medical, and Restorative and Transitional Services staff, is unable to conduct an independent defense against the charges.

Inmates should be allowed to choose persons to assist them from an approved list of facility staff members selected by the Warden. Staff members designated to assist inmates should be trained in and knowledgeable about facility rules and discipline, disciplinary procedures, and due process requirements. However, the burden is on the Warden to indicate reasons for not allowing a particular staff member to represent an inmate in a specific situation.

**Revised**                                **March 9, 2015**                                **Revised**

D 000529

| PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 3.C.1 | Page 7 of 16 |
|---|---|---|

| Part: III - Institutional Operations | Subject: Inmate Discipline |
|---|---|
| Section: C: Rules and Discipline | Date: March 9, 2015 |

## Standard of Proof

The standard of proof in an inmate disciplinary proceeding is a preponderance of the evidence. A preponderance of evidence is established when it is more likely than not that the inmate committed the infraction. Another way of viewing a preponderance of evidence is that if after considering all of the evidence presented, the DHO determines that it is more than 50% likely that the inmate committed the infraction. In reaching a decision, the DHO will consider only the evidence presented at the hearing.

The DHO findings must be on the merits of the evidence. Technical or clerical errors in the processing of the inmate misconduct will not be grounds for dismissing the misconduct, unless there is substantial prejudice to the inmate.

## Hearing Procedures

At the commencement of the hearing, the DHO shall read the charges to the inmate, who may choose to admit, deny, or otherwise explain the incident surrounding the charge. In addition, the inmate may choose to remain silent during the hearing. An inmate's silence during the hearing is not evidence of guilt.

During a disciplinary hearing, the DHO may hear testimony from witnesses, the reporting staff member, and the charged inmate, provided the inmate's appearance would not be disruptive. If, during a hearing, the inmate becomes disruptive, he/she may be removed and the hearing completed.

An inmate charged with a rule violation will have the opportunity (but is not required) to be present, make a statement, present documentary evidence, and call witnesses in his or her behalf when such witnesses are reasonably available and their presence is not deemed by the DHO to cause a clear and present danger to facility safety. The DHO may exclude those witnesses whose appearance would result in presentation of unduly cumulative evidence or a witness who refuses to appear. The reasons for such denial will be documented in the record of the hearing. Inmates may be excluded from the hearing during the testimony of others whose statements must be given in confidence, and the reasons for any such exclusion shall be documented.

Only an inmate's staff assistant may cross-examine witnesses during a hearing. The cross-examination should refer only to the relevant facts, as determined by the DHO, of the incident. Relevant facts include a witness's credibility, for example bias or personal knowledge. An inmate will not cross-examine staff; however, the inmate may suggest questions to be asked of a witness by the staff assistant or DHO.

**Revised**                    **March 9, 2015**                    **Revised**
D 000530

| | **PHILADELPHIA PRISONS** **POLICIES & PROCEDURES** | **Policy Number** 3.C.1 | **Page** 8 **of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

## Postponement/Continuance of Hearings

The DHO may postpone a hearing for good cause, documenting the reason for any such delay. This may include situations where, during a disciplinary hearing, the DHO determines that the Inmate Misconduct Report is incomplete or charges are missing and/or wrong based on the evidence presented. The DHO may dismiss the Inmate Misconduct Report with instructions for it to be re-submitted with the correct charges/information. He/she shall return the report to the facility Deputy Warden for Administration for distribution back to the Fact-Finding Supervisor.

The inmate must be notified of the postponement at least twenty-four (24) hours before the originally scheduled hearing; the inmate may waive this notice and have an immediate hearing. The inmate may also request a continuance for good cause, which may be granted by the DHO for a reasonable period. Such reasons as preparation of a defense, illness, or unavailability of the inmate; further investigation of factual matters relevant to the hearing; or pending criminal court prosecution may be considered. Delaying a hearing is also justifiable on the basis of factual recording of an inmate's unacceptable behavior during the hearing process or the inmate's refusal to participate in a reasonable manner. However, a hearing may be conducted without the inmate present.

## Disciplinary Dispositions

The DHO is empowered to impose appropriate dispositions (see below) when a charge is substantiated through the hearing process.
Substantiating information can be obtained from the following sources:

- staff reports;
- inmate statements;
- information derived from documentary evidence; and
- witness statements.

Disciplinary detention should be imposed when the other available dispositions are inadequate to regulate the inmate's behavior within acceptable limits or it is required to impress on the inmate the seriousness of the offense. Before admission to disciplinary segregation housing, physical health care and behavioral health care staff will evaluate the inmate's medical record for any contraindications to disciplinary segregation. If there are any contraindications, the physical and behavioral health care staff will notify the Shift Commander immediately. Physical health care staff will document this evaluation in the inmate's medical file. A notation also will be made in the inmate's disciplinary file.

The DHO will obtain input from mental health staff before imposing dispositions on an inmate who displays signs of mental illness or retardation. The DHO may consider an inmate's mental capacity in determining guilt. The DHO will also obtain input from the inmate or his or her representative(s) regarding any mitigating circumstances as to punishment. After determining that an inmate is guilty of a charge, the DHO should consider any prior record of disciplinary violations.

| PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 3.C.1 | Page 9 of 16 |
|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

Offenses categorized as critical infractions will be considered the most serious and will result in use of disciplinary detention for periods of the maximum available, in combination with other available penalties.

Offenses of major severity are resolved through hearings and will generally result in the DHO imposing disciplinary detention for periods up to the maximum available, in combination with other available penalties.

Offenses of minor severity that are resolved through hearings will generally result in the DHO imposing dispositions less than the maximum, although combined dispositions will still be available for the purpose of controlling behavior.

**Allowable Dispositions**
The DHO may impose one or a combination of only the allowable dispositions noted below in proportion to the seriousness of the infractions involved for the purpose of controlling and correcting the behavior of the inmate.

The following are allowable dispositions:
- continuance pending outcome of criminal charges or availability of the inmate;
- dismissal of any or all charges and expungement of the record;
- counseling of individual to obtain corrective behavior;
- loss of job and referral for job assignment review;
- reprimand;
- referral for filing of formal criminal charges;
- change in housing;
- assignment of extra work (up to 45 hours for Minor)
- forfeiture of good time/earned time (see below);
- restriction of any privilege for a specified time (an inmate's non-privileged mail, visiting, or other privileges may be withheld, but only when the violation involves rules regulating that activity, [i. e., telephone privileges and TV);
- confiscation of property;
- fine, as appropriate to the inmate's misconduct and ability to pay;
- order of restitution for damages;
- referral to behavioral health care staff;
- suspension of execution of any disposition imposed;
- placement in disciplinary detention (whose cells are comparable to general population cells in terms of furnishings, light, heat, and ventilation) for not more than seven (7) days for a

| PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 3.C.1 | Page 10 of 16 |
|---|---|---|

| Part: III - Institutional Operations | Subject: Inmate Discipline |
|---|---|
| Section: C: Rules and Discipline | Date: March 9, 2015 |

single finding on a minor infraction; up to fifteen (15) days for multiple guilty findings on minor infractions arising from the same incident; fifteen (15) days for a single guilty finding on a major infraction; thirty (30) days for a single guilty finding on a critical infraction; up to sixty (60) days for multiple guilty findings on major or critical infractions arising out of the same episode.

- consecutive dispositions may be imposed for separate offenses arising out of separate episodes;
- commissary and social phone calls are automatically forfeited in disciplinary detention status.

## Forfeiture of Earned Time/Good Time

All earned time ET/GT will be forfeited upon a guilty finding for the following critical infractions (such forfeiture cannot be reinstated):

- C.1    murder;
- C.2    rape;
- C.3    any sexual assault;
- C.4    holding a hostage;
- C.5    escaping, attempting to escape, or making specific plans to escape;
- C.6    rioting or inciting others to riot;
- C.7    assaulting any staff member - whether contact occurred or not, such acts of aggression toward a staff member include, but are not limited to, punching, kicking, striking, spitting, throwing liquids, throwing bodily fluids/feces, or solid objects;
- C.8    assault on inmate by inmate – when the inmate (aggressor) attacks another inmate (victim) without warning for no apparent reason;
- C.9    assault on any non-staff person if personal injuries result, for example – visitor, student, official visitor;
- C.10   fighting with another inmate if personal injuries result, if a weapon is used, and/or when bodily fluids have been used in the fight – both inmates spontaneously engage in a fight, scuffle, wrestling or horseplay that results in either inmate receiving injuries and/or if a weapon was used;
- C.12   encouraging, facilitating, or otherwise conspiring with others to commit any critical infraction;
- C.13   possession or introduction of electronic devices, such as: cellular phone, pager, telecommunication equipment, tape recorder/player or any other electronic device that jeopardizes the security and safety of the facility;
- C.14   possession  or introduction of weapon(s);
- **C.15**   possession  or introduction of critical contraband, to include unauthorized

| ![Philadelphia Prisons Logo] | **PHILADELPHIA PRISONS**<br><br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>3.C.1 | **Page**  11<br><br>**of**      16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

                drugs or drug paraphernalia, including prescribed medication deemed dangerous by the assigned physician but not taken as directed;

- C.16    collecting, storing, throwing, and/or smearing feces, urine, and/or other bodily fluids;
- C.17    terroristic threats; defined as a declaration of intent to commit an extreme crime of violence against another; with the intent of causing the death of a person, or occupants of a building or facility;
- C.18    setting a fire.

All or any portion of ET/GT may be forfeited at the discretion of the DHO upon a guilty finding for the following infractions (such forfeiture may be reinstated upon application to the Warden):

- B.1    tampering with or damaging security equipment and locking devices;
- B.2    failure to return a complete razor and/or tampering with an issued razor;
- B.3    extortion or blackmail, or demanding or receiving anything of value in return for protection against others to avoid bodily harm;
- B.4    engaging in sexual acts - not involving threat or force;
- B.5    indecent exposure;
- B.6    possession  or introduction of major contraband, such as: money valued at more than $50; alcoholic beverages; identification of an employee or another inmate; and, gang related materials;
- B.7    theft of property with a value of more than fifty dollars ($50.00);
- B.8    fraudulent sale or use of commissary privileges, medical cards, or any identification cards;
- B.9    counterfeiting, forging, or reproducing without proper authorization any document, article of identification, money, security items, or official paper (This infraction does not apply to documents related to an inmate's criminal case.);
- B.10    destroying, altering, or damaging property with a value of more than ($50.00);
- B.11    refusing to provide a urine or breath sample;
- B.12    violating a condition of furlough, Work Release Program Agreement, Global Positioning Satellite (GPS) Monitoring Program Rules and Conditions, PPS twelve (12) hour pass authorization or any other conditional or temporary release;
- B.13    violating any municipal, county, state, or federal law of felony class that is otherwise not listed or comprised within a major infraction;
- B.14    possessing property worth more than $50.00 belonging to another person;
- B.15    interfering with the taking of a count or late return for count;
- B.16    encouraging, facilitating, or otherwise conspiring with others to commit any major infraction;
- B.17    threatening  an employee or outside visitor with bodily harm or injury;

| | PHILADELPHIA PRISONS | Policy Number | Page | 12 |
|---|---|---|---|---|
| | POLICIES & PROCEDURES | 3.C.1 | of | 16 |

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

- B.18　possession or introduction of tobacco and/or tobacco related products. Tobacco includes any products which contains tobacco, including, but not limited to: cigarettes (pre-made or rolled), cigars, pipe tobacco, chew, or snuff. Tobacco related products includes any product used in the use of tobacco, including, but not limited to: lighters, matches, or rolling paper;
- B.19　smoking;
- B.21　positive result on an analysis of breath, blood, or urine for consumption/ingestion of Alcohol and/or Controlled Substances constitutes a major infraction of PPS rules and regulations and is a violation of a court ordered work release sentence and court ordered weekender sentence;
- B.22　self-injury – this act is done for manipulative purposes rather than as a result of a suicide attempt, determined by the mental health care professional;
- B.23　tattooing/body piercing – receiving, performing, or assisting in tattooing, or body piercing;
- B.24　unauthorized use of any computer;
- C.11　giving or offering any official or staff member a bribe or anything of value.

One day of ET/GT is automatically forfeited upon a guilty finding for any minor infractions (refer to PPS Policy and Procedure 3.C.2, Prohibited Acts, for a complete list of minor infractions).

**Record of Findings**
The FDC will enter a record of the disposition on the IJMS Inmate Management desktop and produce a hearing report from the IJMS. The DHO will be responsible for the contents of the report, and will sign the report and provide a copy to the inmate.

The record maintained of the hearing will include testimony heard, evidence considered, and the finding and disposition including justification of the disciplinary action taken (if any). This record need not be verbatim and will be completed within two (2) working days following the hearing.

When an inmate is found guilty of only some of the rule violations he or she was originally charged with in connection with a single incident, and when that incident is described in a single disciplinary report, charges resulting in not-guilty findings will be marked over or made illegible. Where there are multiple incidents involving the same inmate, separate disciplinary reports must be prepared for each incident.

The original of the IJMS hearing report or the Disciplinary Hearing Summary Report will be forwarded to the Warden with all other forms and documents pertaining to the misconduct. Subsequent to processing and review, the original report and all related documents shall be maintained in the inmate's file. A copy of the hearing report will be placed in the DHO's files for retention for one (1) year, a copy

D 000535

| ![Philadelphia Prisons logo] | **PHILADELPHIA PRISONS**<br><br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>3.C.1 | **Page** 13<br><br>**of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

signed by the DHO will be provided to the inmate (along with any non-confidential information relied upon by the DHO), and a copy will be provided to the staff member reporting the infraction.

When, at the conclusion of a hearing, it is determined that no violation was committed, an entry will be made into the appropriate IJMS screen to this effect. A copy of this notation will then be forwarded to the Warden's office; the remaining IJMS files or forms shall be destroyed and will not be entered into the inmate's permanent record.

All disciplinary reports, regardless of disposition, may be kept and used for statistical or research purposes. All identification of inmates must be removed from disciplinary reports used in this manner.

Appropriate logs will be maintained to collect data, and data will be entered into the IJMS for each incident. This information will be used to tabulate system statistics.

**Confidential Information**
An individual may be found guilty of a disciplinary infraction on the basis of information from a source whose identity is not disclosed to the inmate at the hearing. Such information may be presented to the DHO orally or in writing.

The DHO may decide to keep a witness's identity confidential if the DHO reasonably determines that disclosure of the witness's identity to the inmate would create a substantial risk to the safety of the witness.

In all cases in which the DHO considers information from a confidential source, a record will be maintained indicating the details of such information and, if possible, the identity of that informant and the degree of staff familiarity with the informant's reliability. Such records will be available only to the Warden and the Director of the Office of Professional Compliance.

The DHO may exclude an inmate from hearing the testimony of a confidential witness. The details of any information from a confidential source will be disclosed to the inmate at the hearing to the extent that this may be done without creating a substantial risk to the safety of the confidential source. When the DHO considers information from a confidential source, the name of the source and all details of such information will be not be given in the presence of the inmate.

The DHO will question the confidential witness thoroughly to assure that all relevant facts have been disclosed. An inmate may submit to the DHO relevant questions to be asked of the witness. When weighing the evidence, the DHO should take into account that the inmate's representative has not had an opportunity to cross-examine the witness.

| | **PHILADELPHIA PRISONS** | **Policy Number** | **Page  14** |
|---|---|---|---|
| | **POLICIES & PROCEDURES** | 3.C.1 | **of    16** |

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

## Appeals

Inmates may appeal the decision of the DHO to the Warden, in writing, within five (5) days from the date of being advised of the DHO's decision.  The inmate will be advised of the right to appeal by the DHO at the time that the disposition is announced. If an inmate appeals the decision of the DHO, he/she will be provided, to the extent possible, copies of reports prepared for the hearing.

The Warden will consider the merit of the appeal based on whether there was substantial evidence to support the charges, whether there was substantial compliance with applicable discipline policies and procedures, and whether the disposition imposed was proportionate to the rule violation.  Technical or clerical errors in the processing of the inmate misconduct will not be grounds for an appeal, unless there is substantial prejudice to the inmate.

The Warden may affirm or reverse the decision outright or modify (but not increase) the disposition imposed.  A decision will be made within five (5) days, and a written copy of the decision will be provided to the inmate.

A log record of all actions in response to appeals will be maintained and kept by the FDC through the IJMS. A DHO may access this log through the IJMS.

## Warden's Review

The Warden or designee will review all disciplinary actions, regardless of whether an appeal is entered, to assure conformity with policy and regulations. Such reviews will be conducted promptly in order to ensure that the report and related information will be filed in a timely manner. The Warden may on his or her own initiative reverse the decision, remand the decision to the DHO, or modify the disposition imposed whenever such action is supported by the record.  Under such a review, a disposition imposed by the DHO may not be increased. Subsequent to review, the Report of Inmate Misconduct and all documents relating to it will be placed in the inmate's file. The Warden will direct the FDC to make the appropriate changes to logs and the IJMS system.

A weekly report of all Disciplinary Actions (refer to attachment 3.C.1.e) will be forwarded to CMR by the Warden of each facility.

## Procedures Following Potential Criminal Misconduct

Any inmate who may have violated a local, state, or federal law while in custody will be subject to criminal prosecution. Alleged violations of any law will be reported, investigated, and handled in the same manner as any regular criminal case in the general community.

**Revised**                                    **March 9, 2015**                                    **Revised**

D 000537

| | PHILADELPHIA PRISONS<br><br>POLICIES & PROCEDURES | Policy Number<br><br>3.C.1 | Page   15<br><br>of       16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Inmate Discipline |
|---|---|
| **Section:** C: Rules and Discipline | **Date:** March 9, 2015 |

On the determination of the Shift Supervisor or Shift Commander that an inmate may have committed a criminal offense, the proper law enforcement agency will be notified. The facility duty officer will be notified.

Any disciplinary hearing in connection with an alleged offense which has been referred for criminal prosecution will be conducted in accordance with this policy. However, before any staff member questions the inmate regarding any aspect of the matter, the inmate will be advised of the right to remain silent and that anything said during the course of the disciplinary process or hearing may be used against him or her in any subsequent criminal proceeding.

**Emergency Procedures**
In the event of a widespread facility disruption requiring emergency action, any or all portions of this policy may be temporarily suspended. Only permissible dispositions may be employed during such an emergency. Any inmate involved in the emergency may be detained without a hearing throughout the course of an officially declared emergency.

**Review of Status**
The DHO will conduct reviews of all inmates in disciplinary detention status for more than seven days (refer to Policy and Procedure 3.E.3, Disciplinary Detention). The DHO may release an inmate at any time prior to the expiration of the term of confinement in Disciplinary Detention. The reviews will be conducted every seven (7) days. During the review, the DHO shall consider all aspects of the facts that resulted in the inmate's detention status and examine the record of the inmate's compliance with facility policy during confinement in detention status. All review activity will also be documented in the disciplinary hearing log in accordance with PPS Policy and Procedure 3.E.3 Disciplinary Detention.

**Training**
Due to the importance of this area, the Training Academy will include a session on inmate discipline procedures in the initial and annual refresher training, including familiarity with the rules of the PPS, rationale for the rules, and dispositions available.

**Inmate Notice**
All inmates and staff members will receive a copy of the rules and regulations, including ranges of penalties and a summary of this disciplinary policy, during orientation in accordance with PPS Policy and Procedure 4.A.4 Housing and Activities of Inmates in Administrative and Diagnostics Status. This information, contained in the Inmate Handbook, will be translated into English and Spanish. The inmate will sign a form indicating receipt of the Inmate Handbook, which will be maintained in his/her files. The services of an interpreter or staff member will be employed, if necessary, to ensure an inmate who is not capable of understanding English or is illiterate is fully aware of the provisions of this policy. Provisions will be made to accommodate physically impaired inmates.

**Revised**                            **March 9, 2015**                            **Revised**

D 000538

| | PHILADELPHIA PRISONS POLICIES & PROCEDURES | Policy Number 3.C.1 | Page 16 of 16 |
|---|---|---|---|
| **Part:** III - Institutional Operations | | **Subject:** Inmate Discipline | |
| **Section:** C: Rules and Discipline | | **Date:** March 9, 2015 | |

## Evaluation

The DHOs will maintain a comprehensive log of all formal hearings in each facility by month. This information will include the number of reports, the charges and classifications of charges, the method of disposition, and the disposition imposed, if any; and any modifications made by the Warden. The DHOs will meet with a Deputy Commissioner on a regular basis to review any issues or problems concerning the implementation of this policy and procedure.

## Staff Requirements

This policy requires that DHOs be designated, trained and deployed in order to conduct hearings as required. The source of these positions must be established prior to implementation.

In addition, FDC and Disciplinary Representatives must be identified and trained. These functions should not require new or re-deployed positions.

**APPROVED / DISAPPROVED**

_____
**Gerald May, Warden /2017**



## CURRAN FROMHOLD CORRECTIONAL FACILITY

## POST ORDER #11
## RECEPTION INTAKE

**PURPOSE:** To accept all admissions; new, court returns, incoming transfers, and any other inmates; entering the facility's perimeter with valid reasons. The officer assigned to this post will examine all incoming and initial admitting paper work to ensure that the Philadelphia Prison System has a legal holding commit document, and perform any additional duties pertinent to initial commitment and reception.

| | |
|---|---|
| **Hours of Duty:** | 7:00am to 3:00pm |
| | 3:00pm to 11:00pm |
| | 11:00pm to 7:00am |

| | |
|---|---|
| **Days:** | Monday thru Sunday |

| **Equipment:** | Hand-held Medal Detector | Watch |
|---|---|---|
| | Admission Logbook | Handcuffs |
| | First Aid Pack | Computer |
| | Phone | Pepper-Spray |

## GENERAL INSTRUCTIONS

1. Report to post in the proper uniform of the day.  Maintain exemplary security and sanitation procedures at all times.

2. The officer assigned to this post may be reassigned temporarily to other posts in the receiving room, as determined by the receiving room supervisor. The concept of "cross-training" is strongly emphasized and practiced in the receiving room.

3. Review all posted memos frequently.

4. **Teamwork** and **communication** are vital to the operations in this area.


## DUTIES

- This officer will search initial intake holding/ processing cell (#8.01) when emptied of all prisoners and inmates.

- When the transporting agent and his/her prisoners are being admitted, he / she will present the required document to the officer, who will re-inspect the documents to ensure that they are in order, have been time stamped by the registrars office and signed by an authorized court member, judge, court clerk or U.S. Marshall.

- If any question arise concerning the commitment papers the receiving room supervisor, and the registrars office will be notified immediately.

- The following questions should be answered by all new commits:

  **1.  Are you 18 years of age?**

  **2.  Do you have any police related injuries? (If so, they must produce a 48 form).  Medical staff must be present to review and accept the Form from the inmate (This information must be reported to the intake Supervisor and entered into lock and track and photos must be taken).**

  **3. Do you have any serious medical problems (heart problems, diabetes, high blood pressure, etc.)?**

- The officer will completely fill out the **Intake Screening Questionnaire By Correctional Officer form**, print and sign their name, date, and have the inmate sign and date it. The form will then be given to the intake nurse.

- The officer will ensure that all newly admitted prisoners/ inmates are secured in the initial entry holding/processing cell (#8.01) while the verification process of all admitting documentation is being reviewed.

- The officer will generate an intake number by putting inmates' PID# in the computer and hitting the home button. To house the inmate you have to hit f9 then f10. Then the officer will interview the inmate asking D.O.B., age height, weight, scars or tattoos, and nationality.

- The officers will ask the inmate if he has any medication in his possession.

- The officer will also confiscate cellular phones and tag them with the inmates name and PID number. The cellular phone will then be turned over to the property officer.

- The officer will make an immediate determination as to weather to separate by cell any newly admitted inmate(s), or any other returning inmate(s) or prisoner(s) according to their status, and A visual observation by the officer. Separation between the following classes of inmates will be strictly maintained.

- Examples of these classes are:
  1. **Court ordered and administrative separations.**
  2. **Court ordered psychiatric admissions.**
  3. **Those inmates who are testifying against other inmates.**
  4. **System ordered separations.**

- If at this time the newly admitted inmate does not have a police photo number or was never arrested in Philadelphia the officer will issue an institutional police photo number from the automated system. He will then be assigned a Philadelphia Prisons intake number.

- Once verification has been completed and all inmates are accounted for, the reception officer will allow the restraints to be removed from the prisoners by the transporting agent.

- Each prisoner being accepted will be patted down, and the officer will use a hand held metal detector to ensure that no weapons or contraband are introduced into the holding cell (#8.01), and to determine if the prisoner has any contraband. If at this time contraband is found, then proper disciplinary action will be taken. Then the prisoner will be placed in a holding/processing cell inside the receiving room. At this time the transporting agency will be permitted to exit the institution.

- This officer will enter the following vital information into the reception logbook for all new admissions. This information will consist of the date, time entered, the name, the police photo number, the intake number, the transporting vehicle number and all will be added to the running headcount number.

- All other inmates coming into or leaving the facility will be recorded in the reception logbook by the following vital information, The information entered in this log will consist of the time, the vehicle number, a description, (court return, hospital trip, discharge, transfer, line ups, clinics, etc.), police photo number, destination and will be added and/or subtracted to the running headcount.

- This officer will then issue a gate pass for the inmates that are entering and/or leaving the facility. That gate pass will be given to the intake control booth officer, so that officer can verify the information in their logbook. Any discrepancies are to be immediately reported to the intake supervisor on duty.

- The officer will set up admitting paper work by using the holding case first and all other detaining documents behind.

- This officer will insure all prisoners/inmates are placed into the proper holding/processing cells in either the admissions or release side.

**POST RELIEF**

- Make proper relief of post. Receive all necessary and relevant instructions and information from the officer being relieved.

- Physically inspect post for proper order, cleanliness, equipment and post orders, etc. Check all doors, and rooms for security and proper locking operations.

- Inspect all equipment. Submit any needed maintenance requests, and make any necessary communication checks.

D 000551

- Review post orders and understand any and all normal operations of post. Sign in the logbook located in (A.R.T.) of lock and track automated system.

- Review logbook for necessary instructions and unusual occurrences on the previous shift.

D 000552

**APPROVED / DISAPPROVED**

_____
**Gerald May, Warden /2017**



## CURRAN FROMHOLD CORRECTIONAL FACILITY

### POST ORDER #15
### INTAKE IDENTIFICATION

**PURPOSE:** The primary responsibility of this post assignment is to accurately identify new admissions. The officer assigned to this post will be responsible for setting up all admitting case paper work to include any other required documents to complete the admission file folder, also the production and placement of bar-coded armbands with photo for each new admission within the Philadelphia Prison System.

**Hours of Duty:**      7:00am to 3:00pm

                        3:00pm to 11:00pm

                        11:00pm to 7:00am

**Days:**               Monday thru Sunday

**Equipment:**      Pen / Pencil        Notebook        Watch

                    First Aid Pack      Flashlight      Computer

                    Phone               Pepper-Spray    Armband Equipment

D 000553

## GENERAL INSTRUCTIONS

1. Maintain security and sanitation procedures at all times.

2. You may be reassigned temporarily to other posts in the receiving room as determined by the receiving room supervisor the concept of 'cross-training' is strongly emphasized and practiced in the receiving room.

3. Review all posted memos frequently.

## DUTIES

- The officer is to be stationed at the admission information counter. The officer will receive all admitting case paperwork from the intake reception officer to assist him/her in properly identifying the new inmate.

- The officer must enter the P.I.D. into the TFP; verify the information on screen with information on documents received from the reception/property area and update information in the TFP as required, including religion.

- The officer will organize the following documentation in a file folder, clothing receipt envelope, holding case paperwork, photos, clothes tag with name, PPS intake number, P.I.D. number and rack number from rack book.

- If an inmate is from another jurisdiction, then you will have to create an event number and enter all necessary information into the TFP, all necessary information will be on the admission documents.

- The file folder containing all documentation, photos, etc., will be given to CMR.

- The officer must check the photo against the inmate to make sure it is current, if not a new photo must be taken.

## POST RELIEF

Make proper relief of post; receive all necessary and relevant instructions and information from the officer being relieved.

Physically inspect post for proper order, cleanliness, equipment inventory and post orders etc.  Check all doors and rooms for security and proper locking operations.

Inspect all equipment, submit any needed maintenance requests and make necessary communications checks.

Review post orders and understand any and all normal operation of post sign in the post lo book-indicating review.

Review logbook for necessary instructions and unusual occurrences on previous shifts.

D 000555



# CURRAN FROMHOLD CORRECTIONAL FACILITY

## POST ORDER #19, 20 & 21
## INTAKE SEARCH & PROCESSING

**PURPOSE:**  This post is responsible for the accurate processing of newly admitted inmates within a timely manner and to ensure newly admitted inmates are placed into an intake housing unit within the court's mandated time frame.

**Hours of Duty**:    7:00am to 3:00pm

3:00pm to 11:00pm

11:00pm to 7:00am – (only 2 officers assigned during this shift)

**Days**:    Monday thru Sunday

**Equipment**:

| | | |
|---|---|---|
| Pen / Pencil | Notebook | Computer |
| Walkie-talkie | Logbook | First Aid Pack |
| Phone | Pepper-Spray | .07% Pepper Spray |
| Handcuffs | Spithood | |

GENERAL INSTRUCTIONS

1.    Attend roll call in the proper uniform of the day.

2.    Maintain exemplary security and sanitation procedures at all times.

3.    You may be reassigned temporarily to other posts in the receiving room, as determined by the receiving room supervisor. The concept of "cross-training" is strongly emphasized and practiced in the receiving room.

4.    Review all posted memos frequently.

5.    **Teamwork** and **communication** are vital to the operations in this area.


## RESPONSIBILITIES

Process and update any information pertaining to all new commits in the Lock&Track (L&T) system.

You may be required to search inmates that have been processed.


### DUTIES

- The processing officer will sign on the computer and Lock&Track; the processing officer will receive the inmates file folders (jackets) from the I/D officer.

- The officer will start by calling the new commits out from the holding cell and direct them to the counter where the computer processing will occur.

- The officer will ensure of the proper identification of the new inmate based on prior information. This information will be attained from the documents in the file folder, the computer image of the inmate and the armband.

- The officer will question the new commits and attain all vital information. This information will be entered into L&T.

- A detailed description of each inmate's civilian clothes will be entered into L&T. (Note: only clothing items that will be placed in storage will be entered into L&T. A receipt number will be generated by L&T for all items placed in storage.

D 000557

- All items issued to the new inmate must be entered into L&T.

- The officer will enter into L&T the inmate's phone numbers from his phone slip including area code and pin numbers.

- The officer will update the inmate's address, emergency references, and education and, employment history as required.

- The officer will enter all new cases and charges according to the documentation the folder all open cases will be updated as needed.

- The officer will print out the following list of documents: holding commitment/custody reports -4 copies; clothing receipt-4 copies; PPS issued items-4 copies; visitor card-1 copy; Center Control card-1 copy; CMR card - 1 copy; housing card-1 copy.

- The officer will collect two holding commitment summary/custody reports and one CMR card putting them inside the processed inmate box.

- The officer will collect one center card, one housing card putting them in the assigned boxes.

- The inmate will then be showered and placed into a holding cell awaiting housing.

- The Processing Officer will give the .07% pepper spray canister to the relieving officer from shift to shift.

## POST RELIEF

Make proper relief of post immediately after roll call receive all keys and relevant information from officer being relieved.

Physically inspect post for proper order, cleanliness, and equipment inventory and post orders. Check all doors and cells for security and proper locking operations.

Inspect all equipment, submit any maintenance requests and make any necessary communication checks.

D 000558

Review post orders and understand normal operations of the post.

Sign in log located in the ART desktop of Lock&Track. Review for information and unusual events.

**APPROVED / DISAPPROVED**

_____

**Gerald May, Warden /2017**

D 000559

| PHILADELPHIA DEPARTMENT OF PRISONS | Policy Number | Page 1 |
|---|---|---|
| POLICIES & PROCEDURES | 3.A.8 | of 16 |

| **Part:** III - Institutional Operations | **Related Pennsylvania Minimum Standards:** PA Code Title 37 §§ 91.6; 95.221; 95.240 95.241; 95.242 |
|---|---|
| **Section:** A - Security and Control | **NCCHC Standards:** J-1-01 **Related ACA Standards:** 4-ALDF-7B-10,14,15 &16 4-ALDF-2B-01,02,03,04,05,06,07 & 08, 2-C0-3A-01 |

| **Subject:** Use of Force and Restraints | **Supersedes:** Policy 3.A.8 signed on June 12, 2008 |
|---|---|

| **Approved:** _____ Commissioner | **Signature Date:** September 20, 2016 |
|---|---|

| **Effective Date:** October 20, 2016 | **Scheduled PAD Review:** Annually **Scheduled Commissioner's Review:** September 20, 2020 |
|---|---|

## Purpose

The purpose of the Use of Force and Restraints policy is to provide the Philadelphia Department of Prisons (PDP) employees with guidance regarding the use of force and restraints.

## Policy

It is the policy of the PDP to ensure that force is used only when necessary and only to the degree required to control the inmate(s) and maintain or restore order. The correct amount of force is the amount of force necessary to establish and maintain control over the subject, neutralizing threat or resistance. The amount of force and the levels of control used will be in accordance with the inmate's level of resistance. As the inmate's resistance escalates, so may the Officer's levels of control options. Options may range from mild (presence) to intense (deadly force). When the inmate's resistive behavior deescalates, the situation deescalates, and control of the inmate is obtained, the staff's level of force must decrease. Force is never to be used as punishment or retaliation.

## Definition of Terms

*Use of Force:* a defensive or offensive action or technique used by staff to respond to a subject's aggression or resistance.

*Reasonable Force:* the amount of physical control reasonably necessary to gain control of a subject(s) considering the totality of the circumstances; force necessary when lesser alternatives have not led to safe control.

*Excessive Force:* the application of an unreasonable amount of force beyond what is necessary in a given incident based on the totality of the circumstances.

*Deadly Force:* force employed by staff or an inmate that is likely to result in serious bodily harm or death.

| | PHILADELPHIA DEPARTMENT OF PRISONS<br><br>POLICIES & PROCEDURES | Policy Number<br><br>3.A.8 | Page  2<br><br>of      16 |
|---|---|---|---|

| Part:  III - Institutional Operations | Subject:  Use of Force and Restraints |
|---|---|
| Section A:  Security and Control | Date:  September 20, 2016 |

*Compliance:*  the subject's verbal and/or physical yielding to staff's authority without apparent threat of resistance or violence.

*Non-Compliance:* A subject's failure or refusal to comply, conform, and/or adapt his/her actions to a rule, lawful command, or requirement. Non-compliance can include the following in order of escalation: nonverbal cues indicating the inmate's attitude, appearance and physical readiness (e.g. body language); verbal responses from the inmate indicating unwillingness or threats; no physical resistance at all from the inmate, where body weight is the only resistance (e.g. laying on the floor, motionless); physical actions by the inmate which attempt to prevent the Officer's control (e.g. holding on to the bars; pulling away during a hands-on escort; laying on chest, with hands underneath the body, refusing to be cuffed); physical actions of assault (e.g. punching, kicking, fighting stance with hands-up); a deadly force assault.

*Pre-planned Use of Force*:  this occurs in situations where an inmate is in an area that can be isolated (e.g. a locked cell) and where there is no immediate, direct threat to the inmate or others.  When there is time for the pre-planned use of force, staff must first determine if the situation can be resolved without resorting to force.  In pre-planned use of force situations, staff must first notify a supervisor, who may or may not authorize a use of force.

*Spontaneous Use of Force*: Events that involve an inmate's participation in prohibited behavior which requires immediate intervention to protect staff and/or others; to quell a disturbance; to prevent escapes; or to prevent an inmate from inflicting injury to himself/herself.  In spontaneous use of force situations, staff may respond with or without the presence or direction of a supervisor.

*De-Escalation:* The act of decreasing resistance or decreasing the response to resistance for a subject and/or staff in an attempt to mitigate the need for force or prepare for a planned use of force event.

*Escalation:* Increasing resistance or increasing the response to a subject's resistance.

**Procedural Overview**
Force is justifiable in situations where it is necessary to:
- preserve the peace, maintain order, or prevent the commission of a felony or misdemeanor crime, including escape and attempted escape;
- prevent suicide or serious self-inflicted injury;
- protect oneself against another's use or attempted use of unlawful physical force;
- protect a third person against another's use or attempted use of unlawful physical force;
- prevent an inmate from taking another person hostage or causing serious bodily harm to another person; and
- enforce the rules and regulation of the PDP.

| | PHILADELPHIA DEPARTMENT OF PRISONS | Policy Number | Page 3 |
|---|---|---|---|
| | POLICIES & PROCEDURES | 3.A.8 | of 16 |

| Part: III - Institutional Operations | Subject: Use of Force and Restraints |
|---|---|
| Section A: Security and Control | Date: September 20, 2016 |

An inmate's non-compliance or physical aggression is the basis for all use of force situations.

Only approved, PDP-issued equipment will be used to apply force unless the Commissioner explicitly approved otherwise. The use of personal weapons, ammunition, and equipment is prohibited in the PDP.

Equipment necessary to use of force applications will be stored, controlled and issued in accordance with PDP Policy and Procedure 3.A.7 Emergency Equipment and Armory Operations.

## Levels of Control

These levels of force should not necessarily be construed as a sequential procedure to be followed from one level to another, since situations requiring force may follow a variety of behavioral scenarios in a number of sequences. The important principle is that the lowest level commensurate with the force situation should always be chosen to effect control.

### *Passive Levels of Force*
- Physical Presence
- Verbal Commands
- Hand Guidance

### *Active Levels of Force*
- Use of Pepper Spray
- Use of pressure points, wrist locks, joint locks, and takedowns (a technique used to bring a subject who is resisting from a standing position to the ground in order to heighten control)
- Striking techniques, such as hand strikes, knee strikes, leg/foot strikes, elbow strikes
- CERT team use of tactical equipment such as Electronic Restraint Devices (ERD) and ERD riot shields, 24"and 36" batons when used applying armbars; 37 mm OC and projectile launchers; flashbangs.
- Use of batons (36" and 24"), water hoses, expandable baton (CERT and Bike Patrol only), pepper balls (CERT only), and beanbags (CERT only)
- Deadly Force

## Passive Levels of Force: Physical Presence (Show of Force)

In some situations where an inmate or inmates are out of control, the observable and audible presence of the Correctional Officer(s) into the immediate area can stop the loss of control and/or deter further escalation.

In cases where an Officer's presence and verbal methods/commands do not result in inmates' compliance or control, or when an incident escalates so rapidly that verbal methods are not feasible, staff shall call

| | PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 4 of 16 |
|---|---|---|---|
| **Part:** III - Institutional Operations | | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | | **Date:** September 20, 2016 | |

for assistance. Verbal commands will be issued by the staff on the scene, with the additional arriving staff serving as visual reinforcement of the PDP's intention to gain control of the inmate.

## Passive Levels of Force: Verbal Commands
It is preferable to gain control of an inmate using direct verbal interaction and commands. The Ask/Advise/Order model for interactive behavior with the inmate(s) directs the interaction as follows:
- Ask for compliance from the inmate, indicating what you want him/her to do to comply, in a firm and fair tone.
- Advise the inmate that, if he/she does not comply with the request, force may be used. If possible, provide a face-saving alternative to the inmate's behavior.
- Order the inmate, indicating what you want him/her to do to comply, in a firm and fair tone. When possible, confirm with the inmate(s) verbally any intention not to comply with the given orders.

## Passive Levels of Force: Hand Guidance
The use of the hand to guide a compliant inmate(s) to a designated location or be placed in restraints without resistance is not considered a use of force. The following are some situations where the use of hand guidance is appropriate:
- compliant inmate(s) are being escorted to their cell;
- compliant inmate(s) are being placed in restraints;
- resistant inmate(s) are de-escalated by Officer's presence or by verbal commands, and become compliant without force.

Note: It is important to remember, this level of control is not effective on an actively resistant inmate(s). If resistance is persistent by the inmate, then force must be escalated until control is achieved.

## Escalation of Force Beyond Passive Levels of Force
The use of active levels of force is justifiable when passive levels of force have been exhausted (if time permits), or are not practical under the circumstance and staff believes the security of the facility or others is at imminent risk, an attack by the inmate(s) is occurring, an inmate or other person (such as a detained visitor) is attempting to flee/escape custody, or an inmate/inmates engage in excessive repetition of non-compliance with direct commands or orders. The type of force used will also depend on environmental factors, which are conditions that should be considered in a threat assessment. These may include the presence of other inmates, staff, or visitors; lighting; confined areas; floor conditions; ventilation; potential weapons, etc. Other variables that will also affect the type and level of force include the subject's size and relative strength in comparison to responding staff, the presence or absence of a reactionary gap, mental health issues, substance use/impairment of subject, the level of experience and/or training of staff and/or subject, etc.



| PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 5 of 16 |
|---|---|---|
| **Part:** III - Institutional Operations | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | **Date:** September 20, 2016 | |

Staff shall use only the amount of force necessary to gain control of the inmate, with minimum harm to both staff and inmate. Once compliance and control is attained and staff and inmate safety is assured, the use of force will de-escalate to a lower level of control.

Unless an emergency situation exists, active levels of force will not be applied without the presence of another staff member and a supervisor. Before committing to use force beyond hand guidance, and as long as time allows, staff will assure that sufficient additional staff and/or resources are present and that any required authorization is given.

The primary role of the supervisor should be to assess the situation, select the responses to be attempted along with their sequence of application, assure the availability of required staff and resources, initiate and terminate responses, and coordinate and supervise responses. Supervisors should avoid becoming physically involved in the use of force incident.

### Active Levels of Force: Use of Pepper Spray (Oleoresin Capsicum)

This is a control technique with a low probability of injury. Pepper spray is a naturally occurring inflammatory agent found in cayenne peppers. OC causes almost immediate swelling and burning of the eyes and breathing passages, inflammation of the respiratory tract, and restriction of breathing. To reduce the risk of injury to staff and inmates, staff trained in and issued pepper spray should use it before using or directing other active levels of force if time and circumstances allow.

The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated. At this level, staff may deploy pepper spray to gain control and/or compliance.

Staff will not use pepper spray as a means of punishment, personal abuse, or harassment. Staff will cease using pepper spray immediately upon the inmate(s) complying with given orders.

All PDP correctional security staff will be equipped with pepper spray (OC) as part of their equipment. Only staff that have been trained in the use of pepper spray (OC) are authorized to use it.

Once control has been established, all staff and inmates involved in the pepper spray incident will be assessed for injuries and decontaminated immediately following the use of pepper spray. After using pepper spray (OC), staff will restrain the exposed inmate(s). The area supervisor will ensure the exposed inmate is searched and escorted to the facility triage, by a staff member not involved in the incident, for decontamination and injury assessment.

| | PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 6 of 16 |
|---|---|---|---|
| **Part:** III - Institutional Operations | | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | | **Date:** September 20, 2016 | |

## Active Levels of Force: Use of Pressure Points, Wrist Locks, Joint Locks, and Takedowns
These are control techniques with low probability of injury. The use of this type of force is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate's level of resistance has escalated. At this level, staff may put their hands on the inmate(s) to gain control and/or compliance by using pressure points, wrist locks, joint locks, and takedowns.

## Active Levels of Force: Striking Techniques
These are control techniques with a high probability of injury. Based on the Officer's threat assesment of the situation and the totality of the circumstance, striking techniques may be used to control inmates who engage in physical actions of assault (e.g. punching, kicking, fighting stance with hands-up) and lower levels of force are not effective or practical. Striking techniques include hand strikes, knee strikes, leg/foot strikes, and elbow strikes.

## Active Levels of Force: CERT Use of Tactical Equipment
These are control techniques with a low probability of injury.  Examples of the tactical equipment used by CERT at this level of force include Electronic Immobilization Devices (EID) and EID riot shields; 24"and 36" batons when used applying armbars or with CERT escorts; 37 mm OC and projectile launchers; flashbangs.

## Active Levels of Force: Use of Tactical Equipment
These are control techniques with high probability of injury. Examples of these devices include the 36" riot baton, the 24" baton, the expandable baton (CERT only), water hoses, pepper balls (CERT only) and beanbags (CERT only).

### *Batons*
When a major disturbance occurs, and additional force is required, the Shift Commander has the authority to issue batons.  The following guidelines should be used when batons are chosen as a method of force:
- Center Control, facility control booths, Armory, Ready Rooms, and/or riot gear carts will maintain a supply of batons for issue on the authorization of the Shift Commander.
- If the need for batons arises, only staff who have completed Correctional Officer training will be supplied batons.
- When it is necessary to use the baton, the Officer will avoid possible fatal points of impact (for example: baton strikes to the head, throat, and spine). If possible, the baton should not be applied in a manner likely to result in death or serious injury.
- If staff with batons are unable to gain control of an inmate or group of inmates, the Officers may advance with batons in formation.  If the inmates continue an aggressive posture, staff may



| | PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 7 of 16 |
|---|---|---|---|
| **Part:** III - Institutional Operations | | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | | **Date:** September 20, 2016 | |

assume an offensive posture accordingly. If the inmates continue or initiate an attack, levels of control may be escalated to achieve compliance or control.
- On any occasion that a baton is applied by staff to an inmate, that inmate must be examined by medical staff as soon as possible.

**Active Levels of Force: Deadly Force**
These are control techniques that have a high probability of causing death or serious injury. Examples of deadly force are use of firearms and baton strikes to the head, throat and spine.

Staff are authorized to use deadly force only in accordance with this policy under the following circumstances:
- protection of self or a third party, such as other staff or inmates, from imminent danger or threat of death or serious bodily injury;
- prevention of the commission of a crime which would reasonably result in death or serious bodily injury to staff and/or a third party;
- protection of property, if damage to property would reasonably result in serious bodily injury or death to staff and/or a third party; and
- prevention of an escape or attempted escape where staff reasonably believes the inmate has committed or attempted to commit a felony which involves the infliction or threatened infliction of death or serious bodily harm; or
- if the Correctional Officer reasonably believes the escapee or attempted escapee poses an imminent danger or threat of death or serious bodily injury to the Correctional Officer or others.

*Guidelines Regarding Firearms*
- Firearms will be used only in situations in which staff are authorized to use deadly force, as described above.
- No firearm will be discharged if less extreme measures will suffice.
- A discharge of a firearm, either accidental or intentional, is considered to be a use of deadly force.
- The Officer discharging the firearm is responsible for each round fired at the target. The Officer must have a clear firing path to the target before firing at the target.
- Staff are not permitted to discharge a firearm in the air as a "warning shot."
- Staff members fired on by an inmate or non-inmate may return fire, taking into account the safety of noncombatants in the vicinity.
- Staff using deadly force will use all possible caution when in the proximity of civilians or when a fired shot may carry to an inhabited area.
- If time and circumstances permit, staff will notify supervisory staff of the situation and request further instructions.

| | **PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES** | **Policy Number** 3.A.8 | **Page** 8 **of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Use of Force and Restraints |
|---|---|
| **Section** A: Security and Control | **Date:** September 20, 2016 |

- Except in extreme emergencies, firearms are not permitted inside the PDP facilities. Firearms are only permitted inside a facility with the authorization of the Commissioner or designee.
- Other law enforcement personnel are not authorized to bring weapons onto PDP grounds without the explicit approval of the Commissioner or a designee.
- Only staff that are currently certified in the use of the firearm to be used, may draw or use that firearm in the course of their duties.

Correctional staff assigned a firearm will not :
- unnecessarily draw from a holster or otherwise display a firearm;
- carelessly handle a firearm;
- discharge firearms under any conditions where bystanders are likely to be in jeopardy, in congested areas, or at moving vehicles or suspects fleeing in vehicles;
- discharge a firearm from a moving vehicle; or
- attempt to fire through an obstruction such as a door, wall, or window.

## Training
Correctional Officers will receive pre-service training in the appropriate use of all permissible types of force and the procedures to be followed in the application of the use of force. All correctional security staff will be trained in the following:
- necessary techniques for applying restraining devices employed by the PDP;
- the difference in the use of restraints during normal escort duty, emergency situations, and movement in secure units;
- the procedures for reporting the use of restraints;
- the use of all PDP control techniques and equipment;
- certification in firearms.

Non-security staff will receive training that will give them a working knowledge of the PDP Use of Force and Restraints policy and their responsibilities in the event of an incident in their area of the facility.

Additional training shall be initiated upon the introduction of modified or new equipment to be used to apply appropriate force in the PDP.

## Videoing of Preplanned Use of Force Incidents
The purpose of videoing preplanned use of force incidents is to protect staff from allegations of unnecessary use of force and to de-escalate the subject's resistant behavior.

| | PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | **Policy Number** 3.A.8 | **Page** 9 **of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Use of Force and Restraints |
|---|---|
| **Section** A: Security and Control | **Date:** September 20, 2016 |

All video equipment will be located in Center Control or a designated secured area that is readily accessible to staff relevant to preplanned use of force incidents.

Staff will video (including audio) incidents that require or that allow for the preplanned use of force (for example, cell extractions). Videoing the incident will include:
- instructions to staff by a supervisor as to their duties and responsibilities;
- identification of staff involved in the use of force;
- verbal dialogue of supervisory staff attempting to persuade the inmate to cooperate;
- the actual use of control techniques, security equipment used, and participating staff; and
- the medical examination of the inmate or his/her refusal to be medically examined for injuries.

After the incident has concluded, the Shift Commander will notify the Warden of the incident.

The video will be retained for at least three years after the date of the incident. If litigation is filed or an investigation is underway, the OPC Director will retain the video until the suit or investigation is completed.

If preplanned use of force incidents are not videoed, as part of the investigation, the supervisor in charge must state the reason, in writing, for not videoing.

**Guidelines Regarding Restraints**
Staff may use restraining devices in the following situations:
- to prevent escapes during inmate transfers;
- to prevent assaults on staff and others by violent or disruptive inmates;
- to assist medical staff in the treatment of violent or disruptive inmates;
- to prevent self injury;
- to prevent damage to property by destructive inmates;
- to prevent the commission of some other offense by violent or disruptive inmates;
- as a precautionary measure to prevent an inmate from re-escalating resistance;
- while escorting inmates out of the facility (Refer to Policy and Procedure 3.A.12 Emergency/Escorted Trips).

All staff should be aware of the following key points regarding restraints:
- Under no circumstances will restraints be used as punishment;
- Restraints do not replace supervision; under no circumstances will a prisoner in restraints be left alone, unsupervised by correctional staff;
- Institutional supervisors and staff assigned to designated areas/units are authorized to carry handcuffs under routine conditions. Privately-owned restraints are prohibited from use;

| | **PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES** | **Policy Number** 3.A.8 | **Page** 10 **of** 16 |
|---|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Use of Force and Restraints |
|---|---|
| **Section** A: Security and Control | **Date:** September 20, 2016 |

- Staff are authorized to use restraints in order to control the behavior of inmates in general population units only if all other reasonable methods have failed.

Types of mechanical restraints include, but are not limited to: handcuffs, flex cuffs, waist chains with associated "black boxes," leg irons, tuff-ties, and leather restraints.

### *Application of Mechanical Restraints (General Population)*
The following guidelines apply to all non-transportation uses of restraints:
- An inmate may be restrained when staff perceives him/her as a threat to the safety and security of the institution, other staff, other inmates, or himself/herself, and when other reasonable methods have failed;
- An inmate will not be kept in restraints any longer than necessary to control a specific behavior.

### *Application of Security Restraints in Medical Areas*
If an inmate's behavior is violent and dangerous enough to constitute a serious risk to institutional security and order, including self-injury or suicidal behavior, then staff, under the advice of appropriate medical staff, may restrain the inmate as per PDP Policy and Procedure 4.E. 16.11 Behavioral Health Restraints and Seclusion.

### *Application of Restraints for Pregnant Females*
When a pregnant inmate needs to be restrained, the restraints used must be the least restrictive necessary to ensure safety and security. Any restraints used must not physically constrict the direct area of the pregnancy. The medical department shall advise when there are specific limitations to the manner in which security restraints must be used.

Restraints shall not be applied to pregnant inmates in the following situations, unless extraordinary circumstances exist:
- any inmate known to be pregnant during any stage of labor;
- any pregnancy related medical distress;
- any period of delivery;
- any period of postpartum;
- transport to/from a medical facility as a result of any of the preceding conditions;
- transport to/from a medical facility after the beginning of the second trimester of pregnancy;
- waist chains/restraint belts will not be applied to an inmate during transport while returning from a medical facility back to the facility following a cesarean section delivery.

The Shift Commander may approve the use of restraints in cases where the inmate poses a substantial risk of imminent flight or extraordinary medical/security circumstances dictate that the inmate be



| PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 11 of 16 |
|---|---|---|

| **Part:** III - Institutional Operations | **Subject:** Use of Force and Restraints |
|---|---|
| **Section** A: Security and Control | **Date:** September 20, 2016 |

restrained to ensure the safety and security of the inmate, staff, medical personnel, and the public. In these circumstances, the restraints shall be applied under the following guidelines:
- waist chains/restraint belts will not be utilized;
- leg restraints shall not be used on any inmate who is in labor;
- restraints will be immediately removed upon request of a doctor, nurse, or other health care professional;
- if any restraint is applied, the inmate will not be left unattended without the ability for staff to remove the restraint should it become medically necessary;
- when restraints are permitted for the above reasons, the least restrictive method possible will be utilized during the second or third trimester of pregnancy; and
- escort staff shall immediately notify the Shift Commander of all requests for restraint removal and/or extraordinary occurrences.

Procedures for restraining an inmate that does not meet any of the conditions above and prior to the second trimester of pregnancy will be as follows:
- waist chains/restraint belts will not be utilized;
- the inmate shall be handcuffed in the front for safety reasons;
- leg restraints may be utilized; and
- the medical department shall advise when there are specific limitations to the manner in which security restraints may be utilized.

Incidents requiring the use of restraints on pregnant inmates will require the completion and forwarding of the Pennsylvania Department of Corrections County Report of Extraordinary Occurrence (refer to Policy and Procedure 3.A.13 Reporting of Incidents).

**Post Use of Force Procedures**
In order to ensure that inmates who are subject to the use of force are not unduly injured or to provide necessary treatment after inadvertent injuries, the following procedures will be put into effect after all use of force situations:
- The inmate will be placed in restraints.
- The inmate will be searched for contraband unless the inmate is in need of emergency medical treatment.
- The area supervisor will notify the medical service provider of the incident and assure that the inmate is searched and escorted to the medical triage area by a staff member not directly involved in the incident.
- If the incident is being videoed, the staff member will pause the recording while the inmate is being examined by the medical service provider. After the medical examination is completed,

| PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 12 of 16 |
|---|---|---|
| **Part:** III - Institutional Operations | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | **Date:** September 20, 2016 | |

the staff member will resume the recording of the inmate being escorted to a secure designated location.
- The restraints will be removed unless the restraints are approved by the medical service provider or authorized by the Shift Commander to prevent self-injury or injury to staff.

Injured staff will be given immediate first aid and referred, if necessary, to a hospital.

In the case of a use of force involving pepper spray with no significant injuries to the involved inmate(s) and no injuries to staff, the investigating supervisor will follow the procedures under the "Pepper Spray Incidents with No Significant Injuries" section of this policy. All uses of force other than those falling into this category will automatically prompt a full institutional investigation.

## General Investigation Requirements
Staff members that use any level of force beyond the level of hand guidance on any person, for any reason, must report the incident immediately to his/her immediate supervisor. The immediate supervisor is responsible to inform the Shift Commander immediately through the chain-of-command. The follow-up to use of force incidents will include the preparing of reports by the staff involved, the inmate(s) involved, medical staff examining the inmate(s) involved, any other witnesses (memorandums), and the investigating Officer.

Investigations regarding the use of force will not terminate because of release or transfer of the inmate(s) involved.

The following forms are available on the PDP Intranet:
- PDP Report of the Use of Force by Employee;
- PDP Health Services Report on Examination of Inmate Involved in Use of Force Incident;
- PDP Inmate Account of Involvement in Use of Force Incident;
- PDP Investigation Report; and
- PDP Summary Report Regarding the Use of Force.

### *PDP Report of the Use of Force by Employee*
Staff who used force must report the details of the incident using the "PDP Report of the Use of Force by Employee" (attachment 3.A.8.a) and submit the report to his/her immediate supervisor no later than the conclusion of that shift. In situations where a staff member is injured due to an incident and requires immediate medical emergency treatment, the investigating supervisor will dispatch a supervisor to the hospital/comp clinic to transcribe the injured staff member's verbal statement.



| PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page  13 of  16 |
|---|---|---|
| **Part:** III – Institutional Operations | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | **Date:** September 20, 2016 | |

### PDP Health Services Report on Examination of Inmate Involved in Use of Force Incident

Medical staff who examine the inmate after the use of force will document their findings on the inmate's condition and treatment in the "PDP Health Services Report on Examination of Inmate Involved in Use of Force Incident" (attachment 3.A.8.b). A copy of this report will be filed in the inmate's medical file.

### PDP Inmate's Account of Involvement in Use of Force Incident

The inmate(s) involved in the use of force incident will complete a standard form that gives their account of the incident (attachment 3.A.8.c). The report will be completed and filed with the investigating supervisor.

### Facility Investigation Report

The supervisor completing the facility investigation into an incident involving the use of force will complete the "Facility Investigation Report."

Under no circumstances will staff members' personal information be part of the investigation package.

Generally, all facility investigation reports will be completed by a commissioned Officer (Lieutenant or higher) on duty at the time of the incident and who did not participate in the use of force. When there is no commissioned Officer (Lieutenant or higher) on duty, the Correctional Sergeant assigned to a satellite facility may conduct an investigation providing he/she did not participate in the use of force incident.

Refer to PDP Policy and Procedure 3.A.13 Reporting of Incidents/Statistics for more information on the requirements for "Facility Investigation Reports." When a use of force incident has taken place in a facility or area of a facility that is under video surveillance, refer to PDP Policy and Procedure 3.A.29 Video Surveillance System for more information on the requirements for copying video to be included in the investigation.

When the investigating supervisor has completed the report and assembled all supporting materials, the investigation report should be forwarded as quickly as possible, but no more than forty-eight (48) hours after the incident, to the designated Deputy Warden for review and further action, if necessary.

### Summary Report Regarding the Use of Force

Investigating Supervisor

The supervisor completing the investigation into an incident involving the use of force will complete his/her section of the "Summary Report Regarding the Use of Force" (attachment 3.A.8.d). This report summarizes the incident and includes his or her evaluation of the use of force.



| PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 14 of 16 |
|---|---|---|
| **Part:** III - Institutional Operations | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | **Date:** September 20, 2016 | |

Deputy Warden

The designated Deputy Warden will review all reports and the findings of the investigating supervisor. If he/she concurs with the findings, he/she will indicate the same and will sign and date the report. If the Deputy Warden indicates that further investigation is warranted, the Deputy Warden will state the reasons why further investigation is warranted and submit his/her findings with the original package.

Warden

The Warden will review the report, the findings of the investigating supervisor, and the concurrence or recommendation of the Deputy Warden. If the Warden concurs with the findings, the Warden will indicate the same and will sign and date the report. If the Warden indicates that further investigation is warranted, the Warden will state the reasons why further investigation is warranted and submit his/her findings with the original package. The Warden has the discretion to refer cases to the OPC.

Deputy Commissioner

The Deputy Commissioner will review the report, the findings of the investigating supervisor, and the concurrence or recommendation of the Deputy Warden and Warden. If the Deputy Commissioner concurs with the findings, the Deputy Commissioner will indicate the same and will sign and date the report. If the Deputy Commissioner indicates that further investigation is warranted, the Deputy Commissioner will state the reasons why further investigation is warranted and submit his/her findings with the original package.

Commissioner

The Commissioner will review the report, the findings of the investigating supervisor, and the concurrence or recommendation of the Deputy Warden, Warden, and Deputy Commissioner. If the Commissioner concurs with the findings, the Commissioner will indicate the same and will sign and date the report. If the Commissioner indicates that further investigation is warranted, the Commissioner will authorize the appropriate investigation.

If the Commissioner requests additional information relative to the use-of-force investigation reports, the requested information is to be submitted by the original investigating supervisor, through his/her chain of command, in the form of an addendum (attachment 3.A.8.f) to the initial investigation report, with the addendum being placed on the top of the original report. A new use-of-force summary report is to be generated and placed on the top of the addendum and the original report.

In light of the new information received, the investigating supervisor, Deputy Warden, Warden, Deputy Commissioner and Commissioner, must review the complete investigation package a second time and the new use-of-force summary report must be resigned by all parties.

| | PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 15 of 16 |
|---|---|---|---|
| **Part:** III - Institutional Operations | | **Subject:** Use of Force and Restraints | |
| **Section** A: Security and Control | | **Date:** September 20, 2016 | |

### Pepper Spray Incidents with No Significant Injuries

When staff utilize pepper spray in a use of force incident, and the inmate(s) require nothing more than decontamination or decontamination and treatment for minor injuries, the investigating supervisor will assure completion of the "Summary Report of OC/Use of Force with No Significant Injuries" form (attachment 3.A.8.e). The following forms and/or items will be included in this type of investigation:

- PDP Report of the Use of Force by Employee
- PDP Health Services Report on Examination of Inmate Involved in Use of Force Incident
- PDP Inmate's Account of Involvement in Use of Force Incident
- Color photos of the inmate(s) involved (taken within one hour of the incident)
- IJMS Custody Report(s) for involved inmate(s)
- Inmate Misconduct Report(s)

Once the documents and other items are gathered, the investigating supervisor will forward the package to the Deputy Warden of Operations, who will review and sign the "Summary Report of OC/Use of Force with No Significant Injuries" and forward the package to the Warden. If the Deputy Warden and/or Warden do not concur with the summary as submitted by the investigating supervisor, and instead suggest further investigation, the package will be returned to the investigating supervisor for completion of a full Facility Investigation Report. If all parties concur with the summary, the package will be retained in the Warden's office as per the retention and storage policies for Facility Investigation Reports. Additionally, the Warden will include the number of these types of use of force in the Warden's Weekly Report to the Deputy Commissioner for Operations and will report the information to CORESTAR staff.

### Reports to State and Local Law Enforcement Authorities

Criteria for reporting such incidents to local law enforcement authorities and the PA Department of Corrections will be in accordance with PDP Policy and Procedure 3.A.13 Reporting of Incidents/Statistics.

### Allegations Against Staff

All cases will be thoroughly investigated where the inmate presents himself/herself before the physical health care provider and/or the behavioral health care provider with unexplained injuries, or injuries that the inmate states were inflicted by PDP staff , contract employees, volunteers, visitors, etc. The physical health care and/or behavioral health care professional who examines the inmate will immediately report his/her findings to the Shift Commander.

In all cases where there are apparent misconduct violations by staff, the Shift Commander will be responsible for executing the appropriate action(s) in a timely manner; however, no disciplinary action will be initiated until the approval and completion of the investigation.

Revised                                    **September 20, 2016**                                    **Revised**



| | PHILADELPHIA DEPARTMENT OF PRISONS POLICIES & PROCEDURES | Policy Number 3.A.8 | Page 16 of 16 |
|---|---|---|---|

| Part: III - Institutional Operations | Subject: Use of Force and Restraints |
|---|---|
| Section A: Security and Control | Date: September 20, 2016 |

Allegations of unlawful (excessive or unnecessary) use of force that are reported to staff inside a facility will be referred to the designated Deputy Warden and Warden of that facility by means of a "Facility Investigation Report."

## Office of Professional Compliance (OPC) Investigations
The results/findings of an OPC investigation (performed on the authorization of the Commissioner or a designee) regarding a use of force may be forwarded to the United States Attorney's Office, the City of Philadelphia District Attorney's Office, or the PPD Northeast Detective Division for further investigation of criminal activities. Refer to PDP Policy and Procedure 3.A.24 Reporting Criminal Activity for more information.

## CORESTAR
Correctional, Outcomes, Re-entry, Ethics, Security, Treatment, and Accountability Review (C.O.R.S.T.A.R) will collect all use of force data as a means of tracking use of force incidents in a more accurate and controlled manner. C.O.R.E.S.T.A.R will prepare this report to capture the levels of resistant behavior used against staff and the staff's responding force.

## Complaints from Outside the System
Complaints by sources or agencies outside of the PDP regarding the unlawful use of force will be immediately referred to the Commissioner's office.

**3.C.2 PROHIBITED ACTS**

## REPORTING STAFF POST INSTRUCTIONS

When completing Inmate Misconduct Report, Reporting staff will select the applicable infraction(s).

**A. Minor Infractions:**
1. lying or providing a false statement to a staff member (Lock & Track - FALSESTATE);
2. encouraging, facilitating, or otherwise conspiring with others to commit any minor infraction (Lock & Track -MINCONSPIR);
3. being in an unauthorized area (Lock & Track -UNAUTAREA);
4. failing to follow safety or sanitation regulations (which are published locally) (Lock & Track -VIOSAFSANI);
5. loaning property or anything of value for profit or increased return (Lock & Track - VIOLOAN);
6. possession of minor contraband, such as food or money valued less than $50. This offense shall not include possession of drugs, weapons, or alcoholic beverages (Lock & Track –CONTRA<$50);
7. changing cells or beds without official authorization (Lock & Track - CNGCELBED);
8. fighting with another inmate, if no injuries occurred and/or if no weapon is used – both inmates spontaneously engage in a fight, scuffle, wrestling or horseplay that results in no injuries to either inmate and/or no weapons involved (Lock & Track - FIGHTNOINJ);
9. theft of property with a value of less than fifty dollars $50.00 (Lock & Track - THEFT<$50);
10. creating a disturbance; disturbing other inmates or staff by refusing, despite request, to cease actions that substantially interfere with facility programs or activities (Lock & Track -DISTURB);
11. refusal to comply with a valid order by a member of the staff (Lock & Track - REFUSAL);
12. being disrespectful towards any staff member (by using profane, obscene, or otherwise demeaning speech, gestures, correspondence or actions - Lock & Track - DISRESPECT);
13. wearing or possession of unauthorized clothing (Lock & Track -UNAUTHCLTH);
14. gambling (Lock & Track -VIOGAMBL);
15. failure to be in possession of proper identification (Lock & Track -VIOIDENT);
16. abuse of medical services including malingering, abuse of medication, or misrepresentation  in the use of medical identification or medication orders (Lock & Track -ABUSEMEDSR);
17. refusal to work or failing to perform work as instructed by a staff member (non-sentenced inmates are able to quit their job assignments)  (Lock & Track - REFUSWORK);
18. unauthorized use of the telephones (Lock & Track - UNAUTHTELE);

D 000633

19. sexual harassment or propositioning of any person (Lock & Track - SEXHARASS);
20. having an unexcused absence from work or any assignment (non-sentenced inmates are able to quit their job assignments) (Lock & Track - UNEXABSEN);
21. violating any other posted rule or regulation approved by the PPS (Lock & Track - VIORULE);
22. unauthorized distribution of printed materials or publications (Refer to policies 4.G.1 and 4.G.2) (Lock & Track - UNAUTHDSTR);
23. destroying, altering, or damaging property with value of less than $50.00 (Lock & Track - DEST<$50);
24. possessing property worth less than $50.00 belonging to another person (Lock & Track - PROP<$50);
25. possessing an unauthorized number of postage stamps/stamped envelopes (Lock & Track - VIOPOSTAGE);
26. violating any municipal, county, state, or federal law of summary or misdemeanor class that is otherwise not listed or comprised within a minor infraction (Lock & Track - VIOMISDEM);
27. being in possession of excessive inmate personal property (Lock & Track – EXCESPROP);
28. obscuring cell doors, beds, vents, windows, cell light or sprinkler head (Lock & Track – OBSCURING);
29. refusal to attend school, juvenile's only (Lock & Track -REFUSCHOOL);
30. refusal to complete schoolwork assignment, juvenile's only  (Lock & Track – REFUSCHWK).

**B.  <u>Major Infractions:</u>**
1. tampering with or damaging security equipment and locking devices (Lock & Track -TAMPER);
2. failure to return a complete razor and/or tampering with an issued razor (Lock & Track—RAZOR);
3. extortion or blackmail, or demanding or receiving anything of value in return for protection against others to avoid bodily harm (Lock & Track -EXTORT);
4. engaging in sexual acts - not involving threat or force (Lock & Track -SEXACTS);
5. indecent exposure (Lock & Track -INDECEXPOS);
6. possession  or introduction of major contraband, such as: money valued at more than $50; alcoholic beverages; identification of an employee or another inmate; and, gang related materials (Lock & Track—MONEY>$50, ALCOHOL, IDENT, GANG);
7. theft of property with a value of more than fifty dollars $50.00 (Lock & Track - THEFT>$50);
8. fraudulent sale or use of commissary privileges, medical cards, or any identification cards (Lock & Track -VIOSALEUSE);
9. counterfeiting, forging, or reproducing without proper authorization any document, article of identification, money, security items, or official paper (This infraction does not apply to documents related to an inmate's criminal case (Lock & Track - FORGE);

D 000634

10. destroying, altering, or damaging property with a value of more than $50.00 (Lock & Track -DEST>$50);

11. refusing to provide a urine or breath sample (Lock & Track -REFUSURIN);

12. violating a condition of furlough, Work Release Program Agreement, Global Positioning Satellite (GPS) Monitoring Program Rules and Conditions, PPS twelve (12) hour pass authorization or any other conditional or temporary release (Lock & Track -VIOCOND);

13. violating any municipal, county, state, or federal law of felony class that is otherwise not listed or comprised within a major infraction (Lock & Track - VIOFELONY);

14. possessing property worth more than $50.00 belonging to another person (Lock & Track -PROP>$50);

15. interfering with the taking of a count or late return for count (Lock & Track - INTERCOUNT);

16. encouraging, facilitating, or otherwise conspiring with others to commit any major infraction (Lock & Track -MAJCONSPIR);

17. threatening  an employee or outside visitor with bodily harm or injury (Lock & Track - THREAT);

18. possession  or introduction of tobacco and/or tobacco related products. Tobacco includes any products which contains tobacco, including, but not limited to: cigarettes (pre-made or rolled), cigars, pipe tobacco, chew, or snuff. Tobacco related products includes any product used in the use of tobacco, including, but not limited to: lighters, matches, or rolling paper (Lock & Track - TOBACCO);

19. smoking  (Lock & Track -SMOKING);

20. leaving the facility and/or PPS campus without proper authorization (Lock & Track -AWOL);

21. positive result on an analysis of breath, blood, or urine for consumption/ingestion of Alcohol and/or Controlled Substances  constitutes a major infraction of PPS rules and regulations and is a violation of a court ordered work release sentence and court ordered weekender sentence (Lock & Track – POSRESULT);

22. self-injury –  this act is done for manipulative purposes rather than as a result of a suicide attempt, determined by the mental health care professional ( Lock & Track – SELFINJURY);

23. tattooing/body piercing – receiving, performing, or assisting in tattooing, or body piercing  (Lock & Track – TATTOO); and,

24. unauthorized use of any computer (Lock & Track—COMPUTER).

## C. **Critical Infractions:**

1. murder (Lock & Track -MURDER);

2. rape (Lock & Track - RAPE);

3. any sexual assault (Lock & Track – SEXASSAULT);

4. holding a hostage (Lock & Track -HOSTAGE);

5. escaping, attempting to escape, or making specific plans to escape (Lock & Track - ESCAPE);

6. rioting or inciting others to riot (Lock & Track -RIOT);

D 000635

7. assaulting any staff member - whether contact occurred or not; such acts of aggression toward a staff member include, but are not limited to, punching, kicking, striking, spitting, throwing liquids, throwing bodily fluids/feces, or solid objects (Lock & Track -ASSLTSTAFF);
8. assault on inmate by inmate – when the inmate (aggressor) attacks another inmate (victim) without warning for no apparent reason (Lock & Track -ASSAULT);
9. assault on any non-staff person if personal injuries result, for example – visitor, student, official visitor (Lock & Track – ASSAULTINJ);
10. fighting with another inmate if personal injuries result, if a weapon is used, and/or when bodily fluids have been used in the fight – both inmates spontaneously engage in a fight, scuffle, wrestling or horseplay that results in either inmate receiving injuries and/or if a weapon was used (Lock & Track -FIGHTINJRY);
11. giving or offering any official or staff member a bribe or anything of value (Lock & Track -BRIBE);
12. encouraging, facilitating, or otherwise conspiring with others to commit any critical infraction (Lock & Track -CRITCONSPIR);
13. possession or introduction of electronic devices, such as: cellular phone, pager, telecommunication equipment, tape recorder/player or any other electronic device that jeopardizes the security and safety of the facility (Lock & Track – ELECDEVICES);
14. possession or introduction of weapon(s) (Lock & Track – WEAPON);
15. possession or introduction of critical contraband, to include unauthorized drugs or drug paraphernalia, including prescribed medication deemed dangerous by the assigned physician but not taken as directed (Lock & Track—DRUGS);
16. collecting, storing, throwing, and/or smearing feces, urine, and/or other bodily fluids (Lock & Track—BIOHAZARD);
17. terroristic threats; defined as a declaration of intent to commit an extreme crime of violence against another; with the intent of causing the death of a person, or occupants of a building or facility (Lock & Track—TERRORISTIC);
18. setting a fire (Lock & Track -FIRE).

D 000636